No. 22-60397

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

HEALTHY GULF; SIERRA CLUB,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS; STEPHEN
MURPHY, in his official capacity as New Orleans District Commander,
U.S. Army Corps of Engineers; MARTIN MAYER in his official capacity
as Chief, Regulatory Division, New Orleans District,
U.S. Army Corps of Engineers,
*Respondents*

_____

On Petition for Review of a Permit Issued by the U.S. Army

_____

**INITIAL BRIEF OF PETITIONERS**

_____

**Louisa Eberle**
Sierra Club
1536 Wynkoop St, Suite 200
Denver, CO 80202
Telephone: (415) 977-5753
louisa.eberle@sierraclub.org
*Attorney for Sierra Club and
Healthy Gulf*

**Thomas Gosselin**
Sierra Club
P.O. Box 4998
Austin, TX 78765
Telephone: (424) 346-3276
tom.gosselin@sierraclub.org
*Attorney for Sierra Club and
Healthy Gulf*

**Dated: November 9, 2022**

# CERTIFICATE OF INTERESTED PERSONS
## CASE NO. 22-60397

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## Petitioners

1. Healthy Gulf; and

2. Sierra Club

Petitioners are nonprofit organizations. Healthy Gulf is organized and exists under the laws of Louisiana. Sierra Club is organized and exists under the laws of California.

## Counsel for Petitioners

Louisa Eberle
Sierra Club
1536 Wynkoop St, Suite 200
Denver, CO 80202
louisa.eberle@sierraclub.org

Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, Texas 78765
tom.gosselin@sierraclub.org

i

## Respondents

1. United States Army Corps of Engineers;

2. Colonel Stephen Murphy, in his official capacity as New Orleans

   District Commander, U.S. Army Corps of Engineers; and

3. Martin Mayer in his official capacity as Chief, Regulatory

   Division, New Orleans District, U.S. Army Corps of Engineers.

## Counsel for Respondent

Justin Heminger
Rebecca Jaffe
Todd Kim
Environment and Natural
Resources Division
U.S. Dept. of Justice
Post Office Box 7415
Washington, DC 20044
justin.heminger@usdoj.gov
rebecca.jaffe@usdoj.gov

Gregory McDonough
Office of the Chief Counsel
U.S. Army Corps of Engineers

David R. Cooper
Todd T. Semonite
U.S. Army Corps of Engineers
441 G Street, NW
Washington, DC 20314

Stephen Roth
U.S. Army Corps of Engineers
Office of District Council
7400 Leake Avenue
New Orleans, LA 70118

## Respondent-Intervenors

1. Driftwood LNG, LLC, a subsidiary of Tellurian; and

2. Driftwood Pipeline, LLC, a subsidiary of Tellurian

## Counsel for Respondent-Intervenors

Gregory G. Garre
Latham & Watkins LLP
555 11th Street NW
Suite 1000
Washington, DC 20004
gregory.garre@lw.com

Robert M. Loeb
Lisa M. Tonery
Orrick, Herrington &
Sutcliffe LLP
1152 15th Street NW
Washington, DC 20005
rloeb@orrick.com

*s/ Louisa Eberle*
Sierra Club
1536 Wynkoop St, Suite 200
Denver, CO 80202
Telephone: (415) 977-5753
louisa.eberle@sierraclub.org

# REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 28.2.3, Healthy Gulf and Sierra Club (hereafter "Healthy Gulf") respectfully request that the Court hold oral argument in this case. At issue is whether the United States Army Corps of Engineers violated the Clean Water Act when it issued a permit authorizing dredge and fill of more than 300 acres of wetlands. Healthy Gulf respectfully submits that oral argument would assist the Court with the complex legal issues and the voluminous administrative record in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .............................................i

REQUEST FOR ORAL ARGUMENT.......................................................iv

TABLE OF CONTENTS ....................................................................... v

TABLE OF AUTHORITIES...............................................................viii

GLOSSARY .................................................................................... xiv

JURISDICTIONAL STATEMENT ......................................................... 1

   I.   Venue and Forum........................................................................ 1

   II.   Standing ................................................................................... 2

STATEMENT OF ISSUES.................................................................. 10

STATEMENT OF THE CASE ............................................................. 12

   I.   Introduction.............................................................................. 12

   II.   Legal Framework ....................................................................... 14

       A.   Clean Water Act.................................................................. 14

       B.   National Environmental Policy Act ..................................... 19

       C.   Natural Gas Act ................................................................. 21

   III.   Factual Background.................................................................... 22

       A.   Project Overview and Environment.....................................22

       B.   Procedural History.............................................................24

       C.   Details of the Final Permit.................................................26

SUMMARY OF ARGUMENT ..................................................................31

ARGUMENT .........................................................................................33

I.    Standard of Review ....................................................................33

II.   The Corps Failed to Clearly Demonstrate that the
      Approved Project Is the Least Environmentally Damaging
      Practicable Alternative Because It Ignored an Alternative
      with Fewer Wetland Impacts. .....................................................35

      A.    A Showing of Impracticability or Greater
            Environmental Harm Requires Specific,
            Compelling Evidence. ..........................................................37

      B.    The Corps Failed to Rebut the Presumption that
            Using the EIS's Alternative Site 6 Instead of the
            Preferred Alternative Would Reduce Wetland Impacts. ....39

            1.    The Corps was required to presume that
                  Alternative Site 6 would cause less environmental
                  harm..............................................................................39

            2.    The Corps violated its Clean Water Act obligations
                  by failing to supplement the EIS's analysis of
                  Alternative Site 6. ........................................................42

            3.    The Corps could not merely defer to the EIS
                  because the EIS failed to provide the detailed,
                  specific justification showing that Alternative
                  Site 6 would cause greater environmental harm. ........46

III.  The Corps' Failure to Comply With the "Rigid"
      Compensatory Mitigation Hierarchy Was Arbitrary. .................48

      A.    The Corps Violated the Clean Water Act and
            Administrative Procedure Act by Failing to Treat
            the Dredged Material Plan as the Least-Preferred
            Compensatory Mitigation Option. .......................................50

       1.   The regulations establish a rigid compensatory mitigation hierarchy. ...................................................... 50

       2.   The dredged material plan is permittee-responsible mitigation. ...................................................................... 53

   B.   The Corps Neither Justified Approving Permittee-Responsible Mitigation Nor Asserted that Higher-Preference Alternatives Were Unavailable. ......................... 55

   C.   The Corps Did Not Assert that It Could Depart From This Hierarchy by Choosing Permittee-Responsible Mitigation, Even If Higher-Tier Alternatives Were Available. ................................................................. 57

   D.   Even If the Mitigation Hierarchy Authorized a Flexible Approach, the Corps' Failed to Demonstrate that the Dredged Material Plan Was the Best Compensatory Mitigation Option. .............................................. 59

       1.   The dredged material plan and permit conditions do not ensure Driftwood will produce high-quality replacement wetlands contemporaneously with wetland destruction. ...................................................... 61

       2.   The Corps ignored serious concerns that would undermine the dredged material plan's success ........... 63

IV.   Vacatur Is the Appropriate Remedy. ........................................ 69

CONCLUSION ....................................................................... 74

CERTIFICATE OF COMPLIANCE ........................................................ 77

CERTIFICATE OF ELECTRONIC COMPLIANCE.............................. 78

# TABLE OF AUTHORITIES

## Cases

*10 Ring Precision, Inc. v. Jones*, 722 F.3d 711 (5th Cir. 2013)...............34

*Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs,*
   650 F.3d 652 (7th Cir. 2011)...............................................................10

*Associated Gas Distributs. v. FERC,*
   899 F.2d 1250 (D.C. Cir. 1990) .............................................................2

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs,*
   310 F. Supp. 3d 707 (M.D. La. 2018)......................................51, 58, 60

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs,*
   894 F.3d 692 (5th Cir. 2018).........13, 18, 19, 27, 32, 48, 51, 52, 57, 59

*Biden v. Texas*, 142 S. Ct. 2528 (2022) ...................................................69

*Butte Env't Council v. U.S. Army Corps of Eng'rs,*
   620 F.3d 936 (9th Cir. 2010)...............................................................35

*Buttrey v. United States*, 690 F.2d 1170 (5th Cir. 1982).............16, 38, 47

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ...................23

*City of Shoreacres v. Waterworth,*
   420 F.3d 440 (5th Cir. 2005).........................................................17, 35

*Ctr. for Biological Diversity v. U.S. EPA,*
   937 F.3d 533 (5th Cir. 2019)..................................................................4

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
   45 F.4th 846 (5th Cir. 2022) ...............................................................69

*Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*,
    869 F.3d 148 (3d Cir. 2017) ................................................................. 44

*Driftwood LNG, LLC and Driftwood Pipeline, LLC*,
    167 FERC ¶ 61,054 (Apr. 18, 2019).................................................. 2, 24

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ....................... 58

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989)....................................... 71

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................ 57, 58, 59

*Found. on Econ. Trends v. Heckler*,
    756 F.2d 143 (D.C. Cir. 1985) ............................................................ 20

*Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs*,
    498 F. Supp. 2d 365 (D. Me. 2007) ..................................................... 37

*Greater Yellowstone Coal. v. Flowers*,
    321 F.3d 1250 (10th Cir. 2003)........................................................... 44

*Greater Yellowstone Coal. v. Flowers*,
    359 F.3d 1257 (10th Cir. 2004)........................................................... 38

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
    No. 10-2008-CM-DJW, 2011 WL 2579799
    (D. Kan. June 28, 2011) ..................................................................... 38

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps
    of Eng'rs*, 702 F.3d 1156 (10th Cir. 2012) ............................. 17, 38, 67

*Holy Cross Wilderness Fund v. Madigan*,
    960 F.2d 1515 (10th Cir. 1992)........................................................... 20

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ...........3

ix

*In re Lively*, 717 F.3d 406 (5th Cir. 2013) ...............................54

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................10

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002)..................70

*Motor Vehicle Mfrs. Ass'n v. State Farm
    Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)............................34, 48, 55, 65

*Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ..............................................54

*Save Our Cmty. v. U.S. EPA*, 971 F.2d 1155 (5th Cir. 1992) .............3, 10

*Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634 (5th Cir. 1983).............8

*Shrimpers & Fishermen of the RGV v. U.S. Army Corps
    of Eng'rs*, 849 F. App'x 459 (5th Cir. 2021)........................26

*Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) ..........................21, 22

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    645 F.3d 978 (8th Cir. 2011).................................19

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    909 F.3d 635 (4th Cir. 2018)........................................2, 33

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018)..............................................2

*Sierra Club v. U.S. Forest Serv.*, 739 F. App'x 185 (4th Cir. 2018)........22

*Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018) .............22

*Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999 (5th Cir. 2019).............34

*Swindol v. Aurora Flight Scis. Corp.*,
  805 F.3d 516 (5th Cir. 2015)...............................................23

*Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021)..........................................69

*Texas v. U.S. EPA*, 829 F.3d 405 (5th Cir. 2016) ......................35, 43, 59

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
  305 F.3d 1152 (10th Cir. 2002)...............................39, 44, 46

