No. 22-60397

---

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

HEALTHY GULF; SIERRA CLUB,
*Petitioners*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
STEPHEN MURPHY, in his official capacity as New Orleans
District Commander, U.S. Army Corps of Engineers;
MARTIN MAYER, in his official capacity as Chief, Regulatory
Division, New Orleans District, U.S. Army Corps of Engineers,
*Respondents*.

---

On Petition for Review of a Permit
By the U.S. Army Corps of Engineers

---

**BRIEF FOR RESPONDENTS**

---

TODD KIM
*Assistant Attorney General*

Of Counsel:

REBECCA JAFFE
MILTON BOYD                    JUSTIN D. HEMINGER
GREG MCDONOUGH                 *Attorneys*
*Attorneys*                    Environment and Natural Resources
Office of the Chief Counsel    Division
U.S. Army Corps of Engineers   U.S. Department of Justice
                               Post Office Box 7415
                               Washington, D.C. 20044
                               (202) 514-5442
                               justin.heminger@usdoj.gov

# CERTIFICATE OF INTERESTED PERSONS

No. 22-60397
*Healthy Gulf, et al.*
*v.*
*U.S. Army Corps of Engineers, et al.*

Under Circuit Rule 28.2.1, Appellees are governmental parties that need not furnish a certificate of interested persons.

s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

## STATEMENT REGARDING ORAL ARGUMENT

This petition for review concerns a Clean Water Act permit issued by the U.S. Army Corps of Engineers for a liquefied natural gas project. Respondents submit that oral argument would be both appropriate and helpful to the Court in ensuring full deliberation of the issues presented.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. ii

TABLE OF AUTHORITIES ................................................................. vi

GLOSSARY ........................................................................................ xii

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ...................................................... 2

STATEMENT OF THE ISSUES ........................................................... 3

PERTINENT STATUTES AND REGULATIONS ................................. 3

STATEMENT OF THE CASE ............................................................... 3

    A.    Statutory and regulatory background ..................................... 3

        1.    The Natural Gas Act .................................................... 3

        2.    The Clean Water Act .................................................... 4

        3.    The National Environmental Policy Act ...................... 8

    B.    Factual background ................................................................. 9

        1.    The Project .................................................................... 9

        2.    FERC's authorization ................................................. 10

        3.    Driftwood's Clean Water Act permit
            application ................................................................... 11

        4.    The Corps' Permit ...................................................... 13

SUMMARY OF ARGUMENT ............................................................. 18

STANDARD OF REVIEW ...................................................................... 21

ARGUMENT ........................................................................................ 23

I.   The Corps selected the least environmentally
     damaging practicable alternative ................................................ 23

     A.   The Corps conducted a robust alternatives
          analysis before approving Driftwood's proposed
          location for the terminal ...................................................... 24

     B.   Healthy Gulf's arguments about FERC's
          Alternative Site 6 are flawed ............................................... 26

          1.   No one raised Alternative Site 6 during the
               Corps' public notice and comment process ................. 26

          2.   The omission of Alternative Site 6 from the
               Corps' alternatives analysis is at most a
               harmless error ............................................................. 31

II.  The Corps properly required mitigation for all project
     impacts that could not be minimized or avoided ........................... 39

     A.   The Corps required full compensatory mitigation
          through a combination of mitigation bank credits
          and the Beneficial Use Plan .................................................. 39

          1.   The mitigation hierarchy allows the Corps
               to exercise its expert judgment when
               determining the appropriate mitigation
               options ........................................................................ 40

          2.   Exercising its expert judgment, the Corps
               approved a mitigation plan that fully
               compensates for permanent wetland losses ................ 45

     B.   Healthy Gulf's technical objections to the
          Beneficial Use Plan lack merit ............................................. 54

       1.     The Permit includes special conditions to ensure that Driftwood successfully restores wetlands ........................................................................ 54

       2.     The Corps reasonably resolved technical issues about the Beneficial Use Plan ........................... 59

III.   Even if remand were necessary, Healthy Gulf's requested vacatur remedy is unjustified under this Court's precedent ............................................................ 67

CONCLUSION ...................................................................... 72

CERTIFICATE OF COMPLIANCE ......................................... 73

CERTIFICATE OF DIGITAL SUBMISSION ......................... 74

CERTIFICATE OF SERVICE ................................................. 75

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Appalachian Power Co. v. EPA,*
    249 F.3d 1032 (D.C. Cir. 2001) ..................................................... 31

*Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers,*
    894 F.3d 692 (5th Cir. 2018) ........................ 7, 40, 43, 44, 46-49, 52

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,*
    781 F.3d 1271 (11th Cir. 2015) ..................................................... 67

*Buttrey v. United States,*
    690 F.2d 1170 (5th Cir. 1982) ....................................................... 21

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,*
    220 F.3d 683 (5th Cir. 2000) ......................................................... 67

*City of Arlington, Texas v. FCC,*
    668 F.3d 229 (5th Cir. 2012),
    *aff'd,* 569 U.S. 290 (2013) ............................................................. 37

*City of Shoreacres v. Waterworth,*
    420 F.3d 440 (5th Cir. 2005) .............................................. 22, 32, 37

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ........................................................................ 21

*Gulf Coast Rod, Reel & Gun Club, Inc. v. Corps of Engineers,*
    676 F. App'x 245 (5th Cir. 2017) ................................................... 28

*Gulf Restoration Network v. Salazar,*
    683 F.3d 158 (5th Cir. 2012) ................................................... 26, 29

*Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs,*
    722 F.3d 1053 (7th Cir. 2013) ....................................................... 63

*Little Sisters of the Poor Saints Peter & Paul Home v.*
    *Pennsylvania*, 140 S. Ct. 2367 (2020) .......................................... 22

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) ....................................................................... 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................... 22

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ............................................................... 52, 61

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ......................................................... 6

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ......................................................................... 8

*Sabine River Auth. v. U.S. Dep't of Interior*,
    951 F.2d 669 (5th Cir. 1992) .................................................... 8, 21

*Shrimpers & Fishermen of the RGV v. U.S. Army*
    *Corps of Engineers*, -- F.4th --,
    2023 WL 108558 (5th Cir. Jan. 5, 2023) .......... 27, 28, 31, 32, 39, 54

*Sims v. Apfel*,
    530 U.S. 103 (2000) ....................................................................... 26

*Sierra Club v. EPA*,
    939 F.3d 649 (5th Cir. 2019) .................................................. 66, 67

*Sierra Club v. U.S. Dep't of Interior*,
    899 F.3d 260 (4th Cir. 2018) ......................................................... 3

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ....................................................... 68

*Texas Tech Physicians Associates v. U.S. Dep't of Health &
    Human Servs.*,
    917 F.3d 837, 846-47 (5th Cir. 2019) .................................................. 38

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ............................................................ 69

*Wages & White Lion Invs. v. FDA*,
    41 F.4th 427 (5th Cir. 2022) .............................................................. 31

*WildEarth Guardians v. Nat'l Park Serv.*,
    703 F.3d 1178 (10th Cir. 2013) ........................................................ 61

## Statutes and Court Rules

Administrative Procedure Act
    5 U.S.C. § 706 ................................................................................ 22, 37

    5 U.S.C. § 706(2) .................................................................................. 2

    5 U.S.C. § 706(2)(A) ........................................................................... 21

Natural Gas Act
    15 U.S.C. § 717b(e) ............................................................................. 2

    15 U.S.C. § 717b(e)(1) ......................................................................... 4

    15 U.S.C. § 717f .................................................................................. 2

    15 U.S.C. § 717f(c) .............................................................................. 4

    15 U.S.C. § 717f(e) .............................................................................. 4

    15 U.S.C. § 717n(b)(1) ......................................................................... 4

    15 U.S.C. § 717r(d) .............................................................................. 3

    15 U.S.C. § 717r(d)(1) .......................................................................... 2

Clean Water Act
  33 U.S.C. § 1311 ................................................................ 2

  33 U.S.C. § 1311(a) ........................................................... 4

  33 U.S.C. § 1344(a) ................................................ 2, 4, 26

  33 U.S.C. § 1344(b)(1) ....................................................... 5

  33 U.S.C. § 1362(6) ............................................................ 4

  33 U.S.C. § 1362(7) ............................................................ 4

  33 U.S.C. § 1362(12) .......................................................... 4

National Environmental Policy Act
  42 U.S.C. § 4332(2)(C) ...................................................... 8

## Federal Regulations

33 C.F.R. Parts 320–332 ......................................................... 5

33 C.F.R. § 325.3(a) ............................................................... 26

33 C.F.R. § 325.3(d)(3) ..................................................... 27, 28

33 C.F.R. § 325.4(a)(3) ............................................................ 7

33 C.F.R. § 332.2 ......................................................... 7, 8, 43

33 C.F.R. § 332.3(a) ..................................................... 40, 45, 52

33 C.F.R. § 332.3(a)(1) .................................................. 6, 7, 49

33 C.F.R. § 332.3(a)(2) ............................................................ 7

33 C.F.R. § 332.3(b) ................................................. 7, 8, 40, 48

33 C.F.R. § 332.3(b)(1) ..................................................... 40, 41

33 C.F.R. § 332.3(b)(2) ............................................ 8, 41, 49, 50, 52

33 C.F.R. § 332.3(b)(2)-(b)(6) ................................................ 41

33 C.F.R. § 332.3(e)(1) ............................................... 43, 44

33 C.F.R. § 332.3(e)(2) ...................................................... 44

33 C.F.R. § 332.3(f)(1) ...................................................... 46

33 C.F.R. § 332.3(g) ......................................................... 8

33 C.F.R. § 332.3(k) ........................................................ 14

33 C.F.R. § 332.4(c) ........................................................ 14

33 C.F.R. § 332.8(c) ......................................................... 7

40 C.F.R. Part 230 ........................................................... 5

40 C.F.R. § 230.3(l) ........................................................ 38

40 C.F.R. § 230.3(m) ......................................................... 4

40 C.F.R. § 230.10(a) ........................................................ 5

40 C.F.R. § 230.10(a)(2) .................................................. 6, 32

40 C.F.R. § 230.10(a)(3) ..................................................... 6

40 C.F.R. § 230.10(c) ........................................................ 5

40 C.F.R. § 230.10(d) ........................................................ 6

40 C.F.R. § 230.41 ........................................................... 4

40 C.F.R. § 230.42 ........................................................... 4

40 C.F.R. § 1502.20 .......................................................... 9

40 C.F.R. § 1508.9(a)(1) ...............................................................9

40 C.F.R. § 1508.9(a)(2) ...............................................................9

*Memorandums of Agreement; Clean Water Act Section*
*404(b)(1) Guidelines; Correction,*
55 Fed. Reg. 9,210 (Mar. 12, 1990) .................................................5

*Compensatory Mitigation for Losses of Aquatic Resources,*
73 Fed. Reg. 19,594 (Apr. 10, 2008) .......................................42, 55

*Update to the Regulations Implementing the Procedural*
*Provisions of the National Environmental Policy Act,*
85 Fed. Reg. 43,304 (July 16, 2020) ................................................9

*National Environmental Policy Act Implementing*
*Regulations Revisions,*
87 Fed. Reg. 23,453 (Apr. 20, 2022) ...............................................9

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA | U.S. Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| LEDPA | Least Environmentally Damaging Practicable Alternative |
| LNG | Liquefied Natural Gas |
| LRAM | Louisiana Rapid Assessment Method |
| NEPA | National Environmental Policy Act |

# INTRODUCTION

Petitioners (Healthy Gulf) challenge a Clean Water Act permit that Respondent U.S. Army Corps of Engineers (the Corps) issued in May 2019 to Intervenors Driftwood LNG, LLC and Driftwood Pipeline, LLC (Driftwood). That Permit authorizes Driftwood to discharge fill material into waters of the United States to construct a natural gas pipeline and liquefied natural gas (LNG) terminal near Lake Charles, Louisiana.

The Court should deny the petition. *First*, the Corps thoroughly analyzed seven project alternatives and authorized the least environmentally damaging practicable alternative (LEDPA), as the Clean Water Act requires. Healthy Gulf contends that the Corps did not consider an eighth possible site for the terminal. But during the Corps' public notice and comment period, no one suggested that site was the LEDPA. The Federal Energy Regulatory Commission (FERC) did consider that site and rejected it on environmental grounds. Regardless, any error on the Corps' part was harmless because the Corps already had authorized another entity to develop the site in question, making it unavailable to Driftwood.

*Second*, the Corps properly required Driftwood to provide full compensatory mitigation for all impacts that could not be minimized or avoided. Consistent with the Clean Water Act regulations, the Corps exercised its expert judgment when it allowed Driftwood to mitigate some impacts by buying "credits" from "mitigation banks" and to mitigate other impacts by using dredged material to restore nearby damaged coastal wetlands. Healthy Gulf raises many technical objections to the latter mitigation, but the record shows that the Corps considered and reasonably rejected those objections.

The petition for review should be denied.

## STATEMENT OF JURISDICTION

Healthy Gulf's claims arise under the Clean Water Act, 33 U.S.C. §§ 1311, 1344(a), and the Administrative Procedure Act, 5 U.S.C. § 706(2). This Court has original jurisdiction to review the Driftwood Permit under the Natural Gas Act, 15 U.S.C. § 717r(d)(1), because the pipeline is subject to 15 U.S.C. § 717f, the LNG facility is subject to 15 U.S.C. § 717b(e), and both the pipeline and the terminal are in Louisiana, within this Circuit, AR4.

The Corps issued the Permit on May 3, 2019. AR6. Healthy Gulf filed a timely petition for review on July 19, 2022. *See Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 267-68 (4th Cir. 2018) (holding that statute of limitations under 15 U.S.C. § 717r(d) is either four or six years).

## STATEMENT OF THE ISSUES

1.    Whether the Corps complied with the Clean Water Act by authorizing the least environmentally damaging practicable alternative for Driftwood's LNG facility.

2.    Whether the Corps reasonably required Driftwood to mitigate all unavoidable impacts by purchasing mitigation bank credits and by using dredged material to restore wetlands along the Louisiana coast.

