# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 6, 2023

Lyle W. Cayce
Clerk

———————

No. 22-60397

———————

Healthy Gulf; Sierra Club,

*Petitioners*,

*versus*

United States Army Corps of Engineers;
Stephen Murphy, *in his official capacity as
New Orleans District Commander, U.S. Army Corps of Engineers*;
Martin Mayer, *in his official capacity as Chief, Regulatory Division,
New Orleans District, U.S. Army Corps of Engineers*,

*Respondents*.

———————

Petition for Review of a Permit by
the U.S. Army Corps of Engineers
Agency No. MVN-2016-01501-WII

———————

Before King, Smith, and Elrod, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Driftwood LNG and Driftwood Pipeline (jointly "Driftwood") want to convert natural gas produced in the United States into liquefied natural gas ("LNG") for export to international markets. That undertaking involves building an LNG production and export terminal and a pipeline that will connect to existing interstate pipeline systems; the terminal would be located on the Calcasieu River in Louisiana.

No. 22-60397

Numerous federal and state agencies are involved in the approval and permitting process for projects such as Driftwood's. One of those agencies—the U.S. Army Corps of Engineers ("the Corps")—granted Driftwood one of the requisite permits.

Petitioners Healthy Gulf and Sierra Club petition for review of that permit, alleging that the Corps's decision violated the governing statute and was arbitrary and capricious. We disagree, so we deny the petition.

## I.

We briefly survey the statutory and regulatory landscape of natural gas pipeline approval before discussing the facts particular to this case.

## A.

The Natural Gas Act gives the Federal Energy Regulatory Commission ("FERC") authority over the approval process for LNG terminals and pipelines. 15 U.S.C. §§ 717b(e)(1) (terminals), 717f(c) (facilities generally, including pipelines). We focus on the approval process for terminals because petitioners challenge the approval process only as it pertains to Driftwood's LNG terminal, not the pipeline.

FERC acts as "the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of complying with the National Environmental Policy Act of 1969" ("NEPA"). *Id.* § 717n(b)(1). Other state and federal agencies, including the Corps, "shall cooperate with" FERC. *Id.* § 717n(b)(2).

One of Corps's roles is ensuring compliance with the Clean Water Act ("CWA"), which generally prohibits "the discharge of any pollutant"—including dredged spoil, rock, and sand—into the "navigable waters" of the

No. 22-60397

United States.[1]

Some areas of water—labeled "special aquatic sites"—have significant ecological characteristics and are generally important to the environmental health of a region's ecosystem. 40 C.F.R. § 230.3(m). Those include wetlands.[2]

The CWA allows the Corps[3] to "issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). In selecting those sites and approving permits, the Corps ensures compliance with certain CWA-mandated regulations called the "Section 404(b)(1) Guidelines" (the "Guidelines"), codified at 40 C.F.R. §§ 230.1–.26, and the Corps' own permit regulations, *see* 33 C.F.R. §§ 320.1–332.8.

The governing principle of the Guidelines is that, in general, "no discharge of dredged or fill material" is permitted where it would "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). The Corps's goal is "no overall net loss to wetlands." CWA § 404(b)(1) Guidelines, 55 Fed. Reg. 9210, 9211 (Mar. 12, 1990).

To that end, the Corps performs a three-step analysis of (i) avoidance, (ii) minimization, and (iii) compensatory mitigation. *See id.* at 9212. *First*, avoidance: "[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative . . . which would have less adverse impact[,]

---

[1] 33 U.S.C. §§ 1311(a), 1362(6)–(7); *see also id.* § 1362(12) (defining "discharge of a pollutant" as "any addition of any pollutant" for our purposes).

[2] "Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(c)(1).

[3] Technically, the Secretary of the Army, who has delegated the authority to the Chief of Engineers. 33 C.F.R. § 323.6(a), (d).

. . . so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). That requirement is often called the least environmentally damaging practicable alternative ("LEDPA").

Alternatives are practicable if they (i) are "available" and (ii) feasible after considering "cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). And in the specific case of projects located on special aquatic sites but which are not inherently water-dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

*Second*, minimization: Permittees must take "appropriate and practicable steps" to minimize potential deleterious consequences of the discharge on the aquatic ecosystem. *Id.* § 230.10(d).

*Third*, compensatory mitigation: "Appropriate and practicable compensatory mitigation is required for unavoidable adverse impacts which remain" after adequate avoidance and mitigation. 55 Fed. Reg. at 9212; *see also* 33 C.F.R. § 332.2. Compensatory mitigation includes the "restoration, enhancement, establishment, and in certain circumstances preservation" of aquatic resources. 33 C.F.R. § 332.3(a)(2); *see also id.* § 332.2.

There are three main types of mitigation, which the Corps "shall consider" in the following order. *Id.* § 332.3(b)(1). At the apex are mitigation bank credits. *Id.* § 332.3(b)(2). Mitigation banks are sites established (and often operated) by permitted, public or private sponsors to restore, establish, enhance, and/or preserve aquatic resources. *Id.* § 332.2. Purchasing a credit transfers the mitigation obligation from the credit purchaser to the bank sponsor. *Id.*

The next-preferred type is in-lieu fee program credits. *Id.*

§ 332.3(b)(3). In-lieu fee programs operate similarly to mitigation banks but generally involve more risk of unsuccessful mitigation and a potentially longer timeframe for mitigation because mitigation banks do not make credits available until specific environmental milestones have been met. *See id.* § 332.3(b)(2)–(3).