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
  319 F.3d 1207 (10th Cir. 2003)...............................................44

*Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) ...........................................58

**Statutes**

5 U.S.C. § 706 ...............................................................33, 69

15 U.S.C. § 717b...............................................................2, 21

15 U.S.C. § 717f...............................................................2, 21

15 U.S.C. § 717n ...............................................................21

15 U.S.C. § 717r...............................................................1, 2

33 U.S.C. § 1251...............................................................14

33 U.S.C. § 1344...............................................1, 10, 12, 15

33 U.S.C. § 2326...............................................................54

33 U.S.C. § 2326g...............................................................54

42 U.S.C. § 4332.................................................................................19, 20

## Regulations

33 C.F.R. § 320.4...............................................................................15, 16

33 C.F.R. § 325.2......................................................................................16

33 C.F.R. § 328.3......................................................................................14

33 C.F.R. § 332.1.............................................................................16, 17, 18

33 C.F.R. § 332.2......................................................................................53

33 C.F.R. § 332.3..............................................13, 18, 19, 48, 50, 51, 52, 60

40 C.F.R. § 1501.7....................................................................................21

40 C.F.R. § 1501.8....................................................................................21

40 C.F.R. § 1506.3....................................................................................21

40 C.F.R. § 230.1..................................................................................12, 38

40 C.F.R. § 230.10.............................. 11, 17, 20, 35, 36, 37, 42, 44, 45, 46

40 C.F.R. § 230.74....................................................................................18

40 C.F.R. § 230.75....................................................................................18

40 C.F.R. § 230.93............................................................18, 50, 60, 61, 63

**Other Authorities**

Compensatory Mitigation for Losses of Aquatic Resources,
 73 Fed. Reg. 19,594 (Apr. 10, 2008) ............................ 18, 50, 54, 60, 61

Fed. R. Evid. 201(b)(2) ................................................................. 23

La. Admin. Code tit. 43, pt. I, § 707(B) .................................... 54

Miriam Webster, Less ............................................................... 37

S. Rep. No. 95-370 (1977) ......................................................... 15

# GLOSSARY

The following acronyms and abbreviations used in this brief:

APA ................... Administrative Procedure Act

Corps ................. United States Army Corps of Engineers

EA ..................... Environmental Assessment

EIS.................... Environmental Impact Statement

EPA ................... Environmental Protection Agency

FERC................. Federal Energy Regulatory Commission

Healthy Gulf. .... Petitioners Healthy Gulf and Sierra Club

LDEQ ................ Louisiana Department of Environmental Quality

LEDPA ............. Least Environmentally Damaging Practicable
Alternative

LNG................... Liquefied Natural Gas

LRAM................ Louisiana Wetland Rapid Assessment Method

NEPA ................ National Environmental Policy Act

RECAP .............. Risk Evaluation / Corrective Action Program

# JURISDICTIONAL STATEMENT

## I.  Venue and Forum

On May 3, 2019, the United States Army Corps of Engineers ("Corps") issued a permit under section 404 of the Clean Water Act, 33 U.S.C. § 1344, for the Driftwood LNG Terminal and Driftwood Pipeline. AR6.[1]

This Court has original jurisdiction over a challenge to this permit pursuant to the Natural Gas Act, 15 U.S.C. § 717r(d)(1). This section provides:

> The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the [Federal Energy Regulatory] Commission) … to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law.

---

[1] The documents in the record lodged by the Corps have been consecutively "bates stamped" using the format AR0XXXXX: the record consists of pages AR00001 to AR26339. This brief cites to the record using these unique page numbers; for legibility, leading "0"s are omitted. Where multiple pages of the record are cited together, "AR" is used only once.

The terminal is subject to regulation and approval under 15

U.S.C. § 717b(e). *Driftwood LNG, LLC and Driftwood Pipeline, LLC*,

167 FERC ¶ 61,054 P 23 (Apr. 18, 2019). The pipelines are subject to 15

U.S.C. § 717f. *Id.* P 29.[2] Both are to be constructed within this Circuit.

Review of this permit is therefore properly before this Court. *Sierra*

*Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 641-42 (4th Cir. 2018).

This petition for review, filed 38 months after the amended permit was

issued, is timely. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260,

267-68 (4th Cir. 2018) (holding that statute of limitations for claims

brought under 15 U.S.C. § 717r(d)(1) is either four or six years).

## II.    Standing

Petitioners Healthy Gulf and Sierra Club ("Healthy Gulf" after

this section) have standing to bring this appeal. Each group has

members who would otherwise have standing to sue in their own right,

as detailed below. Further, the interests the groups seek to protect are

---

[2] Even where a pipeline does not itself cross state lines, the pipeline can be in "interstate" service, and subject to regulation under this Natural Gas Act provision, where the pipeline transports gas that has crossed state lines. *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1255 (D.C. Cir. 1990).

germane to the organizations' purposes and neither the claims asserted
nor the relief requested requires the participating in this lawsuit of
individual members. *See Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333, 343 (1977). Both Healthy Gulf and Sierra Club are non-
profit membership organizations focused on protecting the environment
in the Gulf Coast region, including the Lake Charles area of Louisiana.
Ozane Decl. ¶ 4, Hughes Decl. ¶¶ 3-6. This includes protecting wetlands
that improve water quality and provide storm resilience, like the
wetlands at issue here. Ozane Decl. ¶ 4, Hughes Decl. ¶¶ 6-7. Both
organizations are specifically concerned with the environmental harms
caused by LNG export infrastructure. Ozane Decl. ¶ 4, Hughes Decl. ¶¶
6-7.

   Petitioners' members will be injured by the Corps' approval of the
terminal. Although injury must be particularized, there is a "low
threshold for sufficiency of injury." *Save Our Cmty. v. U.S. EPA*, 971
F.2d 1155, 1161 (5th Cir. 1992). "[H]arm to aesthetic, environmental, or
recreational interests is sufficient to confer standing, . . . and these
injuries need not be large, an identifiable trifle will suffice." *Id.*

(internal quotation marks omitted). Any "lessening of 'aesthetic and recreational values' is an injury in fact." *Ctr. for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 537 (5th Cir. 2019).

Petitioners' members recreate in and near areas that will be impacted by the project. For example, Petitioners' members regularly recreate near the terminal site, which is located roughly 3.5 miles north of Calcasieu Lake, AR2591, and will destroy approximately 319 acres of wetlands, AR257. The proposed "beneficial use of dredged material" plan will impact roughly 2,000 acres between 1.75 and 8.5 miles southwest of the site. AR478. Petitioners' members use these areas for boating, fishing, birdwatching, and other outdoor recreation. Specifically, Petitioners' members boat, birdwatch, and paddleboard in the Calcasieu River directly adjacent to the terminal site. Woosley Decl. ¶¶ 6-8, Lawton Decl. ¶¶ 4-5. Petitioners' members also recreate at Calcasieu Point Landing, which is roughly 2 miles east of the terminal site and immediately across a channel, and Intracoastal Park, which is roughly 2 miles south. Hiatt Decl. ¶¶ 5-10, 12-13, Ozane Decl. ¶¶ 7-9, 12, Lawton Decl. ¶ 4.

4

Construction and operation of the terminal will diminish Petitioners' members enjoyment of these places by causing visual impacts during construction and operation, as the terminal will be a large, highly visible industrial development that will include flares that produce light pollution. AR2678. This visual disturbance will impact Petitioners' members while they are boating adjacent to the site, which members do several times per year and plan to continue doing indefinitely. Woosley Decl. ¶ 6, Lawton Decl. ¶¶ 4-5. Petitioners' members enjoy boating, paddle boarding, and birdwatching in waters adjacent to the Driftwood terminal site due to its natural, undisturbed beauty. Woosley Decl. ¶ 6, Lawton Decl. ¶¶ 4-5. Construction and operation of the Driftwood facility, however, will result in a large, industrial eye sore that will detract from Petitioners' members' enjoyment of this stretch of the Calcasieu River. Lawton Decl. ¶¶ 4-5. Thus, the Driftwood terminal will negatively impact Petitioners' members' recreational and aesthetic interests while they are in waters adjacent to the site.

Additionally, these visual impacts will detract from Petitioners'
members' recreational pursuits at nearby Calcasieu Point. Specifically,
Petitioners' members visit Calcasieu Point as often as several times per
week for fishing, crabbing, boating, wildlife viewing, and viewing
sunsets and the night sky. Hiatt Decl. ¶¶ 5-7, 10-13, Ozane Decl. ¶¶ 7-
9, 12.  Petitioners' members and their families enjoy visiting Calcasieu
Point largely because it is one of the only remaining areas where they
can recreate without visual impacts of industrial development. Hiatt
Decl. ¶¶ 10-11, Ozane Decl. ¶¶ 7-9. Petitioners' members specifically
enjoy visiting Calcasieu Point due to its view of the wetlands that will
be destroyed by construction of the Driftwood terminal. Hiatt Decl. ¶ 6,
Ozane Delc. ¶¶ 7-8. The Driftwood terminal site is close enough to see
without visual aids because it is just across the river from Calcasieu
Point, and Petitioners' members have already suffered from seeing the
early stages of construction at the terminal site. Hiatt Decl. ¶¶ 5-6,
Ozane Decl. ¶¶ 7-9. If construction continues or if the terminal begins
operations, their recreational enjoyment at Calcasieu Point will
continue to be harmed and will, ultimately, be ruined. Hiatt Decl. ¶¶ 7,

6

10-13, Ozane Decl. ¶¶ 7-10, 12. If the Driftwood facility is built, at least one member will no longer visit Calcasieu Point to view sunsets or simply enjoy being in nature. Hiatt Decl. ¶¶ 11-12.

Similarly, construction and operation of the Driftwood terminal will diminish Petitioners' members use of and enjoyment from recreation in Intracoastal Park. One member goes fishing and crabbing at Intracoastal Park roughly three times per year. Hiatt Decl. ¶ 8. Construction and operation will diminish this member's enjoyment of fishing and crabbing at Intracoastal Park both because the Driftwood terminal will be visible without visual aids from the fishing location and because construction and operations may impact the fish and crabs available to be caught. *Id.* ¶¶ 8-9. Another member puts in a boat at Intracoastal Park, and goes boating from there through the Calcasieu River adjacent to the Driftwood site. Lawton Decl. ¶ 4. This member enjoys watching birds and other wildlife during these boat trips. *Id.* Construction and operation of the Driftwood facility will detract from these activities because it will be an unsightly industrial development

7

and will destroy wetlands that this member enjoys viewing along the route. *Id.*

At night, light pollution from the terminal will detract from Petitioners' members' enjoyment of stargazing. One member stargazes from Calcasieu Point roughly once every three months, and from their home roughly twice per week. Hiatt Decl. ¶¶ 13-14. The light pollution from the Driftwood site will also reduce members' enjoyment of the night sky by obscuring the stars. Hiatt Decl. ¶ 14, Woosley Decl. ¶ 11. In short, because Petitioners' members recreate in these areas due to the natural and undisturbed environment, the construction and operation of the facilities will detract from their use and enjoyment of these areas. These aesthetic injuries are, themselves, sufficient to provide standing. *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640 (5th Cir. 1983) (organizational plaintiff had standing because a member of an organization who fished at site in question was injured by adverse aesthetic impact).