## PERTINENT STATUTES AND REGULATIONS

Pertinent regulations are in the Addendum.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

#### 1.    The Natural Gas Act

Under the Natural Gas Act, FERC has primary authority to approve construction of natural gas pipelines and LNG terminals. 15

U.S.C. §§ 717b(e)(1), 717f(c). FERC does so by issuing a certificate of public convenience and necessity for pipelines and approving applications to construct LNG terminals. *Id.* §§ 717b(e)(1), 717f(e). FERC also serves as "the lead agency for the purposes of coordinating all applicable Federal authorizations" and "for the purposes of complying with the National Environmental Policy Act" (NEPA). *Id.* § 717n(b)(1). Other agencies, such as the Corps, examine specific issues under the statutes that they administer and grant additional, necessary authorizations for natural gas projects to proceed.

### 2.    The Clean Water Act

The Clean Water Act prohibits "the discharge of any pollutant"—including spoil, sand, and rock—without a permit into "navigable waters," which are defined as "waters of the United States." 33 U.S.C. §§ 1311(a), 1362(6), 1362(7), 1362(12). Waters of the United States include "special aquatic sites," such as certain wetlands and mud flats. 40 C.F.R. §§ 230.3(m), 230.41, 230.42.

Section 404 of the Clean Water Act authorizes the Corps to issue permits for discharges of "dredged or fill material" into waters of the United States. 33 U.S.C. § 1344(a). The Corps reviews permit

applications to ensure compliance with statutorily mandated

regulations known as the "Section 404(b)(1) Guidelines," codified at

40 C.F.R. Part 230, and the Corps' permit regulations at 33 C.F.R. Parts

320–332. *See* 33 U.S.C. § 1344(b)(1).

The Guidelines specify that no discharge will be permitted if it

will cause significant degradation of waters of the United States. 40

C.F.R. § 230.10(c). The Corps' goal is "no overall net loss to wetlands,"

and it achieves that goal through a three-step mitigation framework by

(1) avoiding impacts, (2) minimizing impacts, and (3) compensating for

impacts that cannot be avoided or minimized. *Memorandums of

Agreement; Clean Water Act Section 404(b)(1) Guidelines; Correction*, 55

Fed. Reg. 9,210, 9,211-12 (Mar. 12, 1990). Each step is described below.

*First*, as to avoidance, "no discharge of dredged or fill material

shall be permitted if there is a practicable alternative to the proposed

discharge which would have less adverse impact on the aquatic

ecosystem, so long as the alternative does not have other significant

adverse environmental consequences." 40 C.F.R. § 230.10(a). This

requirement is often referred to as identifying the least environmentally

damaging practicable alternative (LEDPA). To be "practicable," an

alternative must be "available and capable of being done after taking
into consideration cost, existing technology, and logistics in light of
overall project purposes." 40 C.F.R. § 230.10(a)(2). Thus, the avoidance
component of the framework means choosing the LEDPA. *Ohio Valley
Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 202 (4th Cir. 2009).
When, as here, a project that is not "water dependent" would discharge
pollutants into a "special aquatic site," the regulations presume that
practicable alternatives not involving special aquatic sites are available,
"unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).

*Second*, minimization means using "practicable project
modifications and permit conditions that minimize adverse impacts."
*Aracoma Coal,* 556 F.3d at 202; *see* 40 C.F.R. § 230.10(d) (mandating
that the Corps require "appropriate and practicable steps" to "minimize
potential adverse impacts of the discharge on the aquatic ecosystem").

*Third*, "compensatory mitigation is used where appropriate to
compensate for unavoidable adverse impacts after all avoidance and
minimization measures have been taken." *Aracoma Coal*, 556 F.3d at
202; *accord* 33 C.F.R. § 332.3(a)(1). The purpose of compensatory
mitigation is to replace "aquatic resource functions that will be lost as a

result of the permitted activity." 33 C.F.R. § 332.3(a)(1). Compensatory

mitigation can include restoring, enhancing, establishing, or preserving

special aquatic sites. *Id.* § 332.3(a)(2). The Corps may require

compensatory mitigation as a permit condition. *Id.* § 325.4(a)(3). The

types and locations of mitigation that the Corps may require are defined

by regulation. 33 C.F.R. § 332.3(b); *see also Atchafalaya Basinkeeper v.*

*U.S. Army Corps of Engineers*, 894 F.3d 692, 699-701 (5th Cir. 2018).

Mitigation comes in three basic types. 33 C.F.R. § 332.3(b). *First*, a

permittee may buy mitigation from a Corps-approved "mitigation

bank," which is a site where a sponsor restores, enhances, establishes,

or preserves wetlands or other resources to sell as compensatory

mitigation. *Id.* § 332.2 ("mitigation bank"). When a permittee makes a

purchase from a mitigation bank, the units of mitigation are known as

"credits." *Id.* (defining "credits"). *Second*, a permittee may similarly

purchase credits from an "in-lieu fee program," which is a governmental

or nonprofit entity-sponsored program to restore, establish, enhance, or

preserve mitigation sites selected in accordance with a framework plan.

*Id.* (defining "in-lieu fee program"); *id.* § 332.8(c) (describing

compensation planning frameworks for in-lieu fee programs). *Third*, a

permittee may conduct a project to provide compensatory mitigation to offset its permitted impacts. 33 C.F.R. § 332.2 (defining "permittee-responsible mitigation"). The regulation includes a general order of preference for mitigation options: (1) mitigation bank credits, (2) in-lieu fee programs, and (3) permittee-responsible mitigation. *Id*. § 332.3(b); *id*. § 332.3(g). But the Corps also has discretion to override this preference. *Id*. § 332.3(b)(2).

### 3.    The National Environmental Policy Act

NEPA is a procedural statute that does not mandate substantive results but does require agencies to consider environmental impacts. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA does not require substantive outcomes, rather it "mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992).

Under NEPA, if the project involves a "major Federal action" that would "significantly affect[] the quality of the human environment," an agency must prepare a detailed Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(C). An agency may also prepare a less

8

detailed environmental assessment to comply with NEPA and to determine whether it is necessary to prepare an EIS. 40 C.F.R. §§ 1508.9(a)(1), (2). NEPA regulations encourage agencies to tier their EISs and environmental assessments to eliminate repetition and focus on the issues ripe for decision. *Id.* § 1502.20.[1]

## B.    Factual background

### 1.    The Project

Driftwood seeks to build the Project to convert natural gas produced in the United States into LNG for export to international markets. AR262. The Project has two main components. AR2404. The first component is an LNG production and export facility (the LNG facility). AR2404. The second component (not at issue here) is a 96-mile pipeline that will connect to existing interstate pipeline systems and transport natural gas to the LNG facility. AR2422.

---

[1] The Council on Environmental Quality amended its NEPA regulations in 2020 and 2022. *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, 85 Fed. Reg. 43,304 (July 16, 2020); *National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23,453 (Apr. 20, 2022). This brief cites the regulations in effect in 2019, when the Corps issued the Permit.

The LNG facility would be located on the west bank of the
Calcasieu River near Carlyss, Louisiana. AR18. The site provides deep
water access for LNG ships to berth, load LNG, and then return down
the Calcasieu Ship Channel to the Gulf of Mexico and then to
international markets. AR262. The facility would include five
liquefaction plants (systems that cool natural gas into liquid form)
capable of producing up to 27.6 million tons of LNG per year for global
export. AR2404. At peak production levels, about one LNG carrier
would be loaded from the facility each day. AR2404.

### 2.    FERC's authorization

In 2016, Driftwood sought FERC approval for the Project.
AR2425. As the lead agency for this natural gas project, FERC complied
with NEPA by preparing an EIS, which included several opportunities
for public input. AR2404-19; AR2426-30. The Corps and other federal
agencies served as cooperating agencies in FERC's development of the
EIS. AR2423-26.

In January 2019, FERC issued the final EIS. The EIS, which
spans more than 500 pages (not including appendices), thoroughly
analyzed and disclosed the potential environmental impacts from the

Project. AR2383-92. FERC evaluated a range of alternatives and eliminated from detailed analysis alternatives that either were not reasonable or practicable. AR2510-11. FERC identified six alternative locations for the LNG facility, which it labeled Alternative Sites 1 through 6. AR2519-24. FERC concluded that Alternative Site 6 "did not provide a significant environmental advantage to Driftwood's proposed site" and thus eliminated it from further evaluation. AR2524.

In April 2019, FERC approved Driftwood's Project. AR558. No one sought judicial review of FERC's approval order.

### 3.    Driftwood's Clean Water Act permit application

In March 2017, Driftwood submitted a formal joint application to the Corps for a Clean Water Act Section 404 permit and to the Louisiana Department of Natural Resources, Office of Coastal Management, for a Coastal Use permit. AR23286-87.

Driftwood needed a Section 404 permit from the Corps because the Project would involve the discharge of dredged or fill material into waters of the United States. Driftwood's proposed location for the LNG facility was a 790-acre property on the west bank of the Calcasieu River. AR257-258. Driftwood's plans for construction and operation

would cover about 718 acres of the site and result in the permanent loss of 319.3 acres of wetlands. AR257-58.

Driftwood also sought a state Coastal Use permit to allow it to beneficially use dredged material. To construct an adequate marine berth for LNG ships, Driftwood needed to dredge and dispose of up to 8.25 million cubic yards of material to create the marine berths where ships would load LNG. AR296-97. Under Louisiana law, a party that planned to dredge more than 25,000 cubic yards within the Louisiana Coastal Zone must either put that material to beneficial use or make a voluntary contribution to a coastal resources fund. AR411-412. Meanwhile, under the Clean Water Act, Driftwood needed to provide compensatory mitigation for the unavoidable, permanent loss of coastal wetlands. AR299.

To meet both obligations, Driftwood proposed to put the dredged material to beneficial use (the Beneficial Use Plan). Instead of simply disposing of the dredged material at an onshore disposal site, Driftwood proposed to use the dredged material in a beneficial and cost-effective manner to restore and protect marsh and other habitat along the Louisiana coast. AR476. Driftwood identified ten areas several miles

southwest of the LNG facility (the Beneficial Use Areas). AR474. Over the past several decades, the Beneficial Use Areas had slowly degraded, and what was once healthy coastal marsh had deteriorated and disappeared. AR476. Driftwood's Plan would restore and create emergent wetlands, estuarine intertidal wetlands, and scrub or shrub wetlands. AR478.

### 4.   The Corps' Permit

From 2017 to 2019, the Corps evaluated Driftwood's request for a Section 404 permit. In March 2018, the Corps issued a Joint Public Notice soliciting public comment on behalf of itself and the Louisiana Department of Natural Resources. AR4776-82. Several parties, including Petitioner Healthy Gulf (then known as Gulf Restoration Network) submitted comments, which the Corps considered. AR263-76. During the public comment period, no commenter suggested that FERC's Alternative Site 6 was the LEDPA or otherwise suggested that the Corps should consider this alternative.

In December 2018, Driftwood submitted three final mitigation documents.[2] The first is the Wetland Mitigation Plan, which describes the compensatory mitigation that Driftwood must provide. AR405-470. Driftwood also submitted the final Beneficial Use Plan, AR471-551, which provides a detailed technical explanation of "where and how" Driftwood would use dredged material to restore and protect degraded coastal marsh habitats. AR297, AR299. Under the Beneficial Use Plan, Driftwood would place up to 8.25 million cubic yards of dredged material several miles southwest of the LNG facility in up to ten areas. AR259. Those ten areas are located within the Louisiana Coastal Zone. AR2683. The Beneficial Use Plan calls for restoring about 496.4 acres of saline marsh and 149.4 acres of fresh marsh (about 650 acres in total). AR300. In the long term, the Beneficial Use Plan seeks restoration and creation of up to 3,009 acres of coastal marsh habitat from future maintenance dredge cycles. AR300. The third mitigation document that Driftwood submitted is a Beneficial Use Implementation Plan, which

---

[2] The mitigation documents are incorporated into the final Permit. *See* 33 C.F.R. §§ 332.3(k), 332.4(c); AR11

outlined a schedule to eliminate delay between Project construction and implementation of the Beneficial Use Plan. AR14-21.

In May 2019, the Corps finalized a 66-page Memorandum for the Record documenting its Clean Water Act and NEPA review. AR256-322. The Memorandum included an Environmental Assessment, which incorporated by reference specific sections of FERC's EIS. AR256. The Memorandum also documented the Corps' evaluation of Driftwood's permit application under the 404(b)(1) Guidelines. AR256.

The Corps prepared a detailed alternatives analysis in which it examined the "no action" alternative, Driftwood's proposed location for the LNG facility, and six alternative locations. AR277-86. The Corps concluded that Driftwood's proposed location was the least environmentally damaging practicable alternative (LEDPA). AR286-87. Like FERC, the Corps labeled the alternatives that it studied Alternative Sites 1 through 6, but only some of those alternatives corresponded to the alternatives that FERC studied in the EIS. In particular, Driftwood's permit application to the Corps did not include

the site that FERC labeled Alternative Site 6, and the Corps did not

discuss that alternative in its analysis.[3]

The Corps also considered compensatory mitigation options.

AR299-302. To ensure that Driftwood compensated for all impacts, the

Corps used the Louisiana Rapid Assessment Method (LRAM), a tool for

assessing and calculating wetlands impacts. AR259, AR265, AR300-301.

Based on the LRAM calculations, the Corps concluded that all impacts

would be mitigated through a combination of credits and the Beneficial

Use Plan. AR300.

The Corps confirmed that Driftwood would purchase mitigation

credits from mitigation banks to offset 134.3 acres of wetland impacts

associated with the LNG facility. AR300. And the Corps approved

Driftwood's Beneficial Use Plan to mitigate the remaining 185 acres of

wetland impacts associated with the LNG facility. AR300. The Corps

concluded that the Beneficial Use Plan, under which Driftwood would

initially restore 650 acres of degraded fresh and saltwater coastal

---

[3] In its permit application to the Corps, Driftwood identified six
alternative sites, including one labeled "Alternative Site 6." AR6526-32;
AR281-82 (Pelican Island site). Later, FERC termed that same
alternative in the EIS as Alternative Site 4. AR2524 (Pelican Island
site).

marsh habitat, with potential to restore up to 3,009 acres of such habitats through maintenance dredging cycles, was "expected to outweigh the traditional mitigation bank credit program for impacts to estuarine, palustrine emergent, and palustrine scrub-shrub wetland communities." AR299.

Based on the detailed analysis in the Memorandum, the Corps concluded that Driftwood's Project complied with the 404(b)(1) Guidelines under the Clean Water Act. AR322. Thus, in May 2019, the Corps issued the Permit to Driftwood. AR4-21. The Corps included thirty-six special conditions in the Permit, including many designed to protect the environment. AR7-13. The conditions include detailed requirements for Driftwood to complete and maintain the Beneficial Use Plan. AR11-12.