At the bottom of the hierarchy is permittee-responsible mitigation. *See id.* § 332.3(b)(4)–(6). Instead of purchasing credits from a mitigation bank or in-lieu fee program, the permittee undertakes the mitigation efforts directly—and retains full responsibility for them. *Id.* § 332.2. Permittee-responsible mitigation is the only option for projects not within the service area of a mitigation bank or in-lieu fee program. *Id.* § 332.3(b)(4).

The hierarchy exists as a default (and procedural requirement given that it provides the order in which the Corps must "consider" options), but the Corps may override it as appropriate. *Id.* § 332.3(b)(2)–(3).

The entire above process for CWA permitting, however, is just one piece of the regulatory puzzle: As we noted, there are often multiple agencies involved. Under the NEPA, for any project that is a "major Federal action[]" and "significantly affect[s] the quality of the human environment," an agency must prepare a statement describing, among other things, the project's environmental impact, inevitable adverse environmental effects, and alternatives. 42 U.S.C. § 4332(2)(C). In other (and more common) words, an environmental impact statement, or "EIS." FERC produced the EIS for Driftwood's project in cooperation with other agencies.

NEPA documents "will in most cases provide the information for the evaluation of alternatives under the[] Guidelines," but they may "address a broader range of alternatives than required" for the Corps's purposes. 40 C.F.R. § 230.10(a)(4). They may also "not have considered the alternatives in sufficient detail to respond to the requirements of the[] Guide-

lines," in which case the Corps must supplement them as needed. *Id.*

### B.

Driftwood intends to develop a project to export LNG to domestic and foreign markets. The project comprises two parts: (i) an LNG production and export facility and (ii) ninety-six miles of pipeline that will connect to the interstate pipeline infrastructure and transport natural gas to the LNG facility. Again, only the facility is at issue here. Driftwood wants to locate the project in southwestern Louisiana, on the west bank of the Calcasieu River near Carlyss. That site offers "deep water access to accommodate the safe berthing and loading of LNG" needed for the project. It also provides access to the Calcasieu Ship Channel (and, ultimately, to the Gulf of Mexico). Driftwood expects the facility to produce approximately 60,800 million pounds of LNG per year, which will be exported on an average of one LNG carrier per day.

The relevant application process began in 2017, when Driftwood sought approval from FERC, the lead agency for the project. In 2019, FERC published an EIS of over 500 pages after providing several opportunities for public input.

The EIS identified six potential alternative locations for the LNG facility, including the one—Alternative Site 6 in the EIS—at issue here.[4] FERC rejected Alternative Site 6 because, although "development of th[e] site would affect about 50 acres fewer wetlands than the proposed site, the wetlands in the northern portion of the site appear[ed]" to contain a "vegetation community of special concern." Moreover, Alternative Site 6 would require two miles of additional pipeline. The site therefore "did not provide

---

[4] As we discuss *infra*, the EIS analyzed Alternative Site 6 because a member of the public had suggested it during the public comment period on the draft EIS.

No. 22-60397

a significant environmental advantage to Driftwood's proposed site."

FERC authorized the project in April 2019. 167 FERC ¶ 61,054 (2019). In parallel, in March 2017, Driftwood jointly applied to the Corps for a CWA permit and to the Louisiana Department of Natural Resources for a Coastal Use permit. The application requested permission to develop 718 acres of a 790-acre site for the LNG facility, which would result in the permanent loss of 319.3 acres of wetlands.

Under both state and federal law, Driftwood needed to offset the negative environmental impacts of its project. *First*, under Louisiana law, Driftwood had to use the dredged material beneficially because the project involved dredging more than 25,000 cubic yards.[5] *Second*, under the CWA, Driftwood needed to provide compensatory mitigation for the permanent and unavoidable loss of coastal wetlands.

Driftwood killed the proverbial two birds with one stone. As part of its compensatory mitigation, Driftwood asked to offset 134.3 acres of impacted wetland by purchasing credits from an approved mitigation bank. But it would offset the remaining 185.0 acres through the beneficial use of dredged material—specifically, depositing it strategically in ten areas, ultimately to restore an estimated 3,000 acres of emergent, estuarine intertidal, and scrub or shrub wetlands.[6]

The Corps and the Louisiana Department of Environmental Quality ("LDEQ") issued a joint public notice in March 2018 and opened a twenty-

---

[5] The project required dredging over 8 million cubic yards of material, far in excess of the 25,000-cubic-yard requirement. Driftwood had limited alternatives under state requirements, including contributing to the Louisiana Coastal Resources Trust, but it chose to use the dredged material beneficially.

[6] In the short term, Driftwood's proposed beneficial use would restore approximately 496.4 acres of saline marsh and 149.4 acres of fresh marsh, or about 650 acres total.

day comment period. Interested parties submitted numerous comments, to which Driftwood and the Corps responded. Among the commenters was Healthy Gulf, then known as the Gulf Restoration Network.[7] Healthy Gulf's comment did not discuss Alternative Site 6, nor did any of the other comments.