Additionally, noise and air pollution during construction and operation will impact the nearby environment, AR2640, 2712, 2717,

2740-41, and will further diminish Petitioners' members' enjoyment of the area. For instance, one member is concerned about her and her young, asthmatic child breathing polluted air when they visit Calcasieu Point. Ozane Decl. ¶¶ 10-12. Because Driftwood will emit air pollution during construction and operations, the facility will exacerbate these concerns and reduce her use and enjoyment of Calcasieu Point. *Id.* Similarly, concerns about odors and water quality impacts from the Driftwood facility will deter other members from recreating near the terminal. Lawton Decl. ¶ 5, Hiatt Decl. ¶ 7. Noise impacts will also cause another member distress while she recreates near the site and her home. Woosley Decl. ¶ 8.

The project will further injure Petitioners' members by impacting wetlands used as habitat by birds, such as bald eagles and pelicans, that Petitioners' members enjoy viewing. Lawton Decl. ¶ 4, Hiatt Decl. ¶ 16. Impacts to wetlands will reduce available habitat, thereby reducing the bird wildlife population in and viewable from the surrounding areas and injuring Petitioners' members. *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs,* 650 F.3d 652, 657-58 (7th

Cir. 2011). In addition, the Driftwood LNG project, if completed, will increase LNG vessel traffic from the Gulf of Mexico through the Calcasieu River, which will harm wildlife species such as dolphins that Petitioners' members also enjoy viewing. AR2662-63, Woosley Decl. ¶ 7.

Success in this petition would redress Petitioners' members' injuries by vacating approval of these projects, which would prevent the above injuries from occurring. *Save Our Cmty.*, 971 F.2d at 1161. Petitioners' members' injuries would also be redressed if the Court ordered remand without vacatur. On remand, the Corps will evaluate whether to require additional avoidance or mitigation of the activities that will cause these injuries, as well as whether to deny the project approvals outright. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572, 572 n.7 (1992).

## STATEMENT OF ISSUES

The Corps issued a permit authorizing construction within, and disruption of, 319.3 acres of wetlands at the terminal. AR4-21, 257. In so doing, did the Corps violate the Clean Water Act, 33 U.S.C. § 1344, and its implementing regulations by:

10

1. Failing to "clearly demonstrate[]" that the approved project was the least environmentally damaging practicable alternative, 40 C.F.R. § 230.10(a), where the EIS acknowledged that an alternative terminal site would impact 50 fewer acres of wetlands, but the Corps did not demonstrate that this site would be impracticable or environmentally damaging.

2. Failing to require compensatory mitigation that complies with the rigid compensatory mitigation framework, where:

   a. The Corps' approval of Driftwood's proposed, permittee-responsible "beneficial use of dredged material" plan as compensatory mitigation deviated from the rigid framework established in the regulations and Fifth Circuit case law interpreting those regulations; and

   b. The Corps expressly failed to acknowledge or justify that deviation.

## STATEMENT OF THE CASE

### I.    Introduction

Respondent-Intervenors Driftwood LNG and Driftwood Pipeline propose to construct and operate a liquefied natural gas export terminal and 96-mile gas pipeline near Lake Charles, Louisiana. AR4. The terminal will destroy nearly 320 acres of wetlands—including over 125 acres of wetlands that the Corps has characterized as "rare, imperiled, or difficult to replace." AR2326 (table identifying 126.2 acres as "RID" or "rare, imperiled, or difficult to replace"). Use of these wetlands is regulated by the U.S. Army Corps of Engineers pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344.

The Corps issued a permit for these projects on May 3, 2019. AR6. In issuing the permit, the Corps failed to address its obligations under the Clean Water Act, including crucial deficiencies raised in public comments.

First, the Corps failed to ensure the selected site was the least-environmentally-damaging, practicable alternative. 40 C.F.R. § 230.1(a). Although an alternative site for the terminal was available

12

that would have destroyed 50 fewer acres of wetlands, the Corps failed to examine that site or determine whether the preferred site was nevertheless the "least environmentally damaging practicable alternative." As a result, the Corps failed to rebut the strong presumption that it should select the site that destroys the fewest wetlands.

Second, for 185 acres of wetlands destroyed at the terminal, the Corps failed to comply with the rigid hierarchy of compensatory mitigation types recognized by this Court. *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 699-700 (5th Cir. 2018) (interpreting 33 C.F.R. § 332.3(b)). Specifically, the Corps must require compensatory mitigation in the following order of preference: (1) mitigation bank credits, (2) in-lieu fee programs, (3) permittee-responsible mitigation using a watershed approach, (4) in-kind or on-site permittee-responsible mitigation, and (5) off-site or out-of-kind permittee-responsible mitigation. *Atchafalaya Basinkeeper*, 894 F.3d at 699-700; 33 C.F.R. § 332.3(b). Here, despite expressly claiming that it complied with the mitigation hierarchy, the Corps approved Driftwood's

proposal to restore existing wetlands using dredged material while declining to provide any rationale demonstrating the unavailability of higher-tier options or the superiority of the ultimately-approved permittee-responsible, dredged material plan. Moreover, the Corps failed to address significant concerns that the dredged material plan will not effectively restore wetlands.

For these reasons, the Corps' decision was arbitrary, and the permit should be vacated and remanded to the Corps.

## II.    Legal Framework

### A. Clean Water Act

Congress enacted the Clean Water Act in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251. Congress was particularly concerned with "wetlands," i.e., "areas that are inundated or saturated by" surface or ground water "at a frequency and duration sufficient to support . . . a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(c)(16). Congress explained that

> systematic destruction of the Nation's wetlands is
> causing serious, permanent ecological damage.
> The wetlands and bays, estuaries and deltas are
> the Nation's most biologically active areas. They
> represent a principal source of food supply. They
> are the spawning grounds for much of the fish and
> shellfish which populate the oceans, and they are
> passages for numerous upland game fish. They
> also provide nesting areas for a myriad of species
> of birds and wildlife.

S. Rep. No. 95-370, at 10 (1977). Accordingly, section 404 of the Clean

Water Act comprehensively regulates dredge and fill of waterbodies,

including wetlands. 33 U.S.C. § 1344. Disturbance of wetlands is

prohibited unless specifically authorized by permit. *Id.* § 1344(a), (b),

(d). When issuing permits authorizing this disturbance, the Corps must

comply with regulations issued by the Environmental Protection

Agency ("EPA"), in consultation with the Corps, under Clean Water Act

section 404(b)(1), 33 U.S.C. § 1344(b)(1). These regulations ("the

404(b)(1) Guidelines") are codified at 40 C.F.R. Part 230 and are also

incorporated in the Corps' own regulations. 33 C.F.R. §§ 320.4(b)(4),

325.2(a)(6).[3] The Corps, on its own and jointly with EPA, has also issued

other applicable guidance. *See, e.g.,* 33 C.F.R. § 332.1(f) (explaining

continuing validity of various guidance documents).

The statute, regulations, and guidance codify the "determin[ation] that

'[w]etlands are vital areas that constitute a productive and valuable

public resource.'" *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir.

1982) (citing 33 C.F.R. § 320.4(b)(1)). The Corps' regulations explain

that wetlands perform vital functions, including protecting "habitat . . .

for aquatic or land species," improving water quality, and "shielding

other areas from . . . storm damage" and "flood waters." 33 C.F.R. §

320.4(b)(2). In light of these important functions, the Corps must review

the project within a three-step framework. 33 C.F.R. § 332.1(c)(2).

First, the Corps must require the applicant to "avoid" impacting

wetlands as much as possible. Here, the regulations create a

presumption that any alternative that would reduce wetland impacts is

both practical and less environmentally damaging; the Corps *must*

---

[3] While these regulations are called the 404(b)(1) Guidelines, they
are legally binding regulations rather than non-binding guidance or
policy documents. 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6).

require the applicant to adopt such an alternative unless the Corps and

the applicant "clearly demonstrate[]" that these presumptions have

been rebutted.[4] *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps*

*of Eng'rs*, 702 F.3d 1156, 1168 (10th Cir. 2012) (quoting 40 C.F.R. §

230.10(a)(3)). Put differently, before approving a project, the applicant

and the Corps must rebut the presumption that any alternative

impacting fewer wetlands would cause "less adverse impact on the

aquatic ecosystem." 40 C.F.R. § 230.10(a)(3).

Second, but not directly at issue here, the Corps must require

efforts to "minimize" those impacts to wetlands that cannot be avoided.

33 C.F.R. § 332.1(c)(2). Examples of minimization measures include

"[u]sing machinery and techniques that are especially designed to

reduce damage to wetlands" and "[t]iming discharge to avoid spawning

or migration seasons." 40 C.F.R. §§ 230.74(c), 230.75(e).

---

[4] This presumption does not apply where a project depends on being in a special aquatic site like wetlands. 40 C.F.R. § 230.10(a)(3). Although the terminal needs to be water *adjacent*, there is no reason why an LNG terminal *itself* needs to be situated in water or wetlands. Because this project does not depend upon being located in wetlands as the Corps acknowledged, AR262, this caveat does not apply here and will not be discussed further.

Third, the Corps must require "[c]ompensatory mitigation" for any impacts to wetlands that will occur notwithstanding avoidance and minimization, i.e., impacts that are unavoidable. 33 C.F.R. § 332.1(c)(3). Mitigation must "offset" any "unavoidable impacts" to wetlands, *id.* § 332.3(a)(1), consistent with the "national goal of 'no net loss' of wetland acreage and function." Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,594 (Apr. 10, 2008). Indeed, the regulations require the Corps to ensure that unavoidable environmental impacts to wetlands are *entirely* offset, even if it means requiring a greater than 1:1 mitigation to impact ratio. *See* 40 C.F.R. § 230.93(f)(1)-(2).

Not all compensatory mitigation is equally effective at offsetting environmental harms. With this in mind, the regulations establish a "rigid" hierarchy laying out the forms of mitigation that the Corps must follow. *Atchafalaya Basinkeeper*, 894 F.3d at 699. Specifically, the Corps must "consider the type and location options in the order presented": mitigation bank credits, in-lieu fee programs, and then permittee-responsible mitigation. 33 C.F.R. § 332.3(b). The Corps must consider

18

mitigation bank credits first due to "the better scientific management, large scale, and financial security" they provide. *Atchafalaya Basinkeeper*, 894 F.3d at 699-700 (citing 33 C.F.R. § 332.3(b)(2)).

B. National Environmental Policy Act

In implementing the Clean Water Act, the Corps must also analyze environmental impacts under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq. See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 991 (8th Cir. 2011) (issuance of a 404 permit is a federal action requiring compliance with NEPA). NEPA aims to protect the environment by requiring agencies to look before they leap.