More than three years later, Healthy Gulf petitioned for review of the Permit.

## SUMMARY OF ARGUMENT

1.    The Corps chose the least environmentally damaging practicable alternative (LEDPA). Healthy Gulf's argument to the contrary is not supported by the record, the Clean Water Act, or its implementing regulations.

a.    The Corps complied with the 404(b)(1) Guidelines by preparing an independent alternatives analysis. After examining six alternative locations and the no action alternative, the Corps concluded that Driftwood's proposed location for the LNG facility was the LEDPA. Rather than pointing to any flaw in the Corps' independent analysis, Healthy Gulf focuses on an *eighth* location that the Corps did not address (FERC's Alternative Site 6).

b.    Healthy Gulf contends that the Corps should have considered FERC's Alternative Site 6 as the LEDPA, but the Corps correctly permitted Driftwood's proposed location as the LEDPA. *First*, Healthy Gulf faults the Corps for not explicitly discussing FERC's Alternative Site 6 in its decision, but no party timely raised Alternative Site 6 (as the LEDPA or otherwise) when the Corps solicited public comment on Driftwood's joint permit application. If someone had done

so, the Corps undoubtedly would have explained that Alternative Site 6 was unavailable because the Corps had issued a different permit to a different entity for that same location. *Second*, and relatedly, the petition should be denied because Healthy Gulf has failed to show prejudice from the Corps' failure to address FERC's Alternative Site 6 in its decision. Alternative Site 6 was not practicable because it was unavailable. In 2015, the Corps had issued a Section 404 permit to another entity to develop most of Alternative Site 6 for a different project. Because the Corps had issued an unexpired permit for conflicting activities, Alternative Site 6 was not available for Driftwood's LNG facility, and any error by the Corps is harmless.

2.    The Corps correctly ensured that Driftwood fully mitigated all impacts associated with the LNG facility that could not be minimized or avoided.

a.    The Corps reasonably approved of Driftwood's use of mitigation bank credits and the Beneficial Use Plan. Healthy Gulf claims that the Corps is bound by a rigid hierarchy of mitigation options, so the Corps should have required Driftwood to use only mitigation bank credits instead of a combination of credits plus

restoring up to 3,009 acres of marshes. That claim misinterprets the plain language of the compensatory mitigation regulations. The regulations do establish a hierarchy with a preference for mitigation bank credits over permittee-responsible mitigation. But those same regulations also give the Corps discretion to depart from that preference when a particular mitigation option would be environmentally preferable, as is the case here. The Corps reasonably concluded that having Driftwood restore at least 650 acres (and up to 3,009 acres) of degraded coastal marshes was environmentally preferable to having Driftwood purchase mitigation credits equivalent to 185 acres. The Corps thoroughly vetted the Beneficial Use Plan, and other federal and state agencies also provided input on the Plan. The Corps' conclusion reflects its expert judgment and is supported by the record.

b.    Healthy Gulf raises a host of technical objections to the Beneficial Use Plan, but the record shows that the Corps addressed those objections. The Corps included special conditions in the Permit to ensure that Driftwood successfully implements the Beneficial Use Plan. The Court should defer to the Corps' reasoned resolution of the narrow, technical concerns that Healthy Gulf raises.

3.     If the Court finds a flaw in the Corps' decision that is more than harmless error, it should remand the Permit to the Corps without vacatur. The Corps can readily and lawfully reach the same decision by supplying more explanation, either as to alternatives or mitigation. And vacating the Permit would be highly disruptive to the Corps and Driftwood, in no small part because the Corps issued the Permit more than three years before Healthy Gulf filed this petition for review.

## STANDARD OF REVIEW

The Court reviews the Corps' decision to issue a Clean Water Act permit under the standard in the Administrative Procedure Act (APA). *See Buttrey v. United States*, 690 F.2d 1170, 1183 (5th Cir. 1982). Under that deferential standard, courts may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In applying this "highly deferential" standard, *Sabine River Auth.*, 951 F.2d at 678, "a court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Instead, it "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989). Even when the agency's decision is "of less than ideal clarity," the Court should uphold it "if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court "must look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." *City of Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005) (cleaned up).

The APA requires that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. Under that standard, agency action cannot be held unlawful or set aside on account of any error unless the challenger shows that it was harmed by that error. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020).

# ARGUMENT

## I. The Corps selected the least environmentally damaging practicable alternative.

The Corps complied with the Clean Water Act by permitting the least environmentally damaging practicable alternative (LEDPA) for the LNG facility. Healthy Gulf does not contend that any of the six alternatives that the Corps did evaluate is both practicable and less environmentally damaging when compared to Driftwood's proposed location. Healthy Gulf Brief 35-48. Rather, Healthy Gulf asserts that the Corps failed to prove that *another* site identified by FERC (Alternative Site 6) was *not* the LEDPA. *Id*. Although the Corps did not address that eighth site in its decision, no one raised this issue to the Corps during its public comment period. In any event, the fact that the Corps did not explain that Alternative Site 6 was not the LEDPA is at most harmless error because the Corps had issued a permit to another entity for a conflicting activity in that location and thus it was unavailable.

### A.    The Corps conducted a robust alternatives analysis before approving Driftwood's proposed location for the terminal.

The Corps prepared an extensive alternatives analysis to evaluate Driftwood's permit application. Distorting the record, Healthy Gulf inaccurately asserts that the Corps simply deferred to FERC's EIS. Healthy Gulf Brief 42. The Corps incorporated and relied on specific sections of the EIS, but it also did its own alternatives analysis. AR256, AR277-286. Based on that analysis, the Corps rationally concluded that Driftwood's proposed location for the terminal was the least environmentally damaging practicable alternative—the LEDPA.

Before granting Driftwood's permit, the Corps prepared a 66-page Memorandum to meet its obligations under both NEPA and the Clean Water Act. AR256-322. The Corps explained that it had to evaluate a reasonable range of alternatives under NEPA. AR277. The Corps also had to comply with the Section 404(b)(1) Guidelines for Clean Water Act, which required the Corps to ensure that it permitted the LEDPA. AR277.

The Corps did a detailed analysis of alternatives for the terminal and the pipeline. AR277-286. For the terminal—the portion of the

24

Project that Healthy Gulf challenges—the Corps evaluated the no action alternative (that is, not building the terminal) and six alternative locations, on top of Driftwood's preferred site. AR277-286. The Corps eliminated the no action alternative because it did not meet the purpose and need for the Project, which was to meet growing international demand for U.S. natural gas by exporting LNG. AR285. And the Corps explained why none of the six alternative sites was the LEDPA when compared to Driftwood's preferred location. AR277-286. The Corps found that alternatives 1, 2, 4, and 5 were impracticable based on a combination of factors, including current land uses, limited available land, inability to complete contractual negotiations within the Project's schedule commitments, and safety concerns. AR279-280, AR281, AR286. And the Corps found that alternatives 3 and 6 would both result in greater environmental impacts compared to Driftwood's preferred location for the terminal. AR280-282, AR286. The Corps therefore concluded that Driftwood's preferred location was the LEDPA. AR286-287.

Healthy Gulf does not contend that any of the six alternatives that the Corps considered is both practicable and less environmentally

damaging. Healthy Gulf Brief 35-48. Instead, Healthy Gulf focuses on

an eighth potential site that the Corps did *not* discuss (which FERC

labeled Alternative Site 6). Healthy Gulf Brief 25-26, 35-48. But its

argument about that alternative is flawed.

### B. Healthy Gulf's arguments about FERC's Alternative Site 6 are flawed.

Healthy Gulf asserts that the Corps violated the Clean Water Act

because it failed to show that FERC's Alternative Site 6 was not the

LEDPA. Healthy Gulf Brief 35-48. This assertion is flawed in two ways.

### 1. No one raised Alternative Site 6 during the Corps' public notice and comment process.

Under ordinary principles of administrative law, courts "will not

consider arguments that a party failed to raise in timely fashion before

an administrative agency." *Gulf Restoration Network v. Salazar*, 683

F.3d 158, 174-75 (5th Cir. 2012) (quoting *Sims v. Apfel,* 530 U.S. 103,

114-15 (2000) (Breyer, J., dissenting)). The Clean Water Act requires

the Corps to provide public notice and an opportunity for comment on

404 permit applications, affording interested persons the opportunity to

raise issues with the Corps. 33 U.S.C. § 1344(a); 33 C.F.R. § 325.3(a).

And the Corps' regulation on public notice reinforces the importance of

timely presenting issues to the agency: "It is presumed that all interested parties and agencies will wish to respond to public notices; therefore, a lack of response will be interpreted as meaning that there is no objection to the proposed project." 33 C.F.R. § 325.3(d)(3).

This Court recently applied administrative exhaustion principles to its review of a 404 permit. *See Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Engineers*, -- F.4th --, 2023 WL 108558, at *3-4 (5th Cir. Jan. 5, 2023). "Where, as here, parties challenge the Corps' adequate consideration of alternatives, they must structure their participation to alert the agency to their position in order to allow the agency to give the issue meaningful consideration, unless a flaw is so obvious that there is no need to point out the shortcoming." *Id*. at *3 (cleaned up). "Generally, this means raising the alternative in the comments addressed to the agency." *Id*. (citation omitted).

Exhaustion principles apply here too. In March 2018, the Corps issued a public notice that it was considering Driftwood's permit application and soliciting input from the public. AR4775-4782. The Corps received comments from two federal agencies, the Louisiana Department of Wildlife and Fisheries, one individual, and Petitioner

Healthy Gulf (then known as Gulf Restoration Network). AR5267.

Healthy Gulf submitted comments that generally requested an

alternatives analysis. AR5793-5794. No commenter suggested that

Alternative Site 6 was the LEDPA, or even an available alternative. *Cf.*

33 C.F.R. § 325.3(d)(3) ("It is presumed that all interested parties and

agencies will wish to respond to public notices; therefore, a lack of

response will be interpreted as meaning that there is no objection to the

proposed project."); *see also* AR6526-32 (Driftwood's permit application

identified six alternatives but not FERC's Alternative Site 6).

The Corps considered all the comments that it received. AR263-

276. If a party had timely and clearly brought Alternative Site 6 to the

Corps' attention, then the Corps would have had the opportunity to

respond to any argument that Alternative Site 6 was the LEDPA. *See*

*Shrimpers*, 2023 WL 108558, at *5 ("During the comment period and

now, Petitioners wholly fail to substantiate their argument that the

VCP could be acquired by the Developers, and the Corps reasonably

determined that it was not obtainable."); *Gulf Coast Rod, Reel & Gun*

*Club, Inc. v. Corps of Engineers*, 676 F. App'x 245, 251 (5th Cir. 2017)

(observing that it was "not clear that this alternative was ever proposed

to the Corps" and noting that parties challenging NEPA compliance must "structure their participation to alert the agency to their position" unless a flaw is "so obvious that there is no need to point out the shortcoming"). But the comments that the Corps received in response to its public notice did *not* address Alternative Site 6.

Because no one timely raised Alternative Site 6 to the Corps, this Court should decline to consider Healthy Gulf's argument that Alternative Site 6 is the LEDPA. Nor does any established exception to exhaustion apply. *Cf. Gulf Restoration Network*, 683 F.3d at 176-77 (identifying exceptions, including when exhaustion would be futile or when a petitioner asserts constitutional claims). For example, Healthy Gulf cannot claim that Alternative Site 6 is the LEDPA while also contending that it was futile to raise the issue with the Corps. *Cf. id.*

Healthy Gulf claims that "[p]ublic comments urged consideration of" Alternative Site 6, but what Healthy Gulf refers to is one individual's submission of comments to *FERC* on its draft EIS. Healthy Gulf Brief 39-40 (citing AR2524, 3245). During the public comment period for the draft EIS, the commenter stated briefly that FERC had disregarded an alternative that turned out to be Alternative Site 6.

AR4386-4389. When FERC issued the final EIS, it reiterated why it was excluding Alternative Site 6 from further study.[4] AR2519, AR3245.

The Corps also received the commenter's submission to FERC, as well as other emails from the same individual. AR4381-89; AR4516-17. But the Corps noted that the comments were untimely—submitted about six months after the Corps' comment period expired. AR4776-78 (20-day comment period began on March 5, 2018); AR5991 (comment period extended to April 4, 2018); AR4386-4389 (comments in October 2018). The untimely commenter himself admitted this, telling the Corps that "I missed your public notice." AR4517. Even then, instead of belatedly highlighting FERC's Alternative Site 6 as the LEDPA, the untimely commenter stressed to the Corps a very *different* concern— potential contamination of dredged material associated with Driftwood's Beneficial Use Plan. AR4516-17, AR1921-1925.

The Corps concluded that these communications were "way outside" its comment period and that the untimely commenter's concerns about contamination would need to be addressed by FERC and

---

[4] Contrary to Healthy Gulf's assertions (at 36), FERC rejected Alternative Site 6 because of concerns about wetland impacts, including the probable presence of a wetland "vegetation community of special concern." AR2524, AR2631.

other agencies. AR4381-89; AR4516-17; *see, e.g.*, *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("An agency is not required to consider issues and evidence in comments that are not timely filed."). None of this was sufficient to alert the Corps that it should consider whether Alternative Site 6 was the LEDPA. *See Shrimpers*, 2023 WL 108558, at *3-4 (declining to evaluate alternative when petitioners failed to give the Corps "an earlier opportunity to meaningfully consider it").

### 2. The omission of Alternative Site 6 from the Corps' alternatives analysis is at most a harmless error.

The Corps did not address Alternative Site 6 in its alternatives analysis. If that is error, the error is harmless. A site must be practicable to be the LEDPA. The Corps had already issued a permit to another entity to develop Alternative Site 6, so the site was unavailable when the Corps considered Driftwood's permit application and thus not practicable. *See Shrimpers*, 2023 WL 108558, at *5 (an alternative is impracticable when it is unavailable). Healthy Gulf is not prejudiced by the lack of explanation about Alternative Site 6. *See Wages & White Lion Invs. v. FDA*, 41 F.4th 427, 442 (5th Cir. 2022) (assuming without

deciding that agency had erred but concluding that petitioners had failed to show prejudicial error).