One untimely commenter, however, did mention Alternative Site 6. In about September/October 2018, retired ecologist Kenneth Teague emailed FERC (copying other agencies), commenting on FERC's draft EIS during FERC's public comment period and raising, *inter alia*, the use of Alternative Site 6. Teague also emailed the Corps directly and expressed concerns about the standards used to assess possible contamination of the dredged material Driftwood sought to use beneficially. In that same email, he acknowledged that he had "missed" the Corps's "public notice." The Corps noted in internal communications that the comments arrived "way outside of [its] Public Comment period and close to [its] permit decision."

In May 2019, the Corps published a memorandum detailing its environmental evaluation. That memorandum incorporated by reference particular parts of FERC's EIS. It also discussed alternative locations for the project but not Alternative Site 6 specifically.[8] It concluded that Driftwood's proposed location was the least environmentally damaging practicable alternative ("LEDPA").

The memorandum also addressed Driftwood's proposed compensatory mitigation. The Corps used the Louisiana Wetland Rapid Assessment

---

[7] *Our Story*, HEALTHY GULF, https://healthygulf.org/about-us/our-story/ (last visited June 28, 2023).

[8] "Alternative Site 6" in the Corps's memorandum corresponded to "Alternative Site 4" in the EIS.

Method ("LRAM") to evaluate the impact of Driftwood's project and compensation. The Corps allowed Driftwood to mitigate using both credits and the beneficial use of the dredged material, finding that the "results are expected to outweigh the traditional mitigation bank credit program for impacts to estuarine, palustrine emergent, and palustrine scrub-shrub wetland communities."

The Corps ultimately concluded that the project complied with the Guidelines and issued a permit to Driftwood in May 2019. The permit came with numerous conditions designed to lessen the environmental impact and to require Driftwood to implement its beneficial-use plan.

In July 2022—over three years after the issuance of the permit—Healthy Gulf and the Sierra Club petitioned for review, alleging Administrative Procedure Act ("APA") and CWA violations. Driftwood intervened.

In January 2023, the Corps moved for judicial notice of the permit it had issued to a third party for a project that is located in part on Alternative Site 6. Petitioners opposed, and the court carried the motion with the case. We do not rely on the information in question and therefore deny the motion as moot.

## II.

We use APA standards to assess administrative challenges to permits issued under the CWA. *See Buttrey v. United States*, 690 F.2d 1170, 1183 (5th Cir. 1982). Per the APA, we hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Corps satisfies that requirement by examining and considering the relevant data and articulating a satisfactory explanation for its decision on permitting. *Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs*, 56 F.4th 992, 996 (5th Cir. 2023). Putting it another way: We ask whether "the agency's path may reasonably

No. 22-60397

be discerned."[9]  The standard is deferential, and we do not substitute our judgment for the agency's.  *FCC v. Fox Television Stations Inc.*, 556 U.S. 502, 513–14 (2009).  That is particularly true where there are technical and scientific findings.  *See Shoreacres v. Waterworth*, 420 F.3d 440, 445 (5th Cir. 2005).

## III.

On two grounds, the petitioners assail the Corps's decision to issue Driftwood a permit.

*First*, the Corps "incorporat[ed]" the portion of FERC's EIS analyzing alternatives to the project but did not specifically assess Alternative Site 6.  The Corps therefore failed to identify the LEDPA, which petitioners suggest may be Alternative Site 6.  *Second*, the Corps did not adequately justify its deviation from the statutory hierarchy of compensatory mitigation schemes, which petitioners repeatedly stress is "rigid."  Furthermore, according to petitioners, even if the hierarchy were flexible, the Corps failed to address "serious concerns about the viability of the [proposed] dredged material plan."

The Corps rebuffs both attacks, so its issuance of the permit emerges unscathed.[10]

---

[9] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

[10] We briefly dispose of two arguments.  Driftwood and *amici* ask us to deny the petition as barred by laches because petitioners waited too long to petition for review.  Because we deny the petition on other grounds, we pretermit any discussion of laches, including whether the doctrine still applies in the context of environmental agency actions.

Driftwood also asserts that petitioners' argument about Alternative Site 6 is "moot" because the site is unavailable, so there is no way for us to provide petitioners with meaningful relief.  Driftwood misapprehends the relief we can provide.  The remedy poten-

No. 22-60397

## A.

Petitioners fault the Corps for not adequately considering Alternative Site 6 and thereby failing to demonstrate that the project was the LEDPA. Although FERC's EIS did reject Alternative Site 6, it concluded only that it "did not provide a significant environmental advantage to Driftwood's proposed site," so it "did not evaluate it further." On the other hand, the Corps's memorandum did not discuss Alternative Site 6 at all. According to petitioners, even if the Corps had incorporated the entire discussion of alternative sites from the EIS into its memorandum, FERC's findings did not meet the demands of the CWA. After all, the CWA requires identifying the *least* environmentally damaging option, a more exacting standard than assessing whether one alternative offers a *significant* environmental advantage over another.