Before taking action significantly affecting the environment, an agency must prepare an "Environmental Impact Statement" ("EIS"), which includes considerations such as "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(C). Where an agency believes that a proposed action will have no significant impact, and thus decides to

forego a full impact statement, the agency must prepare an "environmental assessment" with "sufficient evidence and analysis" to support that determination. *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146-47 (D.C. Cir. 1985) (quoting former 40 C.F.R. § 1508.9(1)).

NEPA and section 404 of the Clean Water Act impose similar, but distinct, requirements to analyze alternatives to the proposed action. In many cases, the NEPA documents will provide information sufficient to determine the least environmentally damaging practicable alternative required by the Clean Water Act. *See Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1526 n.17 (10th Cir. 1992). However, an analysis that satisfies NEPA will not necessarily provide all the information required by the Clean Water Act; the Corps' regulations explicitly contemplate that in some cases—in order to identify the least environmentally damaging practicable alternative—the Corps will need to supplement the NEPA documents with additional information. 40 C.F.R. § 230.10(a)(4).

20

C. <u>Natural Gas Act</u>

The projects here further implicate the Federal Energy Regulatory Commission's ("FERC") authority under the Natural Gas Act to regulate "the siting, construction, expansion, or operation" of LNG infrastructure as well as the construction, acquisition, or operation of pipelines that will transport gas in interstate commerce. 15 U.S.C. §§ 717b(e)(1), 717f(c). For projects under FERC's jurisdiction, Congress has designated FERC as the lead agency for coordinated NEPA review. *Sierra Club v. FERC*, 827 F.3d 36, 41 (D.C. Cir. 2016) ("*Freeport*") (citing 15 U.S.C. § 717n(b)(1)). As a result, the Corps participates in FERC's NEPA process as a "cooperating agency," 40 C.F.R. § 1501.8(b), while FERC is responsible for "supervis[ing] the preparation of [the] environmental impact statement," *id.* § 1501.7

At the conclusion of FERC's NEPA process, cooperating agencies such as the Corps can either "adopt" FERC's environmental impact statement, *id.* § 1506.3, or—as the Corps has done here—prepare their own separate NEPA documents. *See* AR256-322 (including the Corps' Environmental Assessment). Under either path, FERC's authority does

21

not preempt or modify other agencies' obligations under NEPA or under other substantive statutes like the Clean Water Act. *Freeport*, 827 F.3d at 41-42; *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 590 (4th Cir.), *reh'g granted on other ground in part*, 739 F. App'x 185 (4th Cir. 2018).

## III.    Factual Background

A. Project Overview and Environment

The Driftwood LNG terminal and Driftwood Pipeline together constitute a proposal to take gas produced in the United States and prepare it for export to the global market. AR262. Gas will be received from the interstate pipeline system, and be transported by a new, 96-mile pipeline to the proposed terminal. AR2422. The terminal site is in Calcasieu Parish, approximately 5 miles south of Carlyss, Louisiana, on the west bank of the Calcasieu River. AR256. Driftwood proposes to develop roughly 718 acres of the 790-acre site. AR257. The site contains approximately 550 acres of wetlands, of which nearly 320 acres will be destroyed. AR2520, 414.

The 320 acres of wetlands that will be permanently destroyed at the terminal site consist of tidal, intermediate, and fresh marsh. AR259,

22

2621-22. At least 125 acres of these wetlands are considered "rare, imperiled, or difficult to replace." AR2326.[5] And more than 100 acres of the wetlands consist of historical coastal prairie habitat, AR419. The Louisiana Department of Wildlife and Fisheries considers coastal prairie habitat to be a vegetation community of special concern. AR2641.

FERC explained that the wetlands impacted by the terminal and pipeline "provide important ecological functions," including "water purification," "shoreline stabilization," "flood protection," and "essential habitat" for fish and wildlife species. AR2622. EPA cautioned that the particular types of wetlands impacted here provide important functions but "have experienced a tremendous decline in Louisiana." AR5837.

---

[5] *Louisiana Wetland Rapid Assessment Method for use within the Boundaries of the New Orleans District, Version 2.0*, at 12 (2017) [hereinafter "LRAM Manual"] (defining "RID" as "rare, imperiled, or difficult to replace"). Although not presented in the administrative record, this guidance, which is not subject to reasonable dispute, is appropriate for judicial notice. *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015) (citing Fed. R. Evid. 201(b)(2)); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) (court may take judicial notice of government records even in record review case).

B. Procedural History

In proceedings before the Corps, the terminal and pipeline were conceived and reviewed jointly, with a single application and permit covering both. AR4. Similarly, FERC addressed the two together. AR2383-3453.

FERC acted as the lead agency in preparing the Environmental Impact Statement ("EIS") required by NEPA, AR2404, releasing a final EIS in January 2019 and approving the projects in April 2019. *Driftwood LNG, LLC and Driftwood Pipeline, LLC*, 167 FERC ¶ 61,054 P 23. In that EIS, FERC discussed a number of alternatives, including "Alternative Site 6," which would move the terminal to a different site, roughly 1.5 miles northeast and across the Calcasieu River. AR2522. FERC did not dispute that this alternative was feasible, and conceded that it would destroy at least 50 fewer acres of wetlands. AR2524.[6] But FERC asserted that Alternative Site 6 may contain an unknown

---

[6] Although FERC's EIS stated that this alternative would reduce wetland impacts by 50 acres, AR2524, Alternative Site 6 only contains 250 acres of wetlands, AR2520, i.e., 70 acres less than the amount that would be destroyed by construction at the proposed site.

amount of certain high-value wetlands and may have other, non-wetland environmental impacts. AR2524. Seemingly on this basis, FERC concluded that this alternative "did not provide a significant environmental advantage to Driftwood's proposed site," and FERC did not evaluate it further. *Id.*

Other agencies also submitted comments on the EIS, applications, and various other documents. For example, technical staff at the Louisiana Department of Wildlife and Fisheries expressed concerns about the efficacy of proposed mitigation, AR1857-59, and the U.S. Environmental Protection Agency, Department of the Interior, and others expressed concerns about a known contaminated site adjacent to Driftwood's proposed dredging areas. AR3222, 3225, 3245-48, 3313, 3315, 4523-24.

Rather than simply adopting FERC's EIS, the Corps prepared its own, separate Environmental Assessment, which incorporated sections of FERC's EIS by reference. AR256-322. Neither the Corps' Environmental Assessment nor any other document authored by the Corps discussed the EIS's Alternative Site 6. Based on this

Environmental Assessment, the Corps approved the projects in May 2019. AR6.

C. Details of the Final Permit

As approved, the Driftwood LNG terminal would include liquefaction facilities—refrigerators and other equipment running in sequence to cool pipeline gas into LNG,[7] AR2420—as well as LNG storage tanks, ship berthing and loading facilities, and ancillary support infrastructure. AR2441-43. The Driftwood pipeline project would include roughly 96-miles of pipeline, three compressor stations, and other ancillary infrastructure. AR2451, 2457-58. This infrastructure would be constructed in phases over seven years. AR2470.

The terminal site contains roughly 550 acres of wetlands. AR2520. The permit requires various measures to avoid and minimize impacts to these affected wetlands, AR258, but the permit nevertheless concludes that, despite those efforts, 319.3 acres of wetland at the terminal site

---

[7] This series of equipment is sometimes called a liquefaction "train[]." *See, e.g.*, *Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs*, 849 F. App'x 459, 461 (5th Cir. 2021).

will be permanently destroyed and lose all wetland function. AR414, 2622, 2860.

The Corps required offsite compensatory mitigation for these wetland losses. AR259. For the pipeline (not directly at issue here), the Corps required Driftwood to mitigate all pipeline impacts—including temporary, permanent, and conversion impacts to nearly 470 acres of wetlands—by acquiring mitigation bank credits, the method at the top of the mitigation hierarchy. AR259; *Atchafalaya Basinkeeper*, 894 F.3d at 699. For the terminal, however, the Corps approved a mix of mitigation bank credits (the most-preferred method) and mitigation through construction of wetlands by Driftwood itself (the least-preferred method). AR259. Specifically, of the wetlands permanently destroyed at the terminal site, 134.3 acres will be mitigated with credits from approved mitigation banks, and the remaining 185 acres (the majority) will be mitigated through Driftwood's "beneficial use of dredged material" ("dredged material") plan to restore existing wetland. *Id.*

The theory underlying the dredged material plan is that saltwater intrusion and other factors have converted roughly half of the existing

27

and former wetlands to open water, meaning that the soil is generally too far underwater to function as a wetland. AR476, 2478. The plan proposes to "restore" these wetlands by spreading dredged material to make them shallower again. As approved, the dredged material plan authorizes Driftwood to (1) dump 8.25 million cubic yards of dredged material into existing wetlands and open water to restore those wetlands and (2) use some of the restored wetlands as prospective compensatory mitigation. AR11, 257.

Specifically, Driftwood would transport dredged material in slurry form by pipeline approximately 1.75 to 8.5 miles southwest of the terminal site. AR478, 486. There, Driftwood plans to spray the slurry across 10 areas, constituting roughly 2,000 acres. AR486. This will raise the soil surface to an initial target elevation of 3.5 ft above the low water mark,[8] which will settle after 5 years to roughly 1.8 ft above the low water mark. *Id.* While the dredged material plan has the potential

---

[8] Elevation targets are provided in terms of the North American Vertical Datum 1988, which roughly equates to the 2016 low water mark. AR485-86.

to restore over 2,000 acres of wetlands, *id.*, the Corps has only approved roughly 650 acres to be compensatory mitigation. AR259.

Merely dumping dredged material in these areas does not guarantee that wetlands will be restored or that full function will be achieved. AR494-95. For the to-be-determined 650 acres that will be utilized as compensatory mitigation, AR259, Driftwood would attempt to restore wetland vegetation by replanting various native species within four weeks of construction. AR495. The dredged material plan does not estimate the likelihood that such plantings will succeed. AR494-95.

For the remaining acres, however, Driftwood has no performance standards or requirements to immediately restore vegetation after depositing dredged material. AR259, 494, 496. As a result, there is no guarantee that the remaining areas will restore wetlands, at all. For instance, despite acknowledging that success depends on having "each targeted plant community . . . established within the first two years," Driftwood will wait two years before even considering vegetative planting in these areas. AR494-95.

None of the dredged material deposition areas will result in functional wetland until months or years after deposition, if they are successfully restored at all. The dredged material plan contains only two performance standards that apply to the 650 acres Driftwood will rely on for compensatory mitigation: (1) one year after dredged material is placed, the "site must have substrate suitable for marsh vegetation growth"; and (2) after the deposited material settles (which could take up to five years), within three more growing seasons (i.e., up to eight years after deposition), areas must contain 80% native wetland species. AR492, 496. If any area used for compensatory mitigation fails to achieve these metrics, Driftwood would replant annually until 80% coverage "has been achieved for a complete growing season." AR12, 496.