To be "practicable," an alternative must be "*available* and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2) (emphasis added). A site that is not owned by the applicant is available only if it "could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity." 40 C.F.R. § 230.10(a)(2). Here, Alternative Site 6 was unavailable to Driftwood because the Corps had already issued a permit for another company's proposed project in that location. *See Shrimpers*, 2023 WL 108558, at *5 (holding that pipeline owned by a different company without sufficient unused capacity to meet the needs of the project was not available and therefore impracticable); *City of Shoreacres*, 420 F.3d at 448 (holding that an alternative site was not available because the Corps had issued a permit to another entity to build a different project at the site).

In 2013, the Corps' New Orleans District received an application for a Section 404 permit for a large portion of Alternative Site 6 to build

a gas to ethanol facility (the Big Lake Fuels Site). *See* Corps' Motion for

Judicial Notice, Exhibit 1.[5] After the public interest review, the Corps

issued permit MVN-2013-02653-WII in June 2015 (the Big Lake Fuels

Permit). *Id.*, Exhibit 2. The permit authorized the company to conduct

work until June 30, 2020. *Id.*, Exhibit 3 at 1. The Big Lake Fuels

Project includes plans for a methanol plant, storage tanks, and a dock

and loading berth along the Intercoastal Waterway. *Id.*, Exhibit 3,

Figure Number 3 (at PDF p.12).

    In February 2019 and April 2020, the Corps issued public notices

for potential modifications to the Big Lake Fuels Permit. *Id.*, Exhibits 4,

5, 6. Thus, the Big Lake Fuels permittee showed its continued intent to

proceed with the project by requesting modifications of its unexpired

permit in 2020, and the Corps did modify the Big Lake Fuels Permit in

2021. *Id.*, Exhibits 4, 5, 6. In other words, during the entire time the

Corps was evaluating Driftwood's permit application—from 2017 to

---

[5] Concurrently with the filing of this brief, the Corps has moved the Court to take judicial notice of the existence of the Corps' permit for activities at FERC's Alternative Site 6, as well as the geographic location of that site. *See* Corps' Motion for Judicial Notice 1-11.

May 2019—most of Alternative Site 6 was within the footprint of another proposed project that had already been permitted by the Corps.

The overlap can be seen by comparing Figures 1 and 2 on the following pages. *Cf.* Healthy Gulf Brief 41 (depicting Figure 1). Figure 1 shows Alternative Site 6 (yellow boundaries), while Figure 2 shows the areas that the Corps permitted under the 2015 Big Lake Fuels Permit (purple boundaries), as well as the permittee's 2020 request to modify the Permit by expanding the permitted activities (red boundaries). *Id.* at 7. Both Alternative Site 6 and the Big Lake Fuels Site occupy similar river frontage along the Intercoastal Waterway, north of Choupique Island (the island in the center of Figure 1 and at the bottom left part of Figure 2).

Figure 1. FERC's EIS diagram showing Alternative Site 6 (yellow boundaries) and Driftwood's proposed site (purple boundaries). AR2522.



Figure 2. Corps' diagram of Big Lake Fuels Site (purple boundaries for 2015 permit and red boundaries for 2020 modification to expand site).



Alternative Site 6 was unavailable because the Corps had already issued a permit for the Big Lake Fuels project, which would put much of Alternative Site 6—critically including the river frontage—to a conflicting use. *See City of Shoreacres*, 420 F.3d at 448 (upholding the Corps' determination that an alternative was impracticable because it "would frustrate the overall project purpose in the further sense that it would needlessly complicate, rather than simplify, the logistics"). The "mere, unsupported theoretical possibility of acquiring" an alternative site "does not constitute a showing that the alternative site is reasonably obtainable, much less that the Corps' decision was arbitrary and capricious." *Id.* at 449. That is all the more true when the Corps had issued a permit for a different project on Alternative Site 6.

Under the APA, the Court must take "due account" of the rule of prejudicial error. 5 U.S.C. § 706. The harmless error rule requires Healthy Gulf to show prejudice from an asserted error. *City of Arlington, Texas v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013). The fundamental question is whether the agency's error "clearly had no bearing on the procedure used or the substance of decision reached." *Id.* at 244 (cleaned up). Healthy Gulf argues that the

Corps substantively violated the Clean Water Act because it did not address FERC's Alternative Site 6. But that site was unavailable because the Corps had issued a permit for most of Alternative Site 6. A site that is not available is not practicable and cannot be the LEDPA. 40 C.F.R. § 230.3(l). The Corps' inclusion of this explanation in its decision document unequivocally would not have changed the decision. As for the Clean Water Act's requirement to permit the LEDPA for Driftwood's LNG facility, the Corps' decision is clearly correct. *See Texas Tech Physicians Associates v. U.S. Dep't of Health & Human Servs.*, 917 F.3d 837, 846-47 (5th Cir. 2019) (acknowledging the *Chenery* doctrine but finding harmless error when the agency did not expressly address two defenses raised by the petitioner before the agency); *cf.* Healthy Gulf Brief 43 n.11 (asserting that Corps "cannot now claim the site was impracticable").

\* \* \*

To sum up, the Corps did a robust LEDPA analysis before selecting Driftwood's proposed location for the LNG facility. Healthy Gulf's claim that the Corps should have selected Alternative Site 6 as the LEDPA is incorrect because: (1) no one suggested that site was the

LEDPA during the Corps' notice and comment process; and (2) the omission of the site from the Corps' LEDPA analysis is at most a harmless error because the site was unavailable. In short, the "permitted project is the LEDPA." *Shrimpers*, 2023 WL 108558, at \*5; *see also id*. ("The Corps has satisfactorily explained its reasons for rejecting the alternatives previously presented to it and more than met the minimal standards of rationality required for our review.").

## II. The Corps properly required mitigation for all project impacts that could not be minimized or avoided.

The Corps properly required Driftwood to mitigate all project impacts that could not be minimized or avoided. Healthy Gulf objects to the Corps' approval of the Beneficial Use Plan, but it misreads the Clean Water Act regulations and this Court's *Basinkeeper* decision, and it raises technical objections that are undercut by the Corps' thorough evaluation of the Plan.

### A. The Corps required full compensatory mitigation through a combination of mitigation bank credits and the Beneficial Use Plan.

The Corps adhered to its framework for compensatory mitigation. The Corps' regulations are not as rigid as Healthy Gulf contends. And the Corps fully justified its decision to require Driftwood to offset some

wetland losses by purchasing mitigation bank credits and other losses

through the Beneficial Use Plan.

> ### 1.    The mitigation hierarchy allows the Corps to exercise its expert judgment when determining the appropriate mitigation options.

The Corps' compensatory mitigation regulations create a

hierarchy for the types and locations of compensatory mitigation that

the Corps requires. 33 C.F.R. § 332.3(b)(1); *see also Atchafalaya*

*Basinkeeper v. U.S. Army Corps of Engineers*, 894 F.3d 692, 699-701

(5th Cir. 2018) (describing the hierarchy). The regulation includes a

*preference* for mitigation options in the following order: (1) mitigation

bank credits, (2) in-lieu fee programs, and (3) permittee-responsible

mitigation. 33 C.F.R. § 332.3(b). In honoring this *preference*, the Corps

still must exercise its expert judgment to ensure that the "fundamental

objective of compensatory mitigation" is met—to "offset environmental

losses resulting from unavoidable impacts." *Id*. § 332.3(a). And when

evaluating compensatory mitigation options, the district engineer is

required to "consider what would be environmentally preferable." *Id*.

Healthy Gulf misinterprets the regulations. Healthy Gulf Brief 50-

52, 55. In Healthy Gulf's view, the Corps must mechanically require a

permittee to purchase all mitigation bank credits that are available; only if no credits are available may the Corps move to the next mitigation option. *Id.* at 55.

The plain language of the regulation contravenes that view. When considering options for "*successfully* providing the required compensatory mitigation," the district engineer "shall *consider* the type and location options in the order presented" in 33 C.F.R. § 332.3(b)(2) through 332.3(b)(6). *Id.* § 332.3(b)(1) (emphasis added). In turn, the mitigation bank credits provision describes the advantages of a mitigation bank and directs that the district engineer "should give preference to the use of mitigation bank credits when these considerations are applicable." *Id.* § 332.3(b)(2). But the very next sentence notes that "these same considerations may also be used to *override* this preference, where appropriate." *Id.* (emphasis added). And one of the examples given for overriding the preference is when a permittee-responsible project "will restore an outstanding resource based on rigorous scientific and technical analysis." *Id.* In short, the regulation sets a clear *preference* for mitigation bank credits over other

mitigation options, but it also imbues the district engineer with discretion to override that preference.

As the Corps explained when promulgating the regulations, they strike a "proper balance of binding requirements and discretion." *Compensatory Mitigation for Losses of Aquatic Resources*, 73 Fed. Reg. 19,594, 19598 (Apr. 10, 2008). The regulations provide "flexibility necessary to ensure that compensatory mitigation requirements for a particular [] permit appropriately offset authorized impacts." *Id*. The Corps stressed the need for "discretionary language" because resource types, project impacts, and compensatory mitigation practices "vary widely across both projects and regions of the country." *Id*. The discretion in the regulations thus promotes "both regulatory efficiency and project success" and ensures that "required mitigation is practicable." *Id*. And the preference hierarchy "does not override a district engineer's judgment as to what constitutes the most appropriate and practicable compensatory mitigation based on consideration of case-specific circumstances." *Id*. at 19,628.

The Corps' interpretation of the plain regulatory text also accords with this Court's decision in *Atchafalaya Basinkeeper v. U.S. Army*

*Corps of Engineers*, 894 F.3d 692 (5th Cir. 2018). In *Basinkeeper*, the Court upheld the Corps' decision to require a project applicant to purchase mitigation bank credits—the first step in the mitigation hierarchy—rather than requiring (as those plaintiffs urged) the permittee to clean up degraded areas. *See id.* at 700 ("If this language does not set up a plain 'hierarchy' strongly approving of mitigation banks—as opposed to the Appellants' proffered clean-up by Bayou Bridge of spoil banks created by other pipeline builders long ago—it is hard to know what would do."). Thus, this Court agreed with the Corps that the regulations set up a plain "'hierarchy' strongly approving of mitigation banks." *Id.* at 700.

But the Court also acknowledged that the regulations contained another preference for in-kind mitigation over out-of-kind mitigation. *Basinkeeper*, 894 F.3d at 700 (quoting 33 C.F.R. §§ 332.3(e)(1)).[6] That preference included a "critical exception" that authorized the Corps to depart from the preference for in-kind mitigation based on the district

---

[6] "In-kind" means a resource of a similar structural and function type to the impacted resource, while "out-of-kind" means a resource of a different type than the impacted resource (bottomland hardwood versus pine forest savannah). 33 C.F.R. § 332.2 (defining "in-kind" and "out-of-kind").

engineer's judgment. *Basinkeeper*, 894 F.3d at 700 (quoting 33 C.F.R.

§ 332.3(e)(2)). Looking again to the regulation's plain text, the Court

explained that the Corps could allow the permittee to purchase out-of-

kind credits within the same watershed if they "*serve the aquatic*

*resource needs of the watershed* and if the Corps' reasoning is

*documented in the administrative record.*" *Id.* (citing 33 C.F.R.

§ 332.3(e)(1), (2)). Thus, the question for the Court was simply "whether

the Corps sufficiently documented" how credits that it required "serve

the Basin's aquatic resource needs." *Id.* at 700.

Healthy Gulf misreads *Basinkeeper* when it contends (at 52) that

this Court "explicitly rejected arguments that the regulations allow a

flexible approach to optimize mitigation." *Basinkeeper* honored the plain

language of the regulations, which sets a hierarchy and identifies

reasons that the Corps may depart from that hierarchy. 894 F.3d at

699-703. *Basinkeeper* also highlighted both the APA's deferential

standard of judicial review for administrative decisions and the

"particular judicial deference" that this Court affords to the Corps when

it employs its scientific judgment and expertise. *Id.* at 701-703 (cleaned

up). In other words, *Basinkeeper* affirmed that within the regulatory

framework, the Corps has discretion to determine the environmentally preferable outcome for compensatory mitigation and to tailor the mitigation plan to best achieve that outcome. 33 C.F.R. §§ 332.3(a), (b). The Corps did that here, as discussed next.

### 2. Exercising its expert judgment, the Corps approved a mitigation plan that fully compensates for permanent wetland losses.

Before issuing the Permit, the Corps rigorously scrutinized Driftwood's proposed mitigation plan, required changes to improve the plan, and explained its reasons for approving different types of mitigation for different impacts—as the regulations contemplate. Based on this thorough analysis, the Corps concluded that Driftwood would fully compensate for *all* permanent wetland impacts associated with the Project that could not be avoided or minimized. The Corps also found that Driftwood's Beneficial Use Plan would not only compensate for the 185 acres of impacts but also has the potential to create a significant environmental benefit exceeding the required mitigation—up to 3,009 acres of restored coastal wetlands. Contrary to Healthy Gulf's assertions, the Corps' application of its expert judgment is reasonable and supported by the record.

*First*, to begin with the big picture, the Corps required Driftwood to fully compensate for the permanent loss of 319.3 acres of wetlands associated with the LNG facility. AR300. To ensure that Driftwood compensated for all impacts, the Corps relied on the Louisiana Rapid Assessment Method (LRAM). AR301; 33 C.F.R. § 332.3(f)(1). The Corps' New Orleans District employs the LRAM as a technical tool to assess the loss in wetland functions attributable to a permitted project and to determine the proper amount of mitigation required to offset those losses. *Basinkeeper*, 894 F.3d at 701 (identifying half a dozen factors that LRAM examines to score wetlands impacts). This Court upheld the Corps' reliance on the LRAM model in *Basinkeeper*, concluding that the LRAM is "the type of 'functional assessment' tool that the [Clean Water Act] regulation advises 'should be used' to 'determine how much compensatory mitigation is required." 894 F.3d at 700 (quoting 33 C.F.R. § 332.3(f)(1)).