A necessary premise of petitioner's theory is that the Corps had an obligation to consider Alternative Site 6. Because it did not, petitioners' argument fails.

In general, parties challenging an agency's compliance with its legal duties must "structure their participation so that it . . . alerts the agency to the [parties'] position and contentions."[11] Thus, "[u]nder ordinary principles of administrative law a reviewing court will not consider arguments that [parties] failed to raise in timely fashion before an administrative agency." *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 174–75 (5th Cir. 2012) (quoting *Sims v. Apfel*, 530 U.S. 103, 114–15 (2000) (Breyer, J., dissenting)).

---

tially available is the setting aside of the issuance of the permit, not an injunction that the Corps locate the project on Alternative Site 6. Driftwood's mootness claim fails.

[11] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (alterations in original) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)).

No. 22-60397

And in the case of alternatives, parties generally must raise them during the public comment period.[12] Moreover, the Corps presumes that "all interested parties and agencies will wish to respond to public notices." 33 C.F.R. § 325.3(d)(3).

There is no dispute that the Corps did indeed provide an opportunity for public comment as required by law.[13] Indeed, Healthy Gulf's predecessor took advantage of the public comment period to point out the need to address alternatives and satisfactorily analyze them to determine the LEDPA. That comment was entirely justified: The joint public notice did not discuss any alternatives analysis, whether already undertaken or contemplated.

There is also no dispute that notice of Alternative Site 6 was provided to the Corps in an untimely manner. Teague emailed the Corps in September 2018, well outside the March 2018 comment window. And Teague's comments directed specifically to the Corps did not mention Alternative Site 6 or, indeed, any alternatives at all. Instead, he focused on the potential contamination of the dredged material. Later, in October 2018, he emailed officials of numerous agencies, including the Corps, informing them that he had provided an updated comment to FERC during its public comment window for the draft EIS. But that comment was expressly directed to FERC, not the Corps: It was addressed to FERC's secretary, discusses only the draft EIS, and referred to "FERC's analysis" and "FERC staff."

---

[12] *See Shrimpers*, 56 F.4th at 998 ("More importantly, [the submitted comments] do not recommend this second alternative Petitioners now suggest."); *accord Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1170 (10th Cir. 2012).

[13] *See* 33 U.S.C. § 1344(a) ("The Secretary may issue permits[] after notice and opportunity for public hearings . . . ."); *see also* 33 C.F.R. § 325.3 (specifying the public notice procedures).

No. 22-60397

It is therefore arguable whether anyone sufficiently alerted the Corps to Alternative Site 6 at all. Teague's comments to the Corps did not mention alternatives, but only contamination. And Teague's comments about Alternative Site 6 were addressed to FERC, in reference to the EIS, and submitted during the EIS comment process, with numerous other agencies copied. But even assuming that Teague's comments put the Corps on notice, they were still untimely in the Corps's permitting process. And untimely arguments are not generally available on judicial review. *Gulf Restoration Network*, 683 F.3d at 174–75.

Petitioners unsuccessfully attempt to excuse the tardiness on several grounds. The first is that the Corps made it functionally impossible for petitioners to raise their point about Alternative Site 6 during the public comment period. As petitioners correctly note, the Corps's joint public notice did not mention any particular alternatives (or indeed any analysis of alternatives).[14] That omission, according to petitioners, made it impracticable for Teague (or petitioners, or anyone else) to offer any specific comment on Alternative Site 6. Petitioners accordingly contend that they were excused from alerting the Corps to their specific contention that Alternative Site 6 was an alternative worth considering.

Petitioners overreach. Although the joint public notice did not specifi-

---

[14] Unbeknownst to petitioners at the time, however, Driftwood *had* engaged in an analysis of alternatives. It listed the mandatory site criteria (*inter alia*, sufficient depth, adequate shoreline for three berths, proximity to existing natural gas pipeline systems, and, of course, availability); it identified six potential alternative sites across Texas, Louisiana, and Mississippi; and it evaluated them.

The Corps evaluated those same six sites in its memorandum and rejected each as a viable alternative. Petitioners do not challenge any of the reasoning or conclusions as to those six sites. Nor do they suggest that the Corps's alternatives analysis was inadequate for any reason other than its failure to determine that Alternative Site 6 was not the LEDPA.

cally present any analysis of alternatives, it thoroughly described the location and nature of the project. The notice stated that the facility would be "on a 790-acre site located in Calcasieu Parish, Louisiana," that it would be "situated along the west bank of the Calcasieu River, between mile markers 22 and 23," and that it would be located in four watersheds, each identified by name and hydrologic unit code. The notice even attached drawings showing the project's placement *vis-à-vis* the watersheds. It also described the project, its environmental impact, and Driftwood's proposed mitigation strategy.