Under this approach, it could be years before the compensatory mitigation areas achieve even this limited success threshold. While the permit requires Driftwood to maintain roughly 650 acres of restored wetlands for 20 years, after Driftwood demonstrates the initial 80% vegetation coverage requirement, the permit does not include any ongoing metrics or performance standards to ensure that the restored

30

areas remain productive wetlands. AR12. Nonetheless, the permit

states that if the restoration project is destroyed or adversely impacted

during that period, Driftwood must restore the affected areas or obtain

other compensatory mitigation. *Id.*

## SUMMARY OF ARGUMENT

The United States Army Corps of Engineers, in approving a

project that would permanently destroy over 300 acres of wetlands—

including over 125 acres of high-quality, "rare, endangered, or difficult

to replace" wetlands—violated its obligations under the Clean Water

Act to avoid impacts to wetlands to the greatest extent practicable and

to require adequate compensatory mitigation.

The Corps failed to demonstrate that the site it approved for the

terminal was the least environmentally damaging practicable

alternative. Part II. The Clean Water Act's implementing regulations

create strong presumptions that (1) alternatives that avoid wetland fill

are available; and (2) such alternatives are less environmentally

damaging. Rebutting these presumptions requires clear, specific

evidence. Part II.A. The Corps failed to rebut the presumptions with

31

regard to the terminal. The EIS prepared by FERC explained that an alternative would avoid impacts to 50 acres of wetlands. But despite incorporating this part of the EIS in its own environmental review, the Corps failed to even acknowledge the existence of this alternative, let alone furnish the specific evidence necessary to rebut the presumptions. Accordingly, the Corps violated its duty to consider whether that alternative is the least environmentally damaging practicable alternative and, ultimately, violated the Clean Water Act and the Administrative Procedure Act by authorizing a project that was not the least environmentally damaging practicable alternative. Part II.B.

Separately, while the Corps required compensatory mitigation for unavoidable wetland impacts, the Corps violated its obligation to follow a "rigid" order of preference when selecting mitigation methods, running afoul of this Court's decision in *Atchafalaya Basinkeeper*, 894 F.3d at 699. Part III.A. Specifically, the Corps approved permittee-responsible mitigation (the least favored method) in the form of the "beneficial use of dredged material" ("dredged material") plan while entirely failing to consider either of the superior types of compensatory

mitigation. Part III.B. Nor did the Corps argue that it could approve this least-preferred mitigation notwithstanding the hierarchy. Part III.C. The Corps' actions here were also contrary to the Corps' own prior position, but the Corps arbitrarily neither acknowledged nor justified this change. Part III.C. Finally, even if the Corps had flexibility with regard to its choice of mitigation method, the Corps still failed to justify its decision to approve the dredged material plan instead of alternative mitigation methods, despite serious concerns about the viability of the dredged material plan. Part III.D. Accordingly, the Corps violated the Clean Water Act and Administrative Procedure Act.

## ARGUMENT

## I.    Standard of Review

In reviewing the Corps' actions here, the Court applies the familiar Administrative Procedure Act ("APA") standard of review. *Sierra Club*, 909 F.3d at 643. The Court must determine whether the Corps' actions, findings, or conclusions were "'arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

Judicial review under this standard is deferential, but is not "toothless." *Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (holding that the Environmental Protection Agency acted arbitrarily and capriciously in formulating a technology-based effluent standard derived from outdated technology). This Court must "ensure that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,' and assess 'whether the [agency's] decision was based on a consideration of the relevant factors[.]'" *Id.* at 1013-14 (quoting *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013)). Generally, an agency decision is arbitrary if it has:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And the Court "must disregard any *post hoc* rationalizations of [agency] action . . . an agency's action must be

upheld, if at all, on the basis articulated by the agency itself." *Texas v.*

*U.S. EPA*, 829 F.3d 405, 425 (5th Cir. 2016) (internal quotation marks

omitted).

## II. The Corps Failed to Clearly Demonstrate that the Approved Project Is the Least Environmentally Damaging Practicable Alternative Because It Ignored an Alternative with Fewer Wetland Impacts.

In reviewing an application under section 404 the Clean Water

Act, the Corps may only approve the "least environmentally damaging

practicable alternative" ("LEDPA") that fulfills the project's "overall

project purposes." *Butte Env't Council v. U.S. Army Corps of Eng'rs*, 620

F.3d 936, 940, 946-47 (9th Cir. 2010) (interpreting 40 C.F.R. §

230.10(a)); *accord City of Shoreacres*, 420 F.3d at 447-48; AR286. And

regulations impose a rebuttable presumption that alternatives with

fewer impacts to wetlands or other "aquatic ecosystem[s]" are less

environmentally damaging. 40 C.F.R. § 230.10(a)(3). Accordingly, the

Corps' primary duty under this mandate is to "clearly demonstrate[]"

that alternatives that would reduce wetland impacts are impracticable

or not environmentally beneficial. 40 C.F.R. § 230.10(a)(3); *accord*

AR286.

35

Here, FERC's EIS identified an alternative—Alternative Site 6—that would reduce the amount of wetlands permanently destroyed by at least 50 acres, or 15%. AR2524, 3245. The EIS did not claim that this alternative was impracticable, or that it was *more* environmentally damaging than Driftwood's preferred site. Instead, the EIS claimed—largely on the basis of non-wetland impacts—that Alternative Site 6 had not been shown to present a "significant environmental advantage" to the preferred site. AR2524, 3245. The Corps adopted the EIS's alternatives analysis, without discussing this alternative. AR2524.

But here, FERC's NEPA analysis in the EIS is plainly insufficient to meet the Corp's Clean Water Act obligations. The Corps, unlike FERC, must presume that harm to wetlands is more significant than other types of environmental harm, 40 C.F.R. § 230.10(a)(3), and nothing in FERC's EIS rebuts this presumption. The Corps failed to clearly demonstrate that Alternative Site 6 would be impracticable or more environmentally damaging. The Corps' failure to select this alternative as the least environmentally damaging practicable alternative was therefore arbitrary.

36

A. <u>A Showing of Impracticability or Greater Environmental Harm Requires Specific, Compelling Evidence.</u>

The Clean Water Act's implementing regulations "set[] forth rebuttable presumptions that 1) alternatives . . . that do not involve special aquatic sites [*e.g.* wetlands] are available, and 2) alternatives that do not involve special aquatic sites have less adverse impact on the aquatic environment."[9] Thus, the Corps must first presume that an alternative that destroys fewer acres of wetlands will be less environmentally damaging. 40 C.F.R. § 230.10(a)(3); Miriam Webster, LESS (meaning "of reduced size, extent, or degree" or "more limited in quantity").

Courts have repeatedly upheld the Corps' rejection of an alternative that would increase the number of wetland acres impacted. *Friends of Magurrewock, Inc. v. U.S. Army Corps of Eng'rs*, 498 F. Supp. 2d 365, 372 (D. Me. 2007); *Hillsdale Env't Loss Prevention, Inc. v. U.S.*

---

[9] Mem. of Agreement between EPA and the Corps regarding Mitigation under CWA Section 404(b)(1) Guidelines, at 3 (Feb. 7, 1990), https://www.epa.gov/sites/default/files/2019-05/documents/1990_army-epa_mitigation_moa.pdf (interpreting 40 C.F.R. § 230.10(a)(3)). Although it is not presented in the administrative record, the Court should take judicial notice of this guidance. . *See supra* note 5.

*Army Corps of Eng'rs*, No. 10-2008-CM-DJW, 2011 WL 2579799, at \*6
(D. Kan. June 28, 2011) (not reported), *aff'd*, 702 F.3d 1156 (10th Cir.
2012). This is because "the degradation or destruction of special aquatic
sites, such as filling operations in wetlands, is considered to be among
the most severe environmental impacts covered" by the regulations. 40
C.F.R. § 230.1(d).

These presumptions are "very strong," *Buttrey*, 690 F.2d at 1180,
and the applicant bears the burden of "clearly demonstrat[ing]" that
these presumptions have been rebutted. *Hillsdale Env't Loss
Prevention*, 702 F.3d at 1166-68. As a result, "[t]he Corps' burden in
finding the least damaging practicable alternative under the [Act's]
guidelines is heaviest for non-water dependent projects planned for a
'special aquatic site,' such as a wetlands area." *Greater Yellowstone
Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004).

The two-pronged presumption that a less damaging alternative is
available can be rebutted only with particularized facts. For example, in
*Utahns for Better Transportation v. U.S. Department of Transportation*,
the Corps erred in rejecting an alternative location for a highway based

38

on impacts to existing development, when the record provided no

information about the extent of that impact: "how many buildings

would have to be taken, how many, if any, refineries would have to be

relocated, how extensive the impact would be on existing utilities, or if

any mitigation would be necessary." 305 F.3d 1152, 1187 n.13 (10th Cir.

2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003). Without

this information, the record "simply [did] not adequately address

whether the [alternative's] impact on existing development would be so

high that it would be impracticable." *Id.* at 1187.

    B.  <u>The Corps Failed to Rebut the Presumption that Using
        the EIS's Alternative Site 6 Instead of the Preferred
        Alternative Would Reduce Wetland Impacts.</u>

        1.  <u>The Corps was required to presume that Alternative
            Site 6 would cause less environmental harm.</u>

As approved, construction of the Driftwood LNG terminal will

permanently destroy 319.3 acres of wetlands, including over 125 acres

of high-quality, "rare, imperiled, or difficult to replace" wetlands.

AR257, 2326. Public comments urged consideration of an alternative

site—which FERC's EIS termed "Alternative Site 6" [10]—that would

destroy at least 50 fewer acres of wetlands. AR2524, 3245. Alternative

Site 6 is a 568-acre parcel located just west of the Alcoa facility on the

Industrial Canal in Calcasieu Parish. AR2519-20, 2524. The location is

shown in Figure 1 below.

---

[10] The Corps' Memo for the Record separately evaluated a
different "off-site alternative 6" or "alternative site #6" that was located
on Pelican Island in Galveston Bay, Texas. AR281. For the purposes of
argument, "Alternative Site 6" refers to the EIS alternative, not the
Pelican Island site.

Figure 1. FERC's EIS diagram showing Alternative Site 6 and
Driftwood's proposed site. AR2522.



Because constructing the terminal at Alternative Site 6 would impact at least 50 fewer acres of—or 15% fewer—wetlands, AR2524, 3245, the Corps was required to presume that alternative would be less environmentally harmful than the preferred site. To rebut that presumption, the Corps was required to provide detailed, specific reasons as to why the alternative was unavailable or would be more environmentally harmful. *See supra* Section II.A. Nevertheless, the Corps adopted FERC's rejection of Alternative Site 6 from FERC's EIS analysis, without conducting the separate LEDPA analysis required under 40 C.F.R. § 230.10(a).

2.  The Corps violated its Clean Water Act obligations by failing to supplement the EIS's analysis of Alternative Site 6.

In evaluating alternatives, one Corps staffer noted that "we really only needed to defer to the section in the FERC FEIS." AR610. And that is exactly what the Corps did here. AR279. Although the Corps' memo for the record discussed some site alternatives, it failed to discuss the EIS's Alternative Site 6. Thus, the only discussion of Alternative Site 6 in the record is contained in FERC's EIS.