Relying on the LRAM calculations, the Corps approved of Driftwood buying credits from mitigation banks to compensate for 134.3 acres of impacts to bottomland hardwood and coastal prairie wetlands. AR265, AR259, AR300, AR418-420, AR426-36. For the remaining 185

acres of impacts to wetlands for the LNG facility, the Corps also relied on the LRAM calculations to approve Driftwood's Beneficial Use Plan to restore 496.4 acres of saltwater marsh and 149.4 acres of fresh marsh. AR265, AR259, AR300, AR418-420, AR426-36.[7] Based on these LRAM calculations, the Corps concluded that "[a]ll impacts will be mitigated" through mitigation bank credits and the Beneficial Use Plan. AR300.

Healthy Gulf challenges the Corps' reliance on the LRAM calculations. Healthy Gulf Brief 58-59. But Healthy Gulf misapprehends *how* the Corps used the LRAM tool. The Corps used the LRAM calculations to ensure that Driftwood fully compensated for all permanent wetland losses, through a combination of mitigation bank credits and implementation of the Beneficial Use Plan. AR300. On that score, Healthy Gulf has pointed to no errors in the LRAM calculations that would call the Corps' conclusion into question. *See Basinkeeper*, 894 F.3d at 701-02 (upholding the Corps' LRAM analysis).

---

[7] In August 2017, Driftwood proposed to use the Beneficial Use Plan to mitigate for 288.6 acres of impacts. AR18424, AR18439. But by October 2017, Driftwood had revised its proposal to purchase mitigation bank credits for 103.6 acres of those impacts and to use the Plan to mitigate for the remaining 185 acres. AR13399, AR13416.

*Second*, the Corps rationally allowed Driftwood to implement the Beneficial Use Plan rather than buy more mitigation bank credits. AR259, AR299-301. The Corps agrees with Healthy Gulf that the Beneficial Use Plan is a form of permittee-responsible mitigation because Driftwood retains responsibility for successful implementation. AR12 (Special Condition 36.i.); Healthy Gulf Brief 53-55. So the question is whether the Corps sufficiently documented its decision to allow Driftwood to depart from the preference for mitigation bank credits over permittee-responsible mitigation, as authorized by 33 C.F.R. § 332.3(b). *See* Argument Point II.A.1.; *see also Basinkeeper*, 894 F.3d at 700.

The Corps did so. The record shows that the Corps rationally concluded that the Beneficial Use Plan's environmental benefits outweighed the benefits of buying credits for the 185 acres of wetland impacts. At the threshold, the Plan required Driftwood to fully compensate for the 185 acres of impacts by restoring 650 acres of coastal marsh wetlands. AR259. And in the long term, the Plan also was expected to restore up to 3,009 acres of marsh habitat, much more

than the 185 acres of coastal wetlands impacts for which Driftwood had to compensate. AR259.

In addition, Driftwood's proposal to beneficially use dredge material accorded with Louisiana state law and with Louisiana's Master Plan for Coastal Protection and Restoration and the goals of the Chenier Plain Coastal Protection and Restoration Authority. AR2478. In practical terms, Louisiana has lost significant coastal wetlands in recent decades, and the State has developed programs to promote restoration of those wetlands to protect coastal areas. The Beneficial Use Plan advances these important State goals by rebuilding coastal wetlands. AR296-97. The Corps concluded that the Beneficial Use Plan would restore degraded fresh and saline coastal marsh and that "these results are expected to *outweigh* the traditional mitigation bank credit program." AR299 (emphasis added). The Corps reached a rational conclusion based on its expert judgment. *Basinkeeper*, 894 F.3d at 700-703; *see* 33 C.F.R. §§ 332.3(a)(1), (b)(1), (b)(2).

In departing from the preference for mitigation bank credits, the Corps also relied on scientific and technical analysis of the Beneficial Use Plan. AR471-551; AR299-301; *see* 33 C.F.R. § 332.3(b)(2) (indicating

that the Corps may "override" the preference for credits, "where

appropriate as, for example, where" a permittee-responsible project

"will restore an outstanding resource based on rigorous scientific and

technical analysis"). The record shows that Driftwood developed the

Plan over several years, with the Corps reviewing Driftwood's proposals

and requiring changes to address specific technical concerns. AR920-25;

AR554-55; AR6361-62.

Before approving the Beneficial Use Plan, the Corps also made

sure that other federal and state agencies provided input. AR2619. The

Corps coordinated the LRAM calculations and final compensatory

mitigation plans with the U.S. Environmental Protection Agency (EPA)

and the Louisiana Department of Wildlife and Fisheries (the Wildlife

Department). AR265, AR270. The Corps responded to input from the

Wildlife Department by adding a special condition in the permit.

AR270. Ultimately, both agencies concurred in the final mitigation

plans that the Corps approved. AR265, AR270, AR2275-78, AR3481-83.

Driftwood also consulted the National Marine Fisheries Service about

the Plan, which agreed that the Plan would ensure that construction of

the LNG facility would not cause significant adverse impacts to essential fish habitat. AR2617; AR10792-94.

The Corps and Driftwood also discussed the Plan with the Louisiana Department of Natural Resources Office of Coastal Management, the state agency responsible for managing coastal resources. AR299. That Office granted a Coastal Use Permit authorizing Driftwood to implement the Plan. AR902-07. Finally, during its NEPA review, FERC also considered the Plan and concluded that "re-creation of emergent wetlands" within the Plan sites "would offset adverse impacts on wetlands from construction and operation of the LNG Facility, resulting in long-term benefits to wetlands near the LNG Facility." AR2620; AR2478-79. Only after vetting the Beneficial Use Plan with other federal and state agencies did the Corps approve Driftwood to use the Plan. AR920; AR299-301.

Healthy Gulf contends that the Corps failed to justify the Beneficial Use Plan. Healthy Gulf Brief 55-59. To be sure, the Corps misstated in its decision that the selected compensatory mitigation did not deviate from the order of options in the regulation, so it did not need to provide a rationale for a deviation. AR301. But just two pages earlier

in its decision, the Corps *did* explain why it was deviating from the preference for mitigation bank credits—because it expected the Plan's results to "outweigh the traditional mitigation bank credit program" for specific types of coastal wetlands. AR299.

Healthy Gulf does not acknowledge that explanation. Nor does it confront the record evidence that the Corps, along with other state and federal agencies, thoroughly scrutinized the Plan to ensure that Driftwood would "restore an outstanding resource based on rigorous scientific and technical analysis." 33 C.F.R. § 332.3(b)(2). Even if the Corps' discussion "might have been improved with the addition of certain details," its "path could 'reasonably be discerned'" from the record and therefore should be "upheld." *Basinkeeper*, 894 F.3d at 699 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). That is even more so here, where the Corps was acting within its core expertise to determine the most environmentally preferable way to provide full compensatory mitigation for all impacts from the Project. 33 C.F.R. § 332.3(a); *see Basinkeeper*, 894 F.3d at 700-703; *id.* at 701 ("In general, the Supreme Court has held that the use of

scientific methodology like that contained in the LRAM is subject to particular judicial deference.").

Healthy Gulf advances two other incorrect arguments about the mitigation hierarchy. The first argument is that the Corps failed to show that higher-preference alternatives were unavailable. Healthy Gulf Brief 55. But the plain text of the regulations does *not* require the Corps to exhaust mitigation bank credits and in-lieu fee program credits before permitting a permittee-responsible mitigation project. *See* Argument Point II.A.1.

The second argument is that *Basinkeeper* "foreclosed" the Corps from selecting the Beneficial Use Plan over higher-tier mitigation options. Healthy Gulf Brief 57-58. *Basinkeeper* did not so hold. *See* Argument Point II.A.1. Healthy Gulf also contends that the Corps has made a stark change in its purported position that the mitigation hierarchy is "rigid and inflexible." Healthy Gulf Brief 57-59. But the Corps' consistent position is that there *is* a preference hierarchy for types of mitigation, that it will provide appropriate justification when it departs from that hierarchy, and that it may reasonably do so based on its expert judgment of environmental benefits. The Corps did so here.

**B.    Healthy Gulf's technical objections to the Beneficial Use Plan lack merit.**

Finally, Healthy Gulf raises two objections to the Beneficial Use Plan, but they reflect technical issues that the Corps addressed before approving the Plan. Health Gulf Br. 59-68. This Court "must be most deferential to the agency where, as here, its decision is based upon its evaluation of complex scientific data within its technical expertise." *Shrimpers*, 2023 WL 108558, at *6 (cleaned up).

**1.    The Permit includes special conditions to ensure that Driftwood successfully restores wetlands.**

Healthy Gulf contends (at 61-63) that the Plan and Permit conditions fail to ensure that Driftwood will create high quality wetlands, but the record disproves that contention. Both the Beneficial Use Plan and the Permit conditions require Driftwood to create and maintain healthy coastal wetlands that are spatially and functionally successful over the long term.

Take for example, Healthy Gulf's assertion that the Plan proposes to replace high quality wetlands with low-quality restored wetlands that have "dubious prospects for success." Healthy Gulf 61. Healthy Gulf notes (at 61) that the Corps must ensure that compensatory

mitigation produces a "high level of functional capacity, even when compensating for degraded or low-quality resources." 73 Fed. Reg. at 19,601. But the very next sentence of that regulation explains that the Corps may "adjust for the relative quality of impact sites and mitigation projects, where appropriate." *Id*. And the Corps is encouraged to rely on functional assessments. *Id*.

That is exactly what the Corps did here. The LRAM calculations show that because Driftwood will create *more* new wetlands than the Project will impact, the additional wetland acreage will ensure complete replacement of lost ecological values—even if the created wetlands may have lower functional value than the lost wetlands. *See* AR433-435 (same document cited by Healthy Gulf at AR2326-28) (showing, for example, that of 126.2 impacted acres, the LRAM impacts would be 1,489.2, while the LRAM mitigation would 2,805.4); AR300.

Healthy Gulf questions whether the performance standards in the Beneficial Use Plan will ensure the restored wetlands flourish in the longer term. Healthy Gulf Brief 62-63. Healthy Gulf fails to note that along with the performance standards, the Plan also contains long-term

performance criteria for various metrics, including target elevation, turbidity, tidal exchange, and vegetative plantings. AR490-96.

Besides, two Permit conditions directly address Healthy Gulf's concerns. *First*, Special Condition 36.a. specifies that Driftwood must execute "successful completion and maintenance" of the Beneficial Use Plan and the marsh re-establishment and creation component of the Project, or it will need to provide additional compensatory mitigation. AR11. If any part of the Plan becomes infeasible, delayed, or fails to occur, Driftwood will have 30 days to resolve the issue. AR11.

*Second*, the Corps may require additional compensatory mitigation for any temporal lag or other deficiencies in the Plan. AR11. Special Condition 36.j. specifies that the Beneficial Use Plan and marsh re-establishment part of the Project "must be maintained to its fullest extent, *both spatially and functionally*, for a period of not less than 20 years." AR12 (emphasis added). Together these two conditions require Driftwood to ensure that the 650 acres of restored wetlands are successful for over two decades, both spatially and functionally, or the Corps may step in and require additional compensatory mitigation.

But that is not all. The Corps included many other special

conditions in the Permit to ensure Driftwood successfully implements

the Beneficial Use Plan:

- Driftwood must provide the Corps with as-built drawings, data, and photographs of the Beneficial Use Areas within 30 days of construction, AR11;

- Driftwood must submit monitoring reports on site conditions with data, maps, and photographs after years two, five, ten, and twenty, AR12;

- Driftwood must ensure 80 percent vegetative coverage with non-invasive wetland species by the third growing season or it must plant native species annually until 80 percent coverage is achieved through a complete growing season, AR12;

- Driftwood must control exotic and invasive species to keep those species below about 3 percent of the vegetative cover, AR12;

- Driftwood must breach, remove, or degrade containment dikes and structures to return areas to natural hydrologic tidal connectivity, AR12;

- Driftwood must promptly notify the Corps if any area is destroyed or adversely impacted within the 20-year maintenance timeframe and must restore the affected area or acquire compensatory mitigation if remediation is infeasible, AR12.

Healthy Gulf also questions the potential temporal gap between

impacts and restoration of wetlands. Healthy Gulf Brief 63. The Corps

addressed this in Special Condition 36.b., which requires Driftwood to

establish the Beneficial Use Areas simultaneously with impacts from

constructing the LNG facility. AR11. Reinforcing this restriction on temporal loss, the Permit also prohibits the facility-related acres that Driftwood impacts from exceeding the acres that Driftwood creates through beneficial placement of dredged material. AR11. To implement Special Condition 36.b., Driftwood developed a schedule for placing dredged material that will result in minimal temporal lag between wetland impacts and new marsh habitat created in the Beneficial Use Areas. AR18-20.

Finally, the Louisiana Department of Natural Resources, Office of Coastal Management imposed even more conditions on Driftwood related to the Beneficial Use Plan when it granted Driftwood a Coastal Use Permit. AR902-907. Many of those conditions reinforce and complement the special conditions in the Clean Water Act Permit. The combined effect of the Permit's conditions is that Driftwood must ensure that the Beneficial Use Plan restores at least the 650 acres of coastal wetlands required to compensate for the 185 acres of impacts or the Corps can require more compensatory mitigation.

### 2. The Corps reasonably resolved technical issues about the Beneficial Use Plan.

Healthy Gulf inaccurately asserts that the Corps "failed to address serious concerns that would fundamentally undermine" the Beneficial Use Plan. Healthy Gulf Brief 63. The record shows that the Corps *did* address those concerns. Healthy Gulf simply disagrees with *how* the Corps did so, which offers no grounds for overturning the Corps' decision.

*First*, Healthy Gulf contends that the Corps failed to address concerns raised by the Louisiana Department of Wildlife and Fisheries about a rock embankment that prevented fish from reaching Beneficial Use Area 4. Healthy Gulf Brief 63-65. Yet the Corps and Driftwood *did* address that issue, as Healthy Gulf admits. *Id*. at 64-65. The Wildlife Department agreed with Driftwood that the embankment allowed hydrologic connectivity for the wetlands in Area 4 but pushed for Driftwood to install access points for fish in the embankment. AR3473; AR2277. Driftwood explained that the embankment was a critical project built in 1997 to combat severe erosion of wetlands in Area 4 and could not be modified without risking serious erosion. AR3469-3473. Based on these discussions, the Wildlife Department concluded that

because Driftwood was creating a surplus of estuarine wetlands and tidal connections in Area 8, its concerns about the fish dips "ha[d] been alleviated." AR2275. After the Wildlife Department communicated that its concerns were resolved, the Corps rationally chose to move forward with its review. AR2264-65.