Alternative Site 6 was located less than two miles northeast of the proposed site. Petitioners do not even attempt to explain how the information provided in the public notice was so vague or deficient as to preclude any possibility of putting the Corps on notice of Alternative Site 6. Even if it were unreasonable to expect petitioners to mention Alternative Site 6 specifically, nothing in the comment by Healthy Gulf's predecessor adverted to *any* sites, collections of sites, or even general areas as potential alternatives, despite recognizing that an alternatives analysis would both be necessary and need to include alternative locations. Nor did the organization request a public hearing to address any uncertainty. *See* 33 U.S.C. § 1344(a). The comment said only that the organization "request[s] an adequate alternatives analysis in response to [the] letter." That is precisely what petitioners received in the Corps's memorandum, which addressed six alternative sites spanning three states. Petitioners oppugn none of the Corps's analysis of any of those alternative sites.

In response, petitioners marshal *Delaware Riverkeeper Network v. United States Army Corps of Engineers*, 869 F.3d 148 (3d Cir. 2017), for the proposition that the administrative timeline justifies Teague's late comments. There, the petitioners objected to a CWA permit because the Corps allegedly had failed to examine an alternative infrastructural system for an

interstate pipeline project.[15]  The alternative was presented in the initial application for a CWA permit and also was addressed in the FERC-produced EIS.  *Id.* at 155–56.  Nevertheless, the Third Circuit concluded that "the Corps' process made it impracticable for [the petitioner] to lodge its objections with the Corps" because "FERC did not publicly release its Environmental Assessment until . . . after the expiration of the Corps' comment period," so "[a]ny deficiencies with the Environmental Assessment for purposes of the [CWA] . . . could not have been addressed to the Corps by comment." *Id.*

The case is inapposite for several reasons.  Alternative Site 6 was not mentioned in Driftwood's application, nor was it raised at any point, by anyone in any way, before the close of the comment period.  Likewise, the existence of Alternative Site 6 as an option was not unforeseeable but for FERC's draft EIS, nor do petitioners seriously claim it was.  Finally, the Corps does not contend that petitioners had to object to Alternative Site 6 in their public comment to the FERC-produced EIS, unlike in *Delaware Riverkeeper Network*.  *See* 869 F.3d at 155–56.  Instead, the Corps's objection is that, in their comment to the Corps about the need to consider alternative sites, petitioners did not raise Alternative Site 6.  In sum, the administrative timeline did not so prevent petitioners from putting the Corps on sufficient notice that it should consider Alternative Site 6 as to excuse their forfeiture.

Petitioners offer a second basis for excusing their forfeiture and ask us to credit the untimely Alternative Site 6 comment because of the "obvious-

---

[15] Explained reductively, the proposed system—pipeline "looping"—involved laying sections of pipes in parallel to existing sections of pipes and emptying into them to maximize the retention of natural gas traveling through the pipes.  The alternative was "compression," i.e., using turbines to increase the pressure and flow rate of gas at given points along the pipe system.  869 F.3d at 151–52, 151 n.2.

flaw" exception, which applies where some deficiency in agency reasoning "might be so obvious that there is no need for a commentator to point [it] out specifically in order to preserve its ability to challenge a proposed action." *Pub. Citizen*, 541 U.S. at 765.

Whatever the specific standard for "obviousness" may be, petitioners fail to meet it. Their first justification for the obviousness of Alternative Site 6 is that FERC addressed it in Section 3.5.1.1 of the EIS. True. But the reason that FERC discussed Alternative Site 6 in detail in the final EIS was, as it said, that "[a] comment on the draft EIS recommended an analysis" of it. Petitioners' second justification is Teague's comments and their content. But neither Teague's nor petitioners' unsubstantiated proclamations that Alternative Site 6 was "obvious" make it so, even assuming that its purported obviousness meant that omitting discussion of it was an "obvious flaw."

In other words, a federal agency routinely responded to a public comment as part of the notice-and-comment process. That development is (hopefully) uncontroversial for any competent administrative agency. We are thus left with petitioners' contradictory contentions that the failure to consider Alternative Site 6 was both such an obvious flaw that it did not need to be raised and so indiscernible that petitioners should be considered incapable of having raised it.

The petitioners' position fails. Under the obvious-flaw exception, the question is whether the flaw is so evident that there is no need for it to be pointed out at all during the public comment period. *See Shrimpers*, 56 F.4th at 998–99. Petitioners offer nothing more than their conclusory contention that Alternative Site 6 was an "obvious" alternative. That is in no way sufficient to demonstrate that the "flaw" of not considering Alternative Site 6 was so obvious that the Corps should have analyzed the site despite the

No. 22-60397

absence of any comment adverting to it during public comment period.

Finally, petitioners attempt to excuse the forfeiture by invoking the "independent knowledge" exception, which some circuits have recognized. Those that do acknowledge the exception apply it where an agency had "independent knowledge of the very issue" that a petitioner is raising in challenge to the agency action. *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006)[16]; *see also Del. Riverkeeper Network*, 869 F.3d at 156.

This circuit has not embraced the exception.[17] We adhere to our precedent and decline to recognize a freestanding independent-knowledge exception.[18]

Even if we did, however, it would be inappropriate to apply it here. The public comment window opened in March 2018 and lasted for twenty days. The untimely comments about Alternative Site 6 were submitted months later, and they were directed to FERC, not the Corps. The agency therefore did not acquire independent knowledge of Alternative Site 6 before the close of the comment period. Applying the exception would undermine the purpose of the Corps's public comment period by allowing the public to take advantage of other agencies' later public comment periods. Though the

---

[16] The Ninth Circuit has combined the obvious-flaw and independent-knowledge inquiries: "This court has interpreted the 'so obvious' standard as requiring that the agency have independent knowledge of the issues that concern petitioners." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011).