42

The EIS rejected Alternative Site 6 with little analysis. The EIS noted that some wetlands at Alternative Site 6 "appear to have the pimple mounds characteristic of remnant coastal prairie habitat, an [Louisiana Department of Wildlife and Fisheries] vegetation community of special concern." AR2524, 2554. In addition, the EIS determined that Alternative Site 6 would require construction of an access road and an additional 2 miles of pipeline (including crossing the Calcasieu Ship Channel). AR2524, 2554. As a result, the EIS concluded that Alternative Site 6 "did not provide a significant environmental advantage to Driftwood's proposed site," and the agency "did not evaluate it further."[11] AR2524, 2554.

While the Corps may rely on FERC's EIS, the Corps has an obligation to supplement the EIS, where, as here, the underlying EIS has not "considered the alternatives in sufficient detail to respond to"

---

[11] Notably, the EIS's conclusion hinged entirely on the relative environmental harm; it did not assert that Alternative Site 6 would be impracticable. Nor did the Corps anywhere assert that Alternative Site 6 was otherwise not available. Because the Corps' decision can be affirmed only on grounds articulated in the record, *Texas*, 829 F.3d at 425, the Corps cannot now claim the site was impracticable.

Clean Water Act requirements. 40 C.F.R. § 230.10(a)(4); *see also Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 156 (3d Cir. 2017) ("FERC's analysis under NEPA is substantively different than the Corps' analysis under the Clean Water Act." (citing *Utahns for Better Transp.*, 305 F.3d at 1186); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1262 n.12 (10th Cir. 2003) ("[U]nder the [Clean Water Act], it is not sufficient for the Corps to consider a range of alternatives to the proposed project: the Corps must rebut the presumption that there are practicable alternatives with less adverse environmental impact.").

The Corps was required to supplement the EIS here because the EIS did not identify—or purport to find—the LEDPA. Rather, FERC's EIS concluded only that Alternative Site 6 "did not provide a significant environmental advantage to Driftwood's proposed site." AR2524, 2554 (same). In doing so, FERC appears to have weighed non-aquatic environmental impacts under NEPA, whereas the Corps has a specific obligation under the Clean Water Act to prioritize avoiding aquatic impacts. 40 C.F.R. § 230.10(a). Specifically, the Corps must select the

44

alternative with the least harm to the aquatic ecosystem unless non-aquatic environmental harms are "significant." *Id.* FERC's EIS did the opposite: it rejected Alternative Site 6 because it did not find significant environmental benefits. Thus, the Corps was required to supplement the EIS in order to identify the LEDPA.

As the agency charged with protecting wetlands, the Corps was in the best position to identify and quantify any remnant coastal prairie habitat at Alternative Site 6, determine whether impacts to those areas could be avoided, compare unavoidable impacts to coastal prairie at Alternative Site 6 with the special wetlands at the preferred site, and evaluate whether any unavoidable incremental impacts to coastal prairie habitat at Alternative Site 6 should override the presumed benefits from avoiding an incremental 50-plus acres of wetlands. AR24122 (FERC requesting the Corps to "[c]onfirm that pimple mounds/mosaics don't present obstacles"). But the Corps failed to provide any of this supplemental analysis. As a result, the Corps failed to "clearly demonstrate[]" that Driftwood's preferred site was the

LEDPA, 40 C.F.R. § 230.10(a)(3), and issuance of the permit violated

the Clean Water Act.

> 3. The Corps could not merely defer to the EIS because the EIS failed to provide the detailed, specific justification showing that Alternative Site 6 would cause greater environmental harm.

Even if the EIS purported to identify the LEDPA (it did not), the

single-paragraph discussion failed to rebut the "very strong"

presumption that Alterative Site 6 was the LEDPA, for two reasons.

First, like the Corps' inadequate analysis in *Utahns for Better*

*Transportation*, 305 F.3d at 1187 n.13, the EIS omitted essential

information about the extent of potential impacts needed to rebut the

"very strong" presumption that Alternative Site 6 would cause less

environmental harm: Is remnant coastal prairie habitat actually

present at Alternative Site 6? If so, how many acres of coastal prairie

might be impacted? Could site configuration changes reduce or

eliminate impacts to those areas? How do the coastal prairie wetlands

at Alternative Site 6 compare to the over 100 acres of historic coastal

prairie habitat at the preferred site? AR419. How many acres of more

common wetlands would offset destroying one acre of coastal prairie

habitat? Rather than answer these questions, the EIS merely speculated that Alternative Site 6 would not provide significant environmental benefits. Without these details, the Corps lacked the information necessary to rebut the "very strong" presumption that destroying fewer wetlands is less environmentally damaging. *Buttrey*, 690 F.2d at 1180.

Second, even if Alternative Site 6 contains wetlands of special concern, rejecting the alternative on that basis was arbitrary because the record shows that *both* the preferred site and Alternative Site 6 would impact wetlands of special importance. Specifically, the preferred site will destroy over 100 acres of historic coastal prairie habitat and over 125 acres of high-quality, "rare, imperiled, or difficult to replace" wetlands. AR2326, 419. Under the Corps' LRAM manual, "rare" habitats "may only be found in a single region within Louisiana or have only up to 100 known occurrences"; "imperiled" habitats "have approximately 20 or less known occurrences and are extremely vulnerable to extirpation"; and "difficult to replace" habitats "exhibit extreme difficulty in restoration." LRAM Manual at 38-39.

47

Yet, in evaluating site alternatives, the EIS failed to acknowledge that avoiding the proposed site would protect wetlands of special value. As a result, the EIS failed to examine whether avoiding over 220 acres of special wetlands at the preferred site outweighs avoiding unspecified impacts to possible "remnant" coastal prairie habitat at Alternative Site 6. In adopting the EIS without supplementing this analysis, the Corps failed to consider an important aspect of the problem, rendering its conclusion arbitrary. *State Farm*, 463 U.S. at 43.

## III.    The Corps' Failure to Comply With the "Rigid" Compensatory Mitigation Hierarchy Was Arbitrary.

The Corps violated the Clean Water Act and Administrative Procedure Act by approving Driftwood's Beneficial Use of Dredged Material ("dredged material") plan—a form of permittee-responsible mitigation—as compensatory mitigation for the majority of wetland impacts at the terminal site. The Corps offered no justification whatsoever for its decision to approve permittee-responsible mitigation rather than other forms of mitigation that are higher in the "rigid" mitigation hierarchy. *Atchafalaya Basinkeeper*, 894 F.3d at 699 (interpreting 33 C.F.R. § 332.3(b)). The Corps did not argue that its

48

choice complied with that hierarchy by demonstrating, for example, that more preferable forms of mitigation were unavailable (and the record indicates that higher-tier options like mitigation bank credits *were* available). Nor did the Corps attempt to argue that it could depart from this hierarchy by choosing permittee-responsible mitigation even if higher-tier alternatives were available. Such an argument would be foreclosed by *Atchafalaya Basinkeeper*, and in the alternative, such an argument would have been a departure from agency practice that would need to be, but was not, explicitly acknowledged and justified.

And finally, even if the Corps *could*, in some circumstances, depart from the mitigation hierarchy, the Corps would still need to show that such a departure was justified *here*. But the Corps failed to provide any discussion of whether or why the permittee-responsible, dredged material plan was superior to other mitigation alternatives. Indeed, the record demonstrates that the dredged material plan will take months or years to produce replacement wetlands, if wetlands are successfully restored, at all. The Corps' complete failure to explain why the plan was selected for mitigation would render the Corps' decision

49

arbitrary even if the regulations and caselaw had not established a

hierarchy that required the Corps to first exhaust other forms of

mitigation.

    A. <u>The Corps Violated the Clean Water Act and
Administrative Procedure Act by Failing to Treat the
Dredged Material Plan as the Least-Preferred
Compensatory Mitigation Option.</u>

       1. <u>The regulations establish a rigid compensatory
mitigation hierarchy.</u>

Compensatory mitigation is required to "offset environmental

losses resulting from unavoidable impacts" to wetlands, particularly

lost aquatic resource functions. 40 C.F.R. § 230.93(a)(1), (f)(1).

Recognizing the potential variety in, and effectiveness of,

compensatory mitigation alternatives, the regulations break

compensatory mitigation options into three categories: (1) mitigation

bank credits; (2) in-lieu fee programs; and (3) permittee-responsible

mitigation. 33 C.F.R. § 332.3(b). Mitigation bank credits are designated

as the first preference, and permittee-responsible mitigation is the

least-preferred. *Id.*; 73 Fed. Reg. at 19,614. In explaining why

mitigation banks are at the top of the hierarchy, this Court has

highlighted "the better scientific management, large scale, and financial
security provided within mitigation banks." *Atchafalaya Basinkeeper*,
894 F.3d at 699-700 (citing 33 C.F.R. § 332.3(b)(2)); *see also* 33 C.F.R. §
332.3(b)(2) ("Mitigation banks typically involve larger, more ecologically
valuable parcels, and more rigorous scientific and technical analysis,
planning and implementation than permittee-responsible mitigation.").

At the same time that the Corps' New Orleans District was
considering the Driftwood permit at issue here, it was simultaneously
arguing in court that this compensatory mitigation hierarchy is rigid
and inflexible. *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
310 F. Supp. 3d 707, 731 (M.D. La.), *vacated and remanded*, 894 F.3d
692 (5th Cir. 2018) ("In opposition, the Corps argues that it must choose
from a 'limited menu' of compensatory mitigation options in a 'strict
priority' order."). Ultimately, this Court agreed, holding that multiple
regulatory provisions dictate a specific order of preference. *Atchafalaya
Basinkeeper*, 894 F.3d at 699-700 (quoting 33 C.F.R. § 332.3(b)(1)
("[T]he district engineer *shall consider* the type and location[s] options
*in the order presented*" in 33 C.F.R. § 332.3(b)(2)-(6) (emphasis added by

51

the Court)) and 33 C.F.R. § 332.3(g) ("Mitigation banks . . . may be used
to compensate . . . in accordance with the *preference hierarchy in
paragraph (b) of this section.*" (emphasis and alterations inserted by the
Court)).

This Court explicitly rejected arguments that the regulations
allow a flexible approach to optimize mitigation. *Atchafalaya
Basinkeeper*, 894 F.3d at 699 ("Criticizing the Corps' approval of out-of-
kind mitigation, the district court stated that Section 332.3 does not
'impos[e] a mechanical and rigid hierarchy' establishing a preference for
out-of-kind mitigation. This was incorrect."). Instead, this Court
concluded that "[i]f this [regulatory] language does not set up a plain
'hierarchy' strongly approving of mitigation banks"—instead of the
permittee-responsible plan recommended by the environmental
appellants—"it is hard to know what would do." *Id.* at 700. Thus, the
Corps was required to consider mitigation bank credits before turning
to less-preferred compensatory mitigation like permittee-responsible
projects.

52

## 2. The dredged material plan is permittee-responsible mitigation.

Driftwood—the permittee—will be the entity responsible for implementing the beneficial use of dredged material plan and for ensuring that the resulting wetland restoration and/or enhancement is ultimately successful. The dredged material plan is plainly "permittee-responsible mitigation," and the Corps never called it anything else.