Although Driftwood could not modify the embankment in Area 4, it found other ways to ensure that aquatic biota could reach restored wetlands. Driftwood adopted the National Marine Fisheries Service's recommendation to create gaps in the containment dikes in Area 5 to allow access for fish. AR268-269. And Driftwood plans to open Area 8 to allow tidal exchange access for aquatic biota. AR269. In the end, the Wildlife Department concurred in the final mitigation plan and did not object to the Permit's issuance. AR270.

*Second*, Healthy Gulf contends that the Corps "ignored concerns" about potential contamination in the dredge material that Driftwood plans to put to beneficial use. Healthy Gulf Brief 65-69. Here again, the record reflects that the Corps did *not* ignore those concerns. Beginning in 2017, early in the environmental review process, the Corps and FERC both raised the risk of contaminated dredged material with

Driftwood. AR22883-86 (FERC July 2017 request for information on "dredging near or in areas with known or potential contaminated soil and groundwater"), AR22874-75 (Corps' July 2017 emails addressing potential contamination), AR13438-39 (Corps' October 2017 email stating "we do not concur" with Driftwood's letter).

As Healthy Gulf notes, a Corps employee stated in September 2018 that the Corps was "punting to FERC" on the contamination issue. Healthy Gulf Brief 66 (AR4566). But that one email does not present the Corps' full analysis of this issue. *See, e.g.*, *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1186-87 (10th Cir. 2013) ("[A] diversity of opinion by local or lower-level agency representatives will not preclude the agency from reaching a contrary decision, so long as the decision is not arbitrary and capricious and is otherwise supported by the record."); *see also Nat'l Ass'n of Home Builders*, 551 U.S. at 658-59 ("[T]he fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.")

In fact, the Corps stayed engaged on the issue and continued discussing it with FERC and Driftwood. AR4381-89 (November 2018

request from FERC for the Corps' input on contamination issue),

AR3490-92 (November 2018 email noting that the Corps needed to

discuss the contamination issue with FERC). For example, in November

2018, the Corps reviewed and provided input on Driftwood's proposed

response to a public comment on the contamination issue for the EIS.

AR3884-87.

After the Corps and FERC collaborated on this issue, FERC

thoroughly addressed the potential for contaminated dredged material

in the final EIS. AR2573-77, AR2584. FERC observed that Driftwood

had developed both a Risk Management Plan and an Unanticipated

Discoveries Plan to account for the possibility of encountering

contaminated material while dredging or excavating the site. AR2576-

77. Driftwood consulted the Louisiana Department of Environmental

Quality, which approved of Driftwood's proactive approach. AR2584.

Driftwood also committed to not dredge a small area of the site where

the soil and sediment was not tested. AR2576. In light of the extensive

technical record, FERC concluded that Driftwood's activities "would not

mobilize existing contaminated soils." AR2577. FERC's technical

judgment is sound.

Healthy Gulf contends (at 66) that FERC's conclusions are "flawed," but that objection is misdirected and untimely. No one, including Healthy Gulf, challenged FERC's conclusions when it issued the final EIS and approved Driftwood's Project. Given that the Corps engaged closely and cooperated with FERC to address the potential contamination risks during the NEPA process, the Corps could reasonably rely on FERC's conclusions. To be sure, the Corps "cannot just rubberstamp another agency's assurances" for any aspect of its analysis. *Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013). But if another agency has "conducted a responsible analysis the Corps can rely on it in making its own decision." *Id*.

Yet the Corps did not merely adopt FERC's technical conclusions, as Healthy Gulf asserts; it also addressed the issue in the Permit. The Corps included two special conditions in the Permit to prevent Driftwood from placing contaminated dredge material in the Beneficial Use Areas. The Permit requires that "any excavated and/or fill material placed within wetlands must be free of contaminants to the best of the permittee's knowledge." AR7. And the Permit requires that Driftwood

"shall at all times exercise due caution as not to allow contaminants from the construction process to enter waters of the [United States]." AR13. These Permit conditions contradict Healthy Gulf's contentions that the Corps blindly adopted FERC's conclusions in the EIS and brushed aside concerns about potential contamination. *Cf.* Healthy Gulf Brief 66-69.

What is more, the Louisiana Department of Natural Resources imposed similar conditions on Driftwood in the Coastal Use Permit. AR902-907. Thus, the Coastal Use Permit requires Driftwood to ensure that all fill material "shall be clean and free of contaminants and shall not contain hazardous materials such as asbestos or asbestos residue, shingles, tires, oil/grease residue, exposed rebar, protruding objects, etc." AR904; *see also* AR905 ("No hydrocarbons, substances containing hydrocarbons, drilling mud, drilling cuttings, and/or toxic substances shall be allowed to enter adjacent waterways and wetlands.").

Healthy Gulf asserts that the Corps failed to address two narrow technical aspects of the potential contamination issue, but neither has merit. Healthy Gulf Brief 67-69. *First*, Healthy Gulf asserts that the Corps arbitrarily relied on FERC's conclusion that oversight by the

Louisiana Department of Environmental Quality would ensure that no contaminated material was used. Healthy Gulf Brief 67. Healthy Gulf claims this reliance was arbitrary because the Louisiana Department of Environmental Quality was only overseeing contamination at one location on the site. Healthy Gulf Brief 67. But Healthy Gulf misinterprets the record, which shows that the Louisiana Department of Environmental Quality's oversight extended beyond contamination discovered at that location. AR2573-2576. Moreover, FERC and the Corps reasonably relied on Driftwood's commitment to not dredge in areas that were contaminated—a commitment that the Corps is enforcing through the Permit conditions. AR2577, AR7, AR13.

Healthy Gulf also criticizes FERC for "effectively" using state contamination standards (abbreviated RECAP), even though the Corps had observed that it did not use RECAP standards as a pass or fail metric for beneficial use. Healthy Gulf Brief 67 (quoting AR22874). According to Healthy Gulf, the Corps "failed to address this discrepancy," *id.* at 67, but a closer look at the record shows that the Corps did address the issue by agreeing with Driftwood's and FERC's reference to an EPA manual on contamination testing. AR2574-76

(FERC's conclusion in the EIS that "the intent of the [EPA manual] is satisfied"); AR3884-86 (Corps' approval of Driftwood's resolution of the relationship between the RECAP and EPA manual standards).

*Second*, Healthy Gulf claims that the Corps failed to satisfy an independent duty to ensure that Driftwood would not deposit contaminated material into the Beneficial Use Areas. Healthy Gulf Brief 67-68. But Healthy Gulf fails to acknowledge the Permit conditions that the Corps included to prohibit Driftwood from using contaminated material. AR7, AR13. Stepping back, the record shows that the Corps (1) carefully addressed the risk of contamination throughout the environmental review; (2) reasonably relied on FERC's technical conclusions in the EIS; and (3) independently addressed the risk of contamination by including express conditions in the Permit.

At bottom, Healthy Gulf is objecting to the Corps' resolution of highly technical and scientific issues that were examined by *multiple* agencies—the Corps, FERC, and the Louisiana Department of Environmental Quality. This Court should defer to the Corps' expert determinations on the potential contamination issue. *Sierra Club v. EPA*, 939 F.3d 649, 680 (5th Cir. 2019) ("A reviewing court must be

most deferential to the agency where, as here, its decision is based upon

its evaluation of complex scientific data within its technical expertise.")

(cleaned up).

## III. Even if remand were necessary, Healthy Gulf's requested vacatur remedy is unjustified under this Court's precedent.

The Court should uphold the Corps' decision because it is rational.

Even if the Court finds a flaw that is prejudicial to Healthy Gulf, it

should decline Healthy Gulf's request (Br. 69-74) to vacate the Permit

and should instead remand to the Corps for further proceedings. This

Court and other courts of appeals typically evaluate two factors when

making the equitable determination whether vacatur is warranted: (1)

whether there is "at least a serious possibility" that the agency "will be

able to substantiate its decision given an opportunity to do so," and (2)

whether vacating the agency action would be "disruptive." *Cent. & S. W.*

*Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000); *see also*

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781

F.3d 1271, 1290-91 (11th Cir. 2015) (identifying this Court and other

sister circuits that have concluded that "remand without vacatur is

permitted under the APA" and identifying the commonly accepted two-

factor test). Both factors here weigh heavily in favor of remand without vacatur.

*First*, any error is not serious enough to warrant vacatur. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021). The Corps thoroughly analyzed seven alternatives before selecting the LEDPA for the LNG facility, and the eighth alternative site that it did not address was neither raised during the Corps' notice and comment process nor even available. Argument Point I. And the Corps rationally required Driftwood to provide full compensatory mitigation for all unavoidable impacts. Argument Point II. Even if the Clean Water Act or the APA requires more, there is at least a "serious possibility" that the Corps "will be able to remedy" that defect by providing additional explanation for its decision. *Texas Ass'n of Mfrs.*, 989 F.3d at 389.

In urging vacatur, Healthy Gulf repeats its inaccurate merits argument that Alternative Site 6 is the LEDPA. Healthy Gulf Brief 70. But Alternative Site 6 was unavailable when the Corps was evaluating

Driftwood's permit application. *See* Argument Point I.B.1. Even if the Corps' failure to explain this when it issued the Permit were a prejudicial error (it is not), the Corps could readily provide that explanation on remand. *See, e.g.*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021) (remanding FERC authorization for an LNG project without vacatur because it is "reasonably likely that on remand [FERC] can redress its failure of explanation . . . while reaching the same result").

*Second*, vacatur of the Permit would cause disruptive consequences. On this score, Healthy Gulf inaccurately claims that Driftwood "is not ready to build the project anyway." Healthy Gulf Brief 71. In fact, Driftwood is actively constructing the LNG facility, a development that was publicly reported in March 2022.[8] Since filing its brief, Healthy Gulf has acknowledged this fact. *See* Healthy Gulf Response to Corps' Second Motion for Extension of Time to File

---

[8] https://www.bechtel.com/newsroom/releases/2022/03/tellurian-starts-driftwood-lng-construction/ (Mar. 28, 2022); https://www.kplctv.com/2022/04/01/driftwood-lng-phase-one-construction-underway/ (Mar. 31, 2022); https://www.houstonchronicle.com/business/energy/article/Tellurian-starts-building-16-8B-Driftwood-LNG-17036431.php (Mar. 29, 2022).

Responsive Brief (Health Gulf Extension Opposition) at 5-6 & n.2, ECF No. 516586025 (Dec. 21, 2022). In opposing the Corps' request for a second extension of time, Healthy Gulf claimed prejudice from a nine-day extension because "[a]ctivities are already ongoing at the site," including "extensive pile driving" and "poured concrete foundations for liquefaction equipment." *Id.*

Moreover, the disruptive consequences that would flow from vacating the Permit could have been avoided or reduced if Healthy Gulf had diligently exercised its right to seek judicial review. The Corps issued the Permit to Driftwood in May 2019, but Healthy Gulf waited until July 2022 to file its petition for review in this Court—a delay of more than *three years*. AR6. Healthy Gulf has acknowledged that it waited to petition for review until "construction was imminent." Healthy Gulf Extension Opposition 5 n.1. It would be inequitable to vacate the Permit, when (1) Driftwood reasonably relied on the unchallenged Permit for three years while expending substantial funds on planning, design, permitting, and construction, and (2) Healthy Gulf, without apparent explanation, delayed suing until Driftwood was about to begin construction.

Vacating the Permit also would be greatly disruptive to the Corps. The Corps devoted substantial resources over more than two years to complying with its Clean Water Act and NEPA obligations before issuing the Permit. Vacatur would require the Corps to redo the permitting process. Healthy Gulf speculates that vacatur of the Permit "is unlikely to meaningfully delay Driftwood's completion." Healthy Gulf Brief 74. That suggestion is unsupported and incorrect. Even if the Corps does not have to start from scratch, vacating the Permit would require the Corps to go through the Clean Water Act's permitting process again. That is unwarranted here because the specific issues that Healthy Gulf has raised—the LEDPA analysis and mitigation—are issues on which the Corps can readily provide further explanation that supports the same decision.

In summary, vacatur is unjustified and an inequitable remedy. If there is any prejudicial error, the Corps' decision should be remanded for further explanation without vacating the Permit.

## CONCLUSION

For all these reasons, the Court should deny the petition.

Respectfully submitted,

s/ *Justin D. Heminger*
TODD KIM
*Assistant Attorney General*

Of Counsel:

MILTON BOYD
GREG MCDONOUGH
*Attorneys*
Office of the Chief Counsel
U.S. Army Corps of Engineers

REBECCA JAFFE
JUSTIN D. HEMINGER
*Attorneys*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5442
justin.heminger@usdoj.gov

January 18, 2023
DJ 90-13-9-16642

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,800 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    all required privacy redactions have been made per 5th Cir. R. 25.2.13;

(2)    the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and

(3)    the document has been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender Antivirus, and according to the program is free of viruses.

s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

74

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2023, I electronically filed the

foregoing using the Court's CM/ECF system, which will notify all

registered counsel.

s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

# ADDENDUM

33 C.F.R. § 325.3 ................................................................. 2a

33 C.F.R. § 332.3 ................................................................. 9a

40 C.F.R. § 230.10 ............................................................. 27a

**Corps' Clean Water Act Regulations**
**33 C.F.R. § 325.3—Public notice**

(a) General. The public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest. The notice must, therefore, include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment. The notice should include the following items of information:

    (1)  Applicable statutory authority or authorities;

    (2)  The name and address of the applicant;

    (3)  The name or title, address and telephone number of the Corps employee from whom additional information concerning the application may be obtained;

    (4)  The location of the proposed activity;

    (5)  A brief description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments, including a description of the type of structures, if any, to be erected on fills or pile or float-supported platforms, and a description of the type, composition, and quantity of materials to be discharged or disposed of in the ocean;

    (6)  A plan and elevation drawing showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area;

    (7)  If the proposed activity would occur in the territorial seas or ocean waters, a description of the activity's relationship to the baseline from which the territorial sea is measured;

(8)  A list of other government authorizations obtained or requested by the applicant, including required certifications relative to water quality, coastal zone management, or marine sanctuaries;

(9)  If appropriate, a statement that the activity is a categorical exclusion for purposes of NEPA (see paragraph 7 of Appendix B to 33 CFR part 230);

(10) A statement of the district engineer's current knowledge on historic properties;

(11) A statement of the district engineer's current knowledge on endangered species (see § 325.2(b)(5));

(12) A statement(s) on evaluation factors (see § 325.3(c));

(13) Any other available information which may assist interested parties in evaluating the likely impact of the proposed activity, if any, on factors affecting the public interest;

(14) The comment period based on § 325.2(d)(2);

(15) A statement that any person may request, in writing, within the comment period specified in the notice, that a public hearing be held to consider the application. Requests for public hearings shall state, with particularity, the reasons for holding a public hearing;

(16) For non-federal applications in states with an approved CZM Plan, a statement on compliance with the approved Plan; and

(17) In addition, for section 103 (ocean dumping) activities:

   (i)  The specific location of the proposed disposal site and its physical boundaries;

(ii) A statement as to whether the proposed disposal site has been designated for use by the Administrator, EPA, pursuant to section 102(c) of the Act;

(iii) If the proposed disposal site has not been designated by the Administrator, EPA, a description of the characteristics of the proposed disposal site and an explanation as to why no previously designated disposal site is feasible;

(iv) A brief description of known dredged material discharges at the proposed disposal site;

(v) Existence and documented effects of other authorized disposals that have been made in the disposal area (e.g., heavy metal background reading and organic carbon content);

(vi) An estimate of the length of time during which disposal would continue at the proposed site; and

(vii) Information on the characteristics and composition of the dredged material.