[17] *See, e.g.*, *Shrimpers*, 56 F.4th at 997–99 (analyzing the "obvious flaw" exception but not mentioning the independent-knowledge exception).

[18] We therefore pretermit discussion of whether independent knowledge is or can be a requirement of the obvious-flaw exception. We do not reach the issue because, as we have explained, any flaw in the Corps's issuance of the permit and accompanying memorandum was not obvious.

No. 22-60397

Corps did collaborate with FERC, it was responsible for reaching its own decision, through its own process, on whether the project complied with the Guidelines.

It would also create the risk of arbitrary line-drawing as to what the right cutoff is—does independent knowledge acquired one day before the scheduled agency action impose a burden on the agency? One month? And those concerns are not hypothetical: The Corps viewed Teague's emails directed specifically to it—which focused on contamination, not alternatives—as "way outside of [its] Public Comment period and close to [its] permit decision" on the project. In light of the existence of public comment periods, we have no interest in adjudicating how "close" is *too* "close" in the context of untimely comments. We therefore see no reason here for deviating from our general requirement that a party "rais[e] the alternative in the comments addressed to the agency" during the relevant public comment period. *See id.* at 998; *see also Pub. Citizen*, 541 U.S. at 764–65.[19]

───────────────────

[19] Petitioners also suggest that the Corps's "incorporation" of the EIS into its memorandum required it to factor Alternative Site 6 into its LEDPA analysis. The memorandum did acknowledge that the EIS "include[d] the alternatives analysis required under NEPA." It also stated that the information in the memorandum's alternatives analysis was "consistent with the information provided in the []EIS."

As the parties all agree, alternatives analyses under NEPA are "substantively different" from those under the Guidelines, which require determining the LEDPA. *Del. Riverkeeper Network*, 869 F.3d at 156; *see also* 40 C.F.R. § 230.10(a)(4). And the inquiry and range of alternatives considered is not always co-extensive. The applicable regulation notes that "the analysis of alternatives required for NEPA environmental documents . . . will in most cases provide the information for the evaluation of alternatives under these Guidelines." 40 C.F.R. § 230.10(a)(4). But it also adds a caveat: "On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph . . . ." *Id.*

That is the case here—petitioners do not contend that the Corps had an obligation to analyze Alternative Site 6 for any reason other than the fact that Teague alerted FERC to its existence during the public comment period on the draft EIS. And although both

No. 22-60397

In sum, petitioners did not timely alert the Corps to Alternative Site 6; as a result, they are unable to challenge the permit issuance on that ground.

B.

Petitioners claim that the Corps violated the regulatory hierarchy for types of compensatory mitigation outlined in 33 C.F.R. § 332.3. Specifically, the Corps allowed Driftwood to compensate in part using permittee-responsible mitigation (the beneficial use of the dredged material) instead of entirely through preferred methods. Petitioners also contend that even if the Corps were allowed to deviate from the hierarchy, it failed to demonstrate cause to do so here.

That argument has no merit. The relevant regulation requires the Corps (through the responsible district engineer) to consider compensatory mitigation options "in the order presented" by the regulation. 33 C.F.R. § 332.3(b)(1). But the Corps has the authority to "override" the regulatory preference "where appropriate, [such] as … where … a permittee-responsible project will restore an outstanding resource based on rigorous scientific and technical analysis." *See id.* § 332.3(b)(2).

That understanding is reflected in *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692 (5th Cir. 2018), on which petitioners heavily rely. *Contra* petitioners' characterization, *Atchafalaya Basinkeeper* did not hold the Corps hostage to a completely inflexible regulatory hierarchy. Instead, and in the context of the relevant regulation, the court reiterated that the regulatory hierarchy was indeed a hierarchy but that the

---

FERC and the Corps evaluated some of the same alternative locations, FERC evaluated some that the Corps did not, and *vice-versa*. Alternative Site 4 in the Corps's memorandum, for example, was not assessed in the EIS. Undoubtedly, the Corps had the option of evaluating Alternative Site 6—doing so would have saved us much ink. But it did not have any obligation to do that.

Corps could depart from it where appropriate and when justified by reasoning documented in the administrative record. *See id.* at 700–01 (describing when the Corps may deviate from the hierarchy established in § 332.3(e)(1)–(2), which addresses in-kind versus out-of-kind mitigation). The regulations applicable here likewise expressly allow the Corps to override the hierarchy. Petitioners' focus on the Corps's failure to establish that the higher-priority mitigation options were "unavailable" is therefore a red herring—there is no such requirement either in the regulation or in our caselaw.