Under 33 C.F.R. § 332.2, "[p]ermittee-responsible mitigation means an aquatic resource restoration, establishment, enhancement, and/or preservation activity undertaken by the permittee (or an authorized agent or contractor) to provide compensatory mitigation for which the permittee retains full responsibility." The preamble to the 2008 Compensatory Mitigation Rule also establishes that any "other" type of mitigation not listed should be "considered to be permittee-responsible mitigation where the permittee retains responsibility for

providing the required compensatory mitigation." 73 Fed. Reg. at

19,601.[12]

Here, under the dredged material plan, Driftwood would be

responsible for "restoring" or "establishing" wetlands via spraying

dredged material and planting vegetation. AR475-76 (describing the

plan as designed to "build," "restore," or "protect" wetlands). And the

Corps' permit explicitly required Driftwood to retain responsibility for

implementation of the dredged material restoration plan. AR12

("[S]atisfying the [Beneficial Use of Dredged Material] Plan

requirements through an acquired contractor does not remove or

---

[12] The Water Resources Development Act of 2020 ("WRDA") and
Louisiana state law provide that insofar as dredged material will need
to be placed *somewhere*, it ought to be used beneficially. S*ee* 33 U.S.C.
§§ 2326, 2326g; LA. ADMIN. CODE tit. 43, pt. I, § 707(B). But while the
WRDA and Louisiana law encourage beneficial use of dredged material,
nothing in those laws displaces or modifies the Clean Water Act's
mitigation requirements. *In re Lively*, 717 F.3d 406, 410 (5th Cir. 2013)
(quoting *Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*, 551 U.S. 644,
662 (2007)) ("Repeals by implication are disfavored and will not be
presumed unless the legislature's intent is 'clear and manifest.'"). There
is no conflict between requiring the Corps and Driftwood to effectively
mitigate wetland loss, pursuant to the Clean Water Act, and requiring
them to additionally and separately put dredged material to beneficial
use, potentially above and beyond the Clean Water Act's requirements.

diminish the permittee's accountability . . . as the primary party responsible for insuring [sic] construction, maintenance and success of the [dredged material restoration] project.").

Other entities also understood the dredged material plan to be a form of permittee-responsible mitigation. For instance, the National Marine Fisheries Service also relied on its expectation that the dredged material restoration plan would comply with the requirements for permittee-responsible mitigation. AR5996.

B. <u>The Corps Neither Justified Approving Permittee-Responsible Mitigation Nor Asserted that Higher-Preference Alternatives Were Unavailable.</u>

Because the dredged material plan, as permittee-responsible mitigation, was at the bottom of the compensatory mitigation hierarchy, the Corps could not lawfully select this option without demonstrating that higher-preference alternatives were unavailable. But the Corps did not even consider other forms of mitigation. AR301. The Corps' decision was therefore contrary to the regulations, and the Corps entirely failed to consider an important aspect of the problem. *State Farm*, 463 U.S. at 43.

55

The Corps' claim that it *complied* with the compensatory mitigation hierarchy, despite selecting the dredged material plan as a form of compensatory mitigation, is both completely unexplained and plainly refuted by the record. AR301 ("Does the selected compensatory mitigation option deviate from the order of the options presented in § 332.3(b)(2)-(6)? No."). The Corps never argued that the dredged material plan was anything other than permittee-responsible mitigation. Nor did the Corps assert that higher-preference forms of mitigation were unavailable. To the contrary, the record indicates credits would have been available, if the Corps had considered the issue. *See* AR3456-65 (listing approved mitigation banks that Driftwood could obtain), AR3571 (Driftwood's list of available compensatory mitigation credits). Instead, the Corps marked "N/A" in the section allowing space to "provide rationale for the deviation" from the hierarchy. AR301. This explicit failure to justify its deviation renders the Corps' approval of the dredged material plan as compensatory mitigation arbitrary.

C. <u>The Corps Did Not Assert that It Could Depart From This Hierarchy by Choosing Permittee-Responsible Mitigation, Even If Higher-Tier Alternatives Were Available.</u>

In principle, the Corps could have alternatively attempted to justify its approval of the dredged material plan by arguing that—even if higher-tier alternatives were available—the dredged material plan was still the best mitigation option. As a preliminary matter, any such argument was foreclosed by *Atchafalaya Basinkeeper*, wherein this Court rejected arguments that the regulations allow for a flexible approach that optimizes benefits to the watershed, at the Corps' urging. 894 F.3d at 699-700.

To the extent the Corps' approval of the dredged material plan here represents a broader rejection of the mitigation hierarchy, that rejection constitutes a change in agency position. It is well-established under the APA that an agency must acknowledge and explain such a change in position. *See, e.g.*, *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing

57

position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1141 (5th Cir. 2021) ("When an agency changes its existing position, it . . . must at least display awareness that it is changing position and show that there are good reasons for the new policy." (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) and citing *Fox Television*, 556 U.S. at 515).

And here, the Corps has previously repeatedly asserted that the compensatory mitigation hierarchy is rigid and inflexible. *Atchafalaya Basinkeeper*, 310 F. Supp. 3d at 731 ("In opposition, the Corps argues that it must choose from a 'limited menu' of compensatory mitigation options in a 'strict priority' order."). Yet, in approving the dredged material plan, the Corps entirely failed to address this prior policy or acknowledge that it was deviating from that policy.

Now, faced with this clear violation of a foundation principle of administrative law, the Corps may argue that its use of the Louisiana Wetland Rapid Assessment Method ("LRAM") provided sufficient

justification, but that argument would fail for three reasons. First, relying on the LRAM worksheets would be a post-hoc rationalization that this Court must reject. AR301; *Texas*, 829 F.3d at 425. Second, the LRAM worksheets do not acknowledge the compensatory mitigation hierarchy, at all, or evaluate whether additional mitigation bank credits were available instead of the dredged material plan. The worksheets plainly cannot justify a deviation they neither recognized nor evaluated. Third, unlike in *Atchafalaya Basinkeeper*, where this court approved of the LRAM, the Corps is seeking to override—rather than comply with— the rigid hierarchy. *See Atchafalaya Basinkeeper*, 894 F.3d at 701.

Accordingly, because *Atchafalaya Basinkeeper* foreclosed this argument and because the Corps entirely failed to acknowledge a stark change in policy, the Corps' acted arbitrarily in approving the dredged material plan. *See Fox Television*, 556 U.S. at 515.

> D. Even if the Mitigation Hierarchy Authorized a Flexible Approach, the Corps' Failed to Demonstrate that the Dredged Material Plan Was the Best Compensatory Mitigation Option.

Finally, if this court finds—despite its clear holding in *Atchafalaya Basinkeeper*—that the Corps was allowed to consider

compensatory mitigation using a more flexible approach, the Corps was nevertheless required to justify selecting the dredged material plan in the administrative record. But the Corps did not assert that Driftwood has a "proven track record" with "access to appropriate scientific expertise" to ensure its permittee-responsible project would be more successful than a mitigation bank, 73 Fed. Reg. at 19,594, or find that the dredged material plan would "restore an outstanding resource based on rigorous scientific and technical analysis." *Atchafalaya Basinkeeper*, 310 F. Supp. 3d at 713 (quoting 33 C.F.R. § 332.3(b)(2)).

To the contrary, the record here demonstrates that (1) the dredged material plan will take years to reach limited success criteria, if success is achieved at all, and (2) the Corps did not resolve serious concerns that would jeopardize the ecological effectiveness of dredged material deposition areas. As a result, the Corps failed to assess whether the dredged material plan will work properly or compensate for the lost values, and the Corps' approval of that plan was therefore arbitrary and capricious and in violation of the Corps' duties under the Clean Water Act. 40 C.F.R. § 230.93(a)(1), (f)(1).

60

1. <u>The dredged material plan and permit conditions do not ensure Driftwood will produce high-quality replacement wetlands contemporaneously with wetland destruction.</u>

Fundamentally, the dredged material plan proposes to offset over 185 acres of wetlands—including over 125 acres of high-quality, "rare, imperiled, or difficult to replace" wetlands—with low-quality restored wetlands that have dubious prospects for success. AR2326-28 (acknowledging that the restored areas will suffer from "high" negative influences with only "passive" management). This strategy directly contradicts the Corps' obligation to ensure high-quality replacement wetlands that more than offset any unavoidable loss of wetland functions. 40 C.F.R. § 230.93(c)(1) ("The ultimate goal of a watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of compensatory mitigation sites."). Specifically, the Corps must ensure that the compensatory mitigation will produce a "high level of functional capacity." 73 Fed. Reg. at 19,601. This applies "even when compensating for degraded or low-quality resources." *Id.*

61

Yet, here, the record indicates the dredged material deposition areas will not result in functional wetland for months or years, if they are successfully restored at all. For the 650 acres Driftwood will rely on for compensatory mitigation, the dredged material plan contains only two performance standards: (1) one year after dredged material is placed, the "site must have substrate suitable for marsh vegetation growth"; and (2) after the deposited material settles (which could take up to five years, AR491), within three more growing seasons (i.e., up to eight years after deposition), areas must contain 80% native wetland species. AR496. If any area used for compensatory mitigation fails to achieve these metrics, Driftwood would replant annually until 80% coverage "has been achieved for a complete growing season." AR12, 496. No where does the Corps or Driftwood estimate the likelihood of success or total time until these metrics are reached.

Under this approach, it could be years before the compensatory mitigation areas achieve even this limited success threshold. Moreover, after the initial 80% vegetation coverage demonstration (which could take years), the permit does not include any metrics or performance

62

targets to ensure that the 80% vegetation threshold or another specific indicator of success endures. AR12. The Corps failed to address the temporal gap created by the dredged material plan or whether the limited success criteria will ensure high-functioning replacement wetlands for years to come.

On the other hand, mitigation bank credits—which appear to have been available, AR3456-65, 3571—would reduce these risks. The regulations specifically recognize that two major advantages of mitigation bank credit over permittee-responsible projects are "reducing temporal losses of functions" and "reducing uncertainty over project success." 40 C.F.R. § 230.93(a)(1). By approving the dredged material plan without discussing these risks, the Corps acted arbitrarily and in violation of its Clean Water Act obligations.

##### 2. The Corps ignored serious concerns that would undermine the dredged material plan's success.

In addition, the Corps failed to address serious concerns that would fundamentally undermine the dredged material plan.

First, the Corps failed to address concerns from the Louisiana Department of Wildlife and Fisheries (the "Department") that a lack of

hydrologic connectivity would impair the functionality of dredged material deposition areas. AR1858. Specifically, the Department recommended that "all interior levees between [dredged material] areas be degraded and containment dikes be adequately gapped after one complete growing season." *Id.* In addition, the Department noted that areas 4, 6, and 10 all lacked the requisite tidal exchange, which would "serve to reduce hydrologic connectivity and limit access for aquatic biota." *Id.* As a result, the Department recommended that "fish dips or gaps be created in the rock dike at all such exchanges." *Id.*

Although the Department determined that Driftwood's initial response was insufficient, AR2277, 3476, after pressure from the Corps and Driftwood, the Department eventually withdrew its objections because area 8 alone provided sufficient acreage to offset the impacted wetlands. AR2275. But this withdrawal did not address the Department's prior concerns that area 4 would "result[] in the creation of a mitigation site/wetland that is not fully functioning and provides only limited benefits to Louisiana's fish and wildlife resources." AR2275, 2277. The Corps nevertheless approved offsetting the

64

destruction of over 125 acres of "high-quality," "rare, imperiled, or

difficult to replace" wetlands using area 4 combined with other areas.