(b) Public notice for general permits. District engineers will publish a public notice for all proposed regional general permits and for significant modifications to, or reissuance of, existing regional permits within their area of jurisdiction. Public notices for statewide regional permits may be issued jointly by the affected Corps districts. The notice will include all applicable information necessary to provide a clear understanding of the proposal. In addition, the notice will state the availability of information at the district office which reveals the Corps' provisional determination that the proposed activities comply with the requirements for issuance of general permits. District engineers will publish a public notice for nationwide permits in accordance with 33 CFR 330.4.

(c) Evaluation factors. A paragraph describing the various evaluation factors on which decisions are based shall be included in every public notice.

(1)  Except as provided in paragraph (c)(3) of this section, the following will be included:

"The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered including the cumulative effects thereof; among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people."

(2)  If the activity would involve the discharge of dredged or fill material into the waters of the United States or the transportation of dredged material for the purpose of disposing of it in ocean waters, the public notice shall also indicate that the evaluation of the impact of the activity on the public interest will include application of the guidelines promulgated by the Administrator, EPA, (40 CFR part 230) or of the criteria established under authority of section 102(a) of the Marine Protection, Research and Sanctuaries Act of 1972, as amended (40 CFR parts 220 to 229), as appropriate. (See 33 CFR parts 323 and 324).

(3)  In cases involving construction of artificial islands, installations and other devices on outer continental shelf lands which are

under mineral lease from the Department of the Interior, the notice will contain the following statement: "The decision as to whether a permit will be issued will be based on an evaluation of the impact of the proposed work on navigation and national security."

(d) Distribution of public notices.

(1) Public notices will be distributed for posting in post offices or other appropriate public places in the vicinity of the site of the proposed work and will be sent to the applicant, to appropriate city and county officials, to adjoining property owners, to appropriate state agencies, to appropriate Indian Tribes or tribal representatives, to concerned Federal agencies, to local, regional and national shipping and other concerned business and conservation organizations, to appropriate River Basin Commissions, to appropriate state and areawide clearing houses as prescribed by OMB Circular A–95, to local news media and to any other interested party. Copies of public notices will be sent to all parties who have specifically requested copies of public notices, to the U.S. Senators and Representatives for the area where the work is to be performed, the field representative of the Secretary of the Interior, the Regional Director of the Fish and Wildlife Service, the Regional Director of the National Park Service, the Regional Administrator of the Environmental Protection Agency (EPA), the Regional Director of the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration (NOAA), the head of the state agency responsible for fish and wildlife resources, the State Historic Preservation Officer, and the District Commander, U.S. Coast Guard.

(2) In addition to the general distribution of public notices cited above, notices will be sent to other addressees in appropriate cases as follows:

(i)  If the activity would involve structures or dredging along the shores of the seas or Great Lakes, to the Coastal Engineering Research Center, Washington, DC 20016.

(ii) If the activity would involve construction of fixed structures or artificial islands on the outer continental shelf or in the territorial seas, to the Assistant Secretary of Defense (Manpower, Installations, and Logistics (ASD(MI&L)), Washington, DC 20310; the Director, Defense Mapping Agency (Hydrographic Center) Washington, DC 20390, Attention, Code NS12; and the National Ocean Service, Office of Coast Survey, N/CS261, 1315 East West Highway, Silver Spring, Maryland 20910–3282, and to affected military installations and activities.

(iii)  If the activity involves the construction of structures to enhance fish propagation (e.g., fishing reefs) along the coasts of the United States, to the Director, Office of Marine Recreational Fisheries, National Marine Fisheries Service, Washington, DC 20235.

(iv) If the activity involves the construction of structures which may affect aircraft operations or for purposes associated with seaplane operations, to the Regional Director of the Federal Aviation Administration.

(v) If the activity would be in connection with a foreign-trade zone, to the Executive Secretary, Foreign–Trade Zones Board, Department of Commerce, Washington, DC 20230 and to the appropriate District Director of Customs as Resident Representative, Foreign–Trade Zones Board.

(3) It is presumed that all interested parties and agencies will wish to respond to public notices; therefore, a lack of response will be interpreted as meaning that there is no objection to the proposed project. A copy of the public notice with the list of the addresses to whom the notice was sent will be included in the record. If a question develops with respect to an activity for which another

agency has responsibility and that other agency has not responded to the public notice, the district engineer may request its comments. Whenever a response to a public notice has been received from a member of Congress, either in behalf of a constituent or himself, the district engineer will inform the member of Congress of the final decision.

(4) District engineers will update public notice mailing lists at least once every two years.

**Corps' Clean Water Act Regulations
33 C.F.R. § 332.3—General compensatory mitigation
requirements.**

(a) General considerations.

(1) The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by DA permits. The district engineer must determine the compensatory mitigation to be required in a DA permit, based on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity. When evaluating compensatory mitigation options, the district engineer will consider what would be environmentally preferable. In making this determination, the district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project. In many cases, the environmentally preferable compensatory mitigation may be provided through mitigation banks or in-lieu fee programs because they usually involve consolidating compensatory mitigation projects where ecologically appropriate, consolidating resources, providing financial planning and scientific expertise (which often is not practical for permittee-responsible compensatory mitigation projects), reducing temporal losses of functions, and reducing uncertainty over project success. Compensatory mitigation requirements must be commensurate with the amount and type of impact that is associated with a particular DA permit. Permit applicants are responsible for proposing an appropriate compensatory mitigation option to offset unavoidable impacts.

(2) Compensatory mitigation may be performed using the methods of restoration, enhancement, establishment, and in certain circumstances preservation. Restoration should generally be the first option considered because the likelihood of success is greater

and the impacts to potentially ecologically important uplands are reduced compared to establishment, and the potential gains in terms of aquatic resource functions are greater, compared to enhancement and preservation.

(3) Compensatory mitigation projects may be sited on public or private lands. Credits for compensatory mitigation projects on public land must be based solely on aquatic resource functions provided by the compensatory mitigation project, over and above those provided by public programs already planned or in place. All compensatory mitigation projects must comply with the standards in this part, if they are to be used to provide compensatory mitigation for activities authorized by DA permits, regardless of whether they are sited on public or private lands and whether the sponsor is a governmental or private entity.

(b) Type and location of compensatory mitigation.

(1) When considering options for successfully providing the required compensatory mitigation, the district engineer shall consider the type and location options in the order presented in paragraphs (b)(2) through (b)(6) of this section. In general, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. When compensating for impacts to marine resources, the location of the compensatory mitigation site should be chosen to replace lost functions and services within the same marine ecological system (e.g., reef complex, littoral drift cell). Compensation for impacts to aquatic resources in coastal watersheds (watersheds that include a tidal water body) should also be located in a coastal watershed where practicable. Compensatory mitigation projects should not be located where

they will increase risks to aviation by attracting wildlife to areas where aircraft-wildlife strikes may occur (e.g., near airports).

(2) Mitigation bank credits. When permitted impacts are located within the service area of an approved mitigation bank, and the bank has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by securing those credits from the sponsor. Since an approved instrument (including an approved mitigation plan and appropriate real estate and financial assurances) for a mitigation bank is required to be in place before its credits can begin to be used to compensate for authorized impacts, use of a mitigation bank can help reduce risk and uncertainty, as well as temporal loss of resource functions and services. Mitigation bank credits are not released for debiting until specific milestones associated with the mitigation bank site's protection and development are achieved, thus use of mitigation bank credits can also help reduce risk that mitigation will not be fully successful. Mitigation banks typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. Also, development of a mitigation bank requires site identification in advance, project-specific planning, and significant investment of financial resources that is often not practicable for many in-lieu fee programs. For these reasons, the district engineer should give preference to the use of mitigation bank credits when these considerations are applicable. However, these same considerations may also be used to override this preference, where appropriate, as, for example, where an in-lieu fee program has released credits available from a specific approved in-lieu fee project, or a permittee-responsible project will restore an outstanding resource based on rigorous scientific and technical analysis.

(3) In-lieu fee program credits. Where permitted impacts are located within the service area of an approved in-lieu fee program, and the sponsor has the appropriate number and resource type of credits available, the permittee's compensatory mitigation

requirements may be met by securing those credits from the sponsor. Where permitted impacts are not located in the service area of an approved mitigation bank, or the approved mitigation bank does not have the appropriate number and resource type of credits available to offset those impacts, in-lieu fee mitigation, if available, is generally preferable to permittee-responsible mitigation. In-lieu fee projects typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. They also devote significant resources to identifying and addressing high-priority resource needs on a watershed scale, as reflected in their compensation planning framework. For these reasons, the district engineer should give preference to in-lieu fee program credits over permittee-responsible mitigation, where these considerations are applicable. However, as with the preference for mitigation bank credits, these same considerations may be used to override this preference where appropriate. Additionally, in cases where permittee-responsible mitigation is likely to successfully meet performance standards before advance credits secured from an in-lieu fee program are fulfilled, the district engineer should also give consideration to this factor in deciding between in-lieu fee mitigation and permittee-responsible mitigation.

(4) Permittee-responsible mitigation under a watershed approach. Where permitted impacts are not in the service area of an approved mitigation bank or in-lieu fee program that has the appropriate number and resource type of credits available, permittee-responsible mitigation is the only option. Where practicable and likely to be successful and sustainable, the resource type and location for the required permittee-responsible compensatory mitigation should be determined using the principles of a watershed approach as outlined in paragraph (c) of this section.

(5) Permittee-responsible mitigation through on-site and in-kind mitigation. In cases where a watershed approach is not practicable, the district engineer should consider opportunities to

offset anticipated aquatic resource impacts by requiring on-site and in-kind compensatory mitigation. The district engineer must also consider the practicability of on-site compensatory mitigation and its compatibility with the proposed project.

(6) Permittee-responsible mitigation through off-site and/or out-of-kind mitigation. If, after considering opportunities for on-site, in-kind compensatory mitigation as provided in paragraph (b)(5) of this section, the district engineer determines that these compensatory mitigation opportunities are not practicable, are unlikely to compensate for the permitted impacts, or will be incompatible with the proposed project, and an alternative, practicable off-site and/or out-of-kind mitigation opportunity is identified that has a greater likelihood of offsetting the permitted impacts or is environmentally preferable to on-site or in-kind mitigation, the district engineer should require that this alternative compensatory mitigation be provided.

(c) Watershed approach to compensatory mitigation.

(1) The district engineer must use a watershed approach to establish compensatory mitigation requirements in DA permits to the extent appropriate and practicable. Where a watershed plan is available, the district engineer will determine whether the plan is appropriate for use in the watershed approach for compensatory mitigation. In cases where the district engineer determines that an appropriate watershed plan is available, the watershed approach should be based on that plan. Where no such plan is available, the watershed approach should be based on information provided by the project sponsor or available from other sources. The ultimate goal of a watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of compensatory mitigation sites.

(2) Considerations.

(i) A watershed approach to compensatory mitigation considers the importance of landscape position and resource type of compensatory mitigation projects for the sustainability of aquatic resource functions within the watershed. Such an approach considers how the types and locations of compensatory mitigation projects will provide the desired aquatic resource functions, and will continue to function over time in a changing landscape. It also considers the habitat requirements of important species, habitat loss or conversion trends, sources of watershed impairment, and current development trends, as well as the requirements of other regulatory and non-regulatory programs that affect the watershed, such as storm water management or habitat conservation programs. It includes the protection and maintenance of terrestrial resources, such as non-wetland riparian areas and uplands, when those resources contribute to or improve the overall ecological functioning of aquatic resources in the watershed. Compensatory mitigation requirements determined through the watershed approach should not focus exclusively on specific functions (e.g., water quality or habitat for certain species), but should provide, where practicable, the suite of functions typically provided by the affected aquatic resource.

(ii) Locational factors (e.g., hydrology, surrounding land use) are important to the success of compensatory mitigation for impacted habitat functions and may lead to siting of such mitigation away from the project area. However, consideration should also be given to functions and services (e.g., water quality, flood control, shoreline protection) that will likely need to be addressed at or near the areas impacted by the permitted impacts.

(iii) A watershed approach may include on-site compensatory mitigation, off-site compensatory mitigation (including

mitigation banks or in-lieu fee programs), or a combination of on-site and off-site compensatory mitigation.

(iv) A watershed approach to compensatory mitigation should include, to the extent practicable, inventories of historic and existing aquatic resources, including identification of degraded aquatic resources, and identification of immediate and long-term aquatic resource needs within watersheds that can be met through permittee-responsible mitigation projects, mitigation banks, or in-lieu fee programs. Planning efforts should identify and prioritize aquatic resource restoration, establishment, and enhancement activities, and preservation of existing aquatic resources that are important for maintaining or improving ecological functions of the watershed. The identification and prioritization of resource needs should be as specific as possible, to enhance the usefulness of the approach in determining compensatory mitigation requirements.

(v) A watershed approach is not appropriate in areas where watershed boundaries do not exist, such as marine areas. In such cases, an appropriate spatial scale should be used to replace lost functions and services within the same ecological system (e.g., reef complex, littoral drift cell).

(3) Information Needs.