The parties do not dispute that the mitigation strategy here contravenes the default hierarchy. The plan proposed by Driftwood and considered by the Corps involves offsetting 134.3 acres of wetland impacts by purchasing mitigation bank credits and offsetting the remaining 185.0 acres of wetlands impacts through the beneficial use of dredged material, a form of permittee-responsible mitigation. Under the default hierarchy, mitigation bank credits would be used to offset the entire detrimental impact of the project. *See* 33 C.F.R. § 332.3(b)(2). The question is therefore whether the Corps examined the relevant data and provided a satisfactory explanation. *State Farm*, 463 U.S. at 43. We bear in mind that we are most deferential to the Corps where its decision is based on an "evaluation of complex scientific data within its technical expertise." *Shrimpers*, 56 F.4th at 1001 (quoting *Sierra Club v. EPA*, 939 F.3d 649, 680 (5th Cir. 2019)). The Corps's approval of the mitigation strategy here easily withstands our scrutiny.

There were two primary justifications for departing from the default mitigation hierarchy. The first was that Driftwood's proposed beneficial-use plan was expected to restore around 650 acres of marsh habitat at the threshold and up to 3,009 acres of coastal marsh habitat in the longer term—far exceeding the restoration required to offset the requisite 185 acres. So Driftwood's permittee-responsible mitigation was "expected to outweigh the traditional mitigation bank credit program." The Corps contemplates using its

discretion in precisely those circumstances: "[D]istrict engineers have the discretion to modify the hierarchy in order to approve the use of the environmentally preferable compensatory mitigation." Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19594, 19614 (Apr. 10, 2008).

The second was that the proposed plan complied with state law and furthered Louisiana's stated interests in restoring and protecting coastal wetlands. The Corps pointed in particular to the goals of the Louisiana Master Plan for Coastal Protection and Restoration and the Chenier Plain Coastal Protection and Restoration Authority.

The record reveals thorough analysis and cooperation by the Corps and other agencies, and a lucid explanation of why the Corps was permitting a departure from the default hierarchy. The approval process spanned several years and involved detailed analysis by (and often the cooperation of) FERC, the Corps, the EPA, the National Marine Fisheries Services, the Louisiana Department of Wildlife and Fisheries, and LDEQ, among others. The administrative record is over 24,000 pages and provides more than enough insight into the agencies' deliberations, as we discuss below.

Given that we look at the Corps's decision not as environmental scientists but "as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality,"[20] we have no difficulty upholding the Corps's decision about Driftwood's mitigation strategy.

We nevertheless respond to petitioners' barrage of wholly meritless objections, assuming, counterfactually, that they were all properly and timely brought to the relevant agency's attention. First, petitioners point to an error in the Corps's memorandum, where the Corps incorrectly noted that the

---

[20] *City of Shoreacres*, 420 F.3d at 445 (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)).

mitigation strategy did not "deviate" from the regulatory hierarchy.[21] That error, however, does not annihilate the numerous findings and explanations in the record, including the Corps's conclusion that the approved mitigation scheme was "expected to outweigh the traditional mitigation bank credit program." Based on the record as a whole, the Corps evidently understood that it was departing from the default hierarchy, and we can easily discern its reasoning despite the error.[22]

Petitioners next attack the Corps's use of the LRAM, urging that any reliance thereon would be a post-hoc rationalization and, besides, that the LRAM "cannot justify a deviation [it] neither recognized nor evaluated." The notion is strange. The Corps used LRAM to determine the required compensatory mitigation *amounts* throughout its entire analysis. Petitioners are correct that the LRAM does not purport to choose among alternatives. That's where the Corps comes in: It takes LRAM data and uses those data—along with its expertise, the governing principles, and project-specific facts—to decide whether to approve particular mitigation strategies. The notion of making data-informed decisions is hardly *outré*. At any rate, the use of the LRAM already has this court's imprimatur.[23]

We proceed to petitioners' concern that the dredged material deposition areas will not immediately—or perhaps ever—result in highly function-

---

[21] The Corps's briefing acknowledges the error.

[22] *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (noting that a lack of perfect clarity does not preclude upholding an agency action).

[23] *See Atchafalaya Basinkeeper*, 894 F.3d at 700–01 ("In general, the Supreme Court has held that the use of scientific methodology like that contained in the LRAM is subject to particular judicial deference." (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377–78 (1989))). Petitioners' attempt to distinguish *Atchafalaya Basinkeeper* on the basis that the LRAM was used in that case to *follow* rather than *override* the default regulatory hierarchy defies both basic notions of logic and the reliability of data.

No. 22-60397

ing wetlands. Petitioners are correct that "all compensatory mitigation projects should provide a high level of functional capacity." 73 Fed. Reg. at 19601. But functionality is the touchstone of the relevant analysis here, which is why the Corps is "moving towards greater reliance on functional and condition assessments to quantify credits and debits." *Id.* That means that the Corps may account for "uncertainty of success or temporal losses" when determining how much mitigation permittees must provide. *Id.* at 19602; *see also id.* at 19601 ("Replacement ratios may be used to adjust for the relative quality of impact sites and mitigation projects . . . ."). In simpler terms, if a proposed mitigation strategy will take longer or is less likely to succeed, the Corps may require the permittee to restore more acres than it is affecting to account for those uncertainties. Likewise, if there is an impact to a particularly high-value area of 50 acres, the permittee may have to restore more than 50 acres to compensate if the restored area is of lesser value.

That is exactly what occurred here. The LRAM is a functional assessment, and the concerns raised by petitioners were already incorporated into the Corps's decisionmaking. Those concerns—and the corresponding functional analyses—explain why Driftwood was required under the permit to restore approximately (at the threshold) 650 acres of marshland to offset 185 acres of wetland impacts. Petitioners offer no rejoinder.

Petitioners' related concerns about accountability and performance standards are unavailing. The beneficial-use plan includes numerous performance criteria and standards related to target elevation, turbidity, tidal exchange, and vegetative plantings. It also has express provisions concerning monitoring.

Moreover, the permit includes a special condition holding Driftwood accountable for the "successful completion and maintenance" of the plan, including "marsh re-establishment/creation." Any failure, deficiency, or

No. 22-60397

temporal lag may lead to additional compensatory mitigation to offset the impact. Furthermore, the permittee-responsible mitigation must occur "simultaneously/concurrently" with any "facility related wetland impacts." Driftwood is also on the hook for the success of its mitigation efforts for at least twenty years.[24]

We reach the penultimate of petitioners' criticisms. They urge that the Corps failed to address concerns from the Louisiana Department of Wildlife and Fisheries ("the Department") regarding the hydrologic connectivity (roughly, the presence of water pathways allowing the movement of organisms and matter from one place to another) in certain areas affected by the project. But they also acknowledge that the Department withdrew its concerns. Although petitioners intimate that the withdrawal was the result of a nefarious "pressure" campaign by Driftwood and the Corps, the record reveals that Driftwood merely addressed the issues, whereupon the Department acknowledged that its "previous concerns . . . [h]ad been alleviated."[25] The Department then concurred in the proposed mitigation plan and "offered no objection to permit issuance." Unsurprisingly, we decline to suggest that we know better than the Department whether its technical concerns were adequately addressed in the cooperative, multi-year permitting process.

---

[24] We mention only in passing the requirements that Driftwood provide data, drawings, photographs, and occasional reports to the Corps and that it must meet vegetative coverage and exotic or invasive-species standards.

[25] Specifically, the Department considered its concerns alleviated by "the creation of a surplus of estuarine wetlands and the tidal connections proposed" in a particular part of the beneficial-use area. In essence, Driftwood's beneficial-use plan more than offset the potential impact that engendered the Department's concerns. Driftwood also noted that one of the Department's proposed solutions involved damaging the structural integrity of an embankment "that combat[ted] severe erosion" and had been approved for construction by five federal agencies (plus Louisiana).

No. 22-60397

Finally, petitioners posit that the Corps ignored concerns that "Driftwood's proposal to dredge materials adjacent to a contaminated site[26] risk[s] spreading the contamination to the dredged material disposition areas." The record says the opposite. Both FERC and the Corps mentioned those concerns to Driftwood early in the review process. Those conversations persisted for over a year,[27] and the Corps, cooperating with FERC, even provided input to Driftwood on the contamination issue.

The ongoing discussion about potentially contaminated dredged material culminated in a thorough analysis in the EIS, which concluded that the project "would not mobilize existing contaminated soils." That determination was based on comparing the boundaries of the contaminated sections of the site with Driftwood's intended dredging locations as well as Driftwood's representations that it would not dredge in an area that had not been tested sufficiently.

Moreover, both the Corps and the Louisiana Department of Natural Resources (which issued Driftwood a Coastal Use permit) imposed conditions on Driftwood to ensure that it did not dredge and use contaminated material. The Corps's permit requires that Driftwood place only material "free of contaminants to the best of [Driftwood]'s knowledge." Similarly, the Coastal Use permit provides that "[a]ll fill material shall be clean and free of contaminants." Driftwood also put forward both an "unanticipated dis-

---

[26] The site in question housed "historical ship building, repair, and barge-cleaning operations."

[27] Petitioners note that a Corps employee stated in a September 2017 email that the Corps was "punting" to FERC certain concerns (raised by Teague) about contamination. Although true, that is irrelevant. For one, the record shows that the Corps was involved in addressing potential contamination before and after that email, as we discuss *infra*. And, at any rate, that email was limited to the specific contamination issues raised by Teague in an untimely email to the Corps, not the contamination question generally.

No. 22-60397

coveries" plan and a risk management plan to address potential encounters with contaminated material during dredging. LDEQ did not object to those plans, and FERC likewise viewed the plans (along with Driftwood's express commitments) as sufficient to alleviate concerns about "mobiliz[ing] existing contaminated soils."[28]

In summary, despite petitioners' numerous objections to the Corps's reasoning and conclusions, we uphold its decision to depart from the default regulatory hierarchy regarding compensatory mitigation. The Corps more than adequately explained its decision.

\* \* \* \* \*

The petition for review of the permit issued by the U.S. Army Corps of Engineers to Driftwood is DENIED. The Corps's motion for judicial notice is DENIED as moot in light of our lack of reliance on any of the documents sought to be noticed.

---

[28] Petitioners also contend that the EIS used the wrong standard in evaluating contamination. But the EIS expressly addressed public comments discussing what standard it should use and found that the intent of the suggested standard—the EPA's Inland Testing Manual—was satisfied. Moreover, the Corps and Driftwood communicated about the two standards and found them reconcilable.