AR2326-27. By doing so without addressing whether area 4 would be

ecologically productive, the Corps arbitrarily ignored an important

aspect of the problem. *State Farm*, 463 U.S. at 43.

Second, the Corps ignored concerns raised by the Environmental

Protection Agency, U.S. Department of the Interior, and several

commenters that Driftwood's proposal to dredge materials adjacent to a

contaminated site risked spreading the contamination to the dredged

material disposition areas. AR3222, 3225, 3245-48, 3313, 3315, 4523-24.

This risk is succinctly summarized in the EIS:

> if contaminated soils and sediment is encountered
> during dredging . . . and transported in a slurry
> form to the [restoration] sites, these materials
> would be distributed across the marsh restoration
> area and could potentially affect sediment quality,
> water quality, fisheries, wildlife, and other
> resources within the [restoration] sites and
> downstream of these areas.

AR2576. Driftwood conducted additional testing in January 2016

through January 2018, which showed exceedances of the Louisiana

Department of Environmental Quality's ("LDEQ") Risk Evaluation /

Corrective Action Program ("RECAP") standards in at least four locations. AR2574.

In responding to these concerns, FERC specifically requested the Corps' expertise. AR13594, 24122. But instead of engaging with the issue, the Corps indicated its intent to "punt[] to FERC" on the question. AR4566, *see also* AR4516. Ultimately, the Corps' memorandum for the record adopted the EIS's discussion of contamination risks but failed to separately address this issue. Meanwhile, in this absence of leadership by the Corps, Driftwood offered, and FERC took, an easy—but inappropriate—out: (1) LDEQ's oversite of the historical contaminated site guaranteed that the adjacent areas were free of contamination; and (2) Driftwood promised that it would not dredge in areas with contamination above the RECAP standards. AR915, 2574-76. Both of these conclusions are flawed, and the Corps' failure to separately evaluate them renders its decision to approve the dredged material plan as compensatory mitigation arbitrary.

First, the Corps' adoption of the EIS's conclusion that LDEQ's oversight would guarantee no contamination outside of the historical site was arbitrary because it is contrary to the record. Driftwood's own tests showed that several areas outside of this historical area *are* contaminated. AR2574. And one of the Corps' staffers noted that "[w]e absolutely do not use RECAP standards as a pass / fail metric for beneficial use." AR22874. Yet, the EIS effectively did so. In adopting the EIS, the Corps failed to address this discrepancy. This failure would be concerning if Driftwood merely wanted to dispose of the dredged material; but it is especially concerning where, as here, Driftwood plans to spray hundreds of millions of cubic yards of potentially-contaminated materials as part of its compensatory mitigation plan. The Corps' failure to address this concern renders its approval of the dredged material plan as compensatory mitigation arbitrary.

Second, even assuming that Driftwood has accurately identified contaminated areas, the Corps violated its duty to independently verify Driftwood's assurances that it could avoid dredging those areas. *See Hillsdale Env't Loss Prevention*, 702 F.3d at 1170. In order to avoid

67

those areas, Driftwood would need to dredge with significant precision. AR2575 (showing dredging areas less than 200 feet from contaminated test sites). But the record contains no evidence that such precision is likely or achievable here. Nor did the EIS (or the Corps' permit) mandate safeguards necessary to ensure that dredged material is not contaminated before Driftwood sprays it over the dredged material restoration areas. For instance, while the EIS indicated that Driftwood would stop dredging if "a sheen or any presence of contamination is encountered," this requirement does not appear in the Corps' permit conditions or the four-page dredged material plan attached to the permit. AR7-21. Even if Driftwood were expressly required to check every piece of dredged material for signs of contamination, not all contamination would show visible signs. AR2577. Thus, the Corps' approval of the dredged material plan without ensuring Driftwood would not deposit contaminated material into the restoration areas was arbitrary.

Ultimately, the Corps' failure to consider these concerns about the success of the dredged material plan renders its decision to approve that plan as compensatory mitigation arbitrary.

## IV.  Vacatur Is the Appropriate Remedy.

The APA provides that courts "*shall . . .* hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (emphasis added). Although this Circuit has recognized authority to depart from this statutory text and to fashion remedies that do not "set aside" agency action, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (citations omitted). This Court will only depart from this default where there is a high likelihood that the agency will justify its decision on remand and where vacatur would cause significant disruption. *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). Here, both factors counsel vacatur.

The Corps is unlikely to be able to substantiate the same decision on remand, particularly given the statutory objectives of the Clean Water Act. The legal flaws are fundamental, and curing them will likely require changes to the project site and mitigation plans, rather than merely providing additional analysis. For instance, the Corps entirely ignored an alternative that will reduce wetlands impacts by 50 acres—an alternative that the Corps is required to presume is the LEDPA. FERC looked at this site in its EIS and did not argue that it was impracticable, suggesting that Corps will not be able to either. And the only environmental reasons FERC gave for rejecting the site are not available to the Corps because the Corps must place special importance on protecting wetlands. Thus, it is unlikely that the Corps will be able to substantiate its decision that the preferred site is the LEDPA. But once the wetlands at the proposed site are filled, they cannot be unfilled. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002). Vacatur would ensure that the Corps conducts the required alternatives and mitigation analyses on a clean slate, increasing the

likelihood that the Corps would require steps to avoid and mitigate the destruction of sensitive coastal wetlands.

On the other hand, vacatur will not be disruptive. Driftwood is not ready to build the project anyway. Although Driftwood is currently engaged in site preparation that will cause irreparable injury,[13] it has not actually decided to pursue the project to completion, and may never do so. Specifically, Driftwood has not made a "final investment decision," and it recently withdrew a $1 billion high-yield bond sale[14]

---

[13] FERC, Notice to Proceed with Site Preparation (Dec. 11, 2019). The Court should take judicial notice of this document. *See supra* note 5.

[14] Jill R. Shah, *Tellurian Plunges After Axing $1 Billion Bond for LNG Plant*, BLOOMBERG (Sept. 19, 2022), https://www.bloomberg.com/news/articles/2022-09-19/tellurian-pulls-1-billion-bond-deal-leaving-lng-site-in-limbo. The Court can consider extra-record evidence when determining remedy. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (recognizing an exception to the rule limiting the court to evidence in the record "in cases where relief is at issue").

and lost two of its major sales contracts.[15] The executive chairman of

Driftwood's parent company, Tellurian, noted that the bond offering

development "puts in jeopardy the financial ability to deliver gas on the

schedule that we were hoping to stick to."[16] Entami Corp., a Driftwood

shareholder that "specializes in event-driven and distressed-debt

investing," also recently demanded that Tellurian put itself up for sale,

claiming that the company lacks the expertise, financial resources, and

"institutional credibility" to complete the LNG facility.[17] Thus, the

Driftwood project faces substantial headwinds to continuing with

---

[15] *Tellurian Says Driftwood LNG Deals with Shell, Vitol Scrapped*, REUTERS (Sept. 23, 2022), https://www.reuters.com/business/energy/tellurian-says-driftwood-lng-deals-with-shell-vitol-scrapped-2022-09-23/.

[16] *Id.*

[17] Jill R. Shah, *Tellurian Investor Demands Sale of LNG Developer, Cites Nepotism*, BLOOMBERG LAW (Sept. 16, 2022), https://news.bloomberglaw.com/esg/tellurian-investor-demands-sale-of-lng-developer-cites-nepotism.

construction unrelated to this legal challenge.[18] If this Court vacates and remands, it is likely that the Corps will reach a new decision (either changing or affirming the initial permit) before, or not long after, Driftwood is able to resolve these issues.

Nor will vacatur be disruptive to anyone other than Driftwood. Other, more viable LNG export projects in the region are proceeding ahead of Driftwood's schedule, and customers are signing up for these projects instead of for Driftwood.[19] Even if Driftwood were to make a final investment decision tomorrow and begin construction in earnest, construction is already estimated to take at least seven years. AR2470. Accordingly, while vacatur of the 404 permit is unlikely to meaningfully

---

[18] Justin Jacobs, *US Gas Export Pioneer's Venture Flounders Amid Ravenous Demand*, FINANCIAL TIMES (Sep. 25, 2022), https://www.ft.com/content/689c3e6e-a529-49a1-a0f0-820f4f7d6830.

[19] Marcy de Luna, *Long-Term U.S. LNG Deals Pick Up as Demand Increases*, REUTERS (May 2, 2022), https://www.reuters.com/business/energy/long-term-us-lng-deals-pick-up-demand-increases-2022-05-02/; *NextDecade to Sell Rio Grande LNG Output to Guandong Energy*, OIL & GAS J. (Jul. 6, 2022), https://www.ogj.com/pipelines-transportation/lng/article/14279177/nextdecade-to-sell-rio-grande-lng-output-to-guandong-energy.

delay Driftwood's completion, even if it did, this delay would not meaningfully disrupt the United States' interests in supplying LNG to our allies. Even if European demand for LNG continues into the late 2020s, competing Gulf Coast projects would be better able to provide that gas anyway.

Because it is the only remedy that would serve the Clean Water Act's fundamental purpose of avoiding impacts to wetlands, this Court should vacate the Corps' approval of the Driftwood LNG facility and Driftwood Pipeline and order the Corps to conduct the requisite analyses on a clean slate.

## CONCLUSION

For the reasons stated above, Healthy Gulf requests that this Court vacate the permit issued by the Corps for the Driftwood LNG and Driftwood Pipeline projects, and remand to the Corps for consideration of the issues identified herein.

Dated: November 9, 2022

74

Respectfully submitted,

***s/ Louisa Eberle***
Louisa Eberle
Sierra Club
1536 Wynkoop St., Ste. 200
Denver, CO 80202
Telephone: (415) 977-5753
louisa.eberle@sierraclub.org
*Attorney for Sierra Club and
Healthy Gulf*

Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
Telephone: (424) 346-3276
tom.gosselin@sierraclub.org
*Attorney for Sierra Club and
Healthy Gulf*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2022, I electronically filed the foregoing Initial Brief of Petitioners with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.


<u>s/ *Louisa Eberle*</u>
Louisa Eberle

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify that this brief complies with:

1) the type-volume limitations of Rule 32(a)(7) because it contains 12,717 words, excluding the parts of the brief exempted by Rule 32(f); and

2) the typeface and type style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

<u>**s/ *Louisa Eberle***</u>
Louisa Eberle

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I further hereby certify that in the foregoing brief filed using the

Fifth Circuit CM/ECF document filing system, (1) the privacy

redactions required by Fifth Circuit Rule 25.2.13 have been made, and

(2) the electronic submission is an exact copy of the paper document.


*s/ Louisa Eberle*
Louisa Eberle