(i) In the absence of a watershed plan determined by the district engineer under paragraph (c)(1) of this section to be appropriate for use in the watershed approach, the district engineer will use a watershed approach based on analysis of information regarding watershed conditions and needs, including potential sites for aquatic resource restoration activities and priorities for aquatic resource restoration and preservation. Such information includes: current trends in habitat loss or conversion; cumulative impacts of past development activities, current development trends, the presence and needs of sensitive species; site conditions that

favor or hinder the success of compensatory mitigation projects; and chronic environmental problems such as flooding or poor water quality.

(ii) This information may be available from sources such as wetland maps; soil surveys; U.S. Geological Survey topographic and hydrologic maps; aerial photographs; information on rare, endangered and threatened species and critical habitat; local ecological reports or studies; and other information sources that could be used to identify locations for suitable compensatory mitigation projects in the watershed.

(iii) The level of information and analysis needed to support a watershed approach must be commensurate with the scope and scale of the proposed impacts requiring a DA permit, as well as the functions lost as a result of those impacts.

(4) Watershed scale. The size of watershed addressed using a watershed approach should not be larger than is appropriate to ensure that the aquatic resources provided through compensation activities will effectively compensate for adverse environmental impacts resulting from activities authorized by DA permits. The district engineer should consider relevant environmental factors and appropriate locally developed standards and criteria when determining the appropriate watershed scale in guiding compensation activities.

(d) Site selection.

(1) The compensatory mitigation project site must be ecologically suitable for providing the desired aquatic resource functions. In determining the ecological suitability of the compensatory mitigation project site, the district engineer must consider, to the extent practicable, the following factors:

(i) Hydrological conditions, soil characteristics, and other physical and chemical characteristics;

(ii) Watershed-scale features, such as aquatic habitat diversity, habitat connectivity, and other landscape scale functions;

(iii) The size and location of the compensatory mitigation site relative to hydrologic sources (including the availability of water rights) and other ecological features;

(iv) Compatibility with adjacent land uses and watershed management plans;

(v) Reasonably foreseeable effects the compensatory mitigation project will have on ecologically important aquatic or terrestrial resources (e.g., shallow sub-tidal habitat, mature forests), cultural sites, or habitat for federally- or state-listed threatened and endangered species; and

(vi) Other relevant factors including, but not limited to, development trends, anticipated land use changes, habitat status and trends, the relative locations of the impact and mitigation sites in the stream network, local or regional goals for the restoration or protection of particular habitat types or functions (e.g., re-establishment of habitat corridors or habitat for species of concern), water quality goals, floodplain management goals, and the relative potential for chemical contamination of the aquatic resources.

(2) District engineers may require on-site, off-site, or a combination of on-site and off-site compensatory mitigation to replace permitted losses of aquatic resource functions and services.

(3) Applicants should propose compensation sites adjacent to existing aquatic resources or where aquatic resources previously existed.

(e) Mitigation type.

(1) In general, in-kind mitigation is preferable to out-of-kind mitigation because it is most likely to compensate for the functions and services lost at the impact site. For example, tidal wetland compensatory mitigation projects are most likely to compensate for unavoidable impacts to tidal wetlands, while perennial stream compensatory mitigation projects are most likely to compensate for unavoidable impacts to perennial streams. Thus, except as provided in paragraph (e)(2) of this section, the required compensatory mitigation shall be of a similar type to the affected aquatic resource.

(2) If the district engineer determines, using the watershed approach in accordance with paragraph (c) of this section that out-of-kind compensatory mitigation will serve the aquatic resource needs of the watershed, the district engineer may authorize the use of such out-of-kind compensatory mitigation. The basis for authorization of out-of-kind compensatory mitigation must be documented in the administrative record for the permit action.

(3) For difficult-to-replace resources (e.g., bogs, fens, springs, streams, Atlantic white cedar swamps) if further avoidance and minimization is not practicable, the required compensation should be provided, if practicable, through in-kind rehabilitation, enhancement, or preservation since there is greater certainty that these methods of compensation will successfully offset permitted impacts.

(f) Amount of compensatory mitigation.

(1) If the district engineer determines that compensatory mitigation is necessary to offset unavoidable impacts to aquatic resources, the amount of required compensatory mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions. In cases where appropriate functional or condition assessment methods or other suitable metrics are available, these methods should be used where practicable to determine how

much compensatory mitigation is required. If a functional or condition assessment or other suitable metric is not used, a minimum one-to-one acreage or linear foot compensation ratio must be used.

(2) The district engineer must require a mitigation ratio greater than one-to-one where necessary to account for the method of compensatory mitigation (e.g., preservation), the likelihood of success, differences between the functions lost at the impact site and the functions expected to be produced by the compensatory mitigation project, temporal losses of aquatic resource functions, the difficulty of restoring or establishing the desired aquatic resource type and functions, and/or the distance between the affected aquatic resource and the compensation site. The rationale for the required replacement ratio must be documented in the administrative record for the permit action.

(3) If an in-lieu fee program will be used to provide the required compensatory mitigation, and the appropriate number and resource type of released credits are not available, the district engineer must require sufficient compensation to account for the risk and uncertainty associated with in-lieu fee projects that have not been implemented before the permitted impacts have occurred.

(g) Use of mitigation banks and in-lieu fee programs. Mitigation banks and in-lieu fee programs may be used to compensate for impacts to aquatic resources authorized by general permits and individual permits, including after-the-fact permits, in accordance with the preference hierarchy in paragraph (b) of this section.

(h) Preservation.

    (1) Preservation may be used to provide compensatory mitigation for activities authorized by DA permits when all the following criteria are met:

        (i)   The resources to be preserved provide important physical, chemical, or biological functions for the watershed;

        (ii)  The resources to be preserved contribute significantly to the ecological sustainability of the watershed. In determining the contribution of those resources to the ecological sustainability of the watershed, the district engineer must use appropriate quantitative assessment tools, where available;

        (iii) Preservation is determined by the district engineer to be appropriate and practicable;

        (iv) The resources are under threat of destruction or adverse modifications; and

        (v)  The preserved site will be permanently protected through an appropriate real estate or other legal instrument (e.g., easement, title transfer to state resource agency or land trust).

    (2) Where preservation is used to provide compensatory mitigation, to the extent appropriate and practicable the preservation shall be done in conjunction with aquatic resource restoration, establishment, and/or enhancement activities. This requirement may be waived by the district engineer where preservation has been identified as a high priority using a watershed approach described in paragraph (c) of this section, but compensation ratios shall be higher.

(i) Buffers. District engineers may require the restoration, establishment, enhancement, and preservation, as well as the maintenance, of riparian areas and/or buffers around aquatic resources where necessary to ensure the long-term viability of those resources. Buffers may also provide habitat or corridors necessary for the ecological functioning of aquatic resources. If buffers are required by the district engineer as part of the compensatory mitigation project, compensatory mitigation credit will be provided for those buffers.

(j) Relationship to other federal, tribal, state, and local programs.

   (1) Compensatory mitigation projects for DA permits may also be used to satisfy the environmental requirements of other programs, such as tribal, state, or local wetlands regulatory programs, other federal programs such as the Surface Mining Control and Reclamation Act, Corps civil works projects, and Department of Defense military construction projects, consistent with the terms and requirements of these programs and subject to the following considerations:

      (i) The compensatory mitigation project must include appropriate compensation required by the DA permit for unavoidable impacts to aquatic resources authorized by that permit.

      (ii) Under no circumstances may the same credits be used to provide mitigation for more than one permitted activity. However, where appropriate, compensatory mitigation projects, including mitigation banks and in-lieu fee projects, may be designed to holistically address requirements under multiple programs and authorities for the same activity.

   (2) Except for projects undertaken by federal agencies, or where federal funding is specifically authorized to provide compensatory mitigation, federally-funded aquatic resource restoration or conservation projects undertaken for purposes other than compensatory mitigation, such as the Wetlands Reserve Program,

Conservation Reserve Program, and Partners for Wildlife Program activities, cannot be used for the purpose of generating compensatory mitigation credits for activities authorized by DA permits. However, compensatory mitigation credits may be generated by activities undertaken in conjunction with, but supplemental to, such programs in order to maximize the overall ecological benefits of the restoration or conservation project.

(3) Compensatory mitigation projects may also be used to provide compensatory mitigation under the Endangered Species Act or for Habitat Conservation Plans, as long as they comply with the requirements of paragraph (j)(1) of this section.

(k) Permit conditions.

(1) The compensatory mitigation requirements for a DA permit, including the amount and type of compensatory mitigation, must be clearly stated in the special conditions of the individual permit or general permit verification (see 33 CFR 325.4 and 330.6(a)). The special conditions must be enforceable.

(2) For an individual permit that requires permittee-responsible mitigation, the special conditions must:

(i)   Identify the party responsible for providing the compensatory mitigation;

(ii)  Incorporate, by reference, the final mitigation plan approved by the district engineer;

(iii) State the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and

(iv)  Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan.

(3) For a general permit activity that requires permittee-responsible compensatory mitigation, the special conditions must describe the compensatory mitigation proposal, which may be either conceptual or detailed. The general permit verification must also include a special condition that states that the permittee cannot commence work in waters of the United States until the district engineer approves the final mitigation plan, unless the district engineer determines that such a special condition is not practicable and not necessary to ensure timely completion of the required compensatory mitigation. To the extent appropriate and practicable, special conditions of the general permit verification should also address the requirements of paragraph (k)(2) of this section.

(4) If a mitigation bank or in-lieu fee program is used to provide the required compensatory mitigation, the special conditions must indicate whether a mitigation bank or in-lieu fee program will be used, and specify the number and resource type of credits the permittee is required to secure. In the case of an individual permit, the special condition must also identify the specific mitigation bank or in-lieu fee program that will be used. For general permit verifications, the special conditions may either identify the specific mitigation bank or in-lieu fee program, or state that the specific mitigation bank or in-lieu fee program used to provide the required compensatory mitigation must be approved by the district engineer before the credits are secured.

(l) Party responsible for compensatory mitigation.

(1) For permittee-responsible mitigation, the special conditions of the DA permit must clearly indicate the party or parties responsible for the implementation, performance, and long-term management of the compensatory mitigation project.

(2) For mitigation banks and in-lieu fee programs, the instrument must clearly indicate the party or parties responsible for the implementation, performance, and long-term management of the

compensatory mitigation project(s). The instrument must also contain a provision expressing the sponsor's agreement to assume responsibility for a permittee's compensatory mitigation requirements, once that permittee has secured the appropriate number and resource type of credits from the sponsor and the district engineer has received the documentation described in paragraph (l)(3) of this section.

(3) If use of a mitigation bank or in-lieu fee program is approved by the district engineer to provide part or all of the required compensatory mitigation for a DA permit, the permittee retains responsibility for providing the compensatory mitigation until the appropriate number and resource type of credits have been secured from a sponsor and the district engineer has received documentation that confirms that the sponsor has accepted the responsibility for providing the required compensatory mitigation. This documentation may consist of a letter or form signed by the sponsor, with the permit number and a statement indicating the number and resource type of credits that have been secured from the sponsor. Copies of this documentation will be retained in the administrative records for both the permit and the instrument. If the sponsor fails to provide the required compensatory mitigation, the district engineer may pursue measures against the sponsor to ensure compliance.

(m) Timing. Implementation of the compensatory mitigation project shall be, to the maximum extent practicable, in advance of or concurrent with the activity causing the authorized impacts. The district engineer shall require, to the extent appropriate and practicable, additional compensatory mitigation to offset temporal losses of aquatic functions that will result from the permitted activity.

(n) Financial assurances.

(1) The district engineer shall require sufficient financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance

24a

with applicable performance standards. In cases where an alternate mechanism is available to ensure a high level of confidence that the compensatory mitigation will be provided and maintained (e.g., a formal, documented commitment from a government agency or public authority) the district engineer may determine that financial assurances are not necessary for that compensatory mitigation project.

(2) The amount of the required financial assurances must be determined by the district engineer, in consultation with the project sponsor, and must be based on the size and complexity of the compensatory mitigation project, the degree of completion of the project at the time of project approval, the likelihood of success, the past performance of the project sponsor, and any other factors the district engineer deems appropriate. Financial assurances may be in the form of performance bonds, escrow accounts, casualty insurance, letters of credit, legislative appropriations for government sponsored projects, or other appropriate instruments, subject to the approval of the district engineer. The rationale for determining the amount of the required financial assurances must be documented in the administrative record for either the DA permit or the instrument. In determining the assurance amount, the district engineer shall consider the cost of providing replacement mitigation, including costs for land acquisition, planning and engineering, legal fees, mobilization, construction, and monitoring.

(3) If financial assurances are required, the DA permit must include a special condition requiring the financial assurances to be in place prior to commencing the permitted activity.

(4) Financial assurances shall be phased out once the compensatory mitigation project has been determined by the district engineer to be successful in accordance with its performance standards. The DA permit or instrument must clearly specify the conditions under which the financial assurances are to be released to the permittee, sponsor, and/or other financial assurance provider, including, as appropriate, linkage to achievement of performance

standards, adaptive management, or compliance with special conditions.

(5) A financial assurance must be in a form that ensures that the district engineer will receive notification at least 120 days in advance of any termination or revocation. For third-party assurance providers, this may take the form of a contractual requirement for the assurance provider to notify the district engineer at least 120 days before the assurance is revoked or terminated.

(6) Financial assurances shall be payable at the direction of the district engineer to his designee or to a standby trust agreement. When a standby trust is used (e.g., with performance bonds or letters of credit) all amounts paid by the financial assurance provider shall be deposited directly into the standby trust fund for distribution by the trustee in accordance with the district engineer's instructions.

(o) Compliance with applicable law. The compensatory mitigation project must comply with all applicable federal, state, and local laws. The DA permit, mitigation banking instrument, or in-lieu fee program instrument must not require participation by the Corps or any other federal agency in project management, including receipt or management of financial assurances or long-term financing mechanisms, except as determined by the Corps or other agency to be consistent with its statutory authority, mission, and priorities.

## Clean Water Act 404(b)(1) Guidelines
## 40 C.F.R. § 230.10---Restrictions on discharge.

Note: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

   (1)  For the purpose of this requirement, practicable alternatives include, but are not limited to:

      (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

      (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

   (2)  An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2)  Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3)  Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

(4)  Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c)  Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1)  Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2)  Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

(3)  Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4)  Